UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; ESURANCE INSURANCE COMPANY; and ESURANCE PROPERTY AND CASUALTY INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | |
| v. | **Demand for Jury Trial** |
| MERCYLAND HEALTH SERVICES, PLLC; TOX TESTING, INC.; PARAGON LABS, LLC; SCAN CLEAR, LLC; MICHIGAN TECHNOLOGY PARTNERS, LLC; CURE IMAGING, LLC; US HEALTH PHARMACEUTICALS, LLC d/b/a MEDS DIRECT; LIVONIA CARE PHARMACY, INC.; OMEGA REHAB SERVICES, LLC; PRIME REHABILITATION SERVICES, LLC; ISPINE, PLLC; BLOCK BILLING SOLUTIONS, LLC; MICHAEL ANGELO; CHITRA SINHA, M.D.; JOSEPH RUEFIEL, P.T.; STEFAN PRIBIL, M.D.; MOHAMMED ALI ABRAHAM, M.D. a/k/a MOHAMMED ALI IBRAHIM; and NILESH PATEL, | |
| Defendants. | |

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "plaintiffs"), by their attorneys, SMITH & BRINK, hereby allege as follows.

## I.   INTRODUCTION

1.      This is a case about a medical clinic, urine drug testing companies, magnetic resonance imaging ("MRI") facilities, pharmacies, physical therapy clinics, and the physicians, owners, managers, agents, and representatives of the same who abused the unlimited medical benefits under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking reimbursement under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.      Defendants Mercyland Health Services, PLLC ("Mercyland"); Tox Testing, Inc. ("Tox Testing"); Paragon Labs, LLC ("Paragon"); Scan Clear, LLC ("Scan Clear"); Michigan Technology Partners, LLC ("Michigan Technology");

2

Cure Imaging, LLC ("Cure Imaging"); US Health Pharmaceuticals, LLC d/b/a Meds Direct ("Meds Direct"); Livonia Care Pharmacy, Inc. ("Livonia Care"); Omega Rehab Services, LLC ("Omega Rehab"); Prime Rehabilitation Services, LLC ("Prime Rehabilitation"); ISpine, PLLC ("ISpine"); and Block Billing Solutions, LLC ("Block Billing") (collectively, the "Defendant Entities"); Michael Angelo ("Angelo"); Chitra Sinha, M.D. ("Sinha"); Joseph Ruefiel, P.T. ("Ruefiel"); Stefan Pribil, M.D. ("Pribil"); Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim ("Abraham"); and Nilesh Patel ("Patel") (collectively with the Defendant Entities, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.      The purpose of the fraudulent scheme devised and implemented by the defendants was to generate claims to, and collect payments from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had allegedly been involved in motor vehicle accidents.

4.      The defendants engaged in a fraudulent scheme to consistently bill Allstate for treatment or services that were never actually provided to patients and manufactured documents to make it appear as though patients received services when, in fact, no such services were rendered.

5.     To achieve their fraudulent objective, the defendants unlawfully and improperly solicited patients and offered monetary compensation to patients to undergo unnecessary treatment and services.

6.     The treatment, when provided, was done as part of a predetermined protocol consisting of unreasonable and unnecessary physical therapy, injections and other procedures, medications, application of P-Stim devices, urine drug testing, and MRIs.

7.     The defendants also engaged in several fraudulent billing practices, including unbundling services so as to inflate the amount charged and upcoding office visits in order to charge Allstate for more services than were actually provided.

8.     The defendants also charged excessive amounts that far exceeded reasonable and customary billing for services, including MRIs, office visits, urine drug testing, medications, and procedures.

9.     Allstate's investigation of claims submitted to it by and on behalf of the defendants revealed treatment that was not tailored to the clinical needs of each patient, but rather was performed solely to generate profit for the defendants.

10.     Allstate reasonably relied to its detriment on the bills and medical documentation submitted to it by and on behalf of the defendants.

11.     Each of the defendants named herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

4

12.    All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

13.    The insurance fraud scheme perpetrated by the defendants was designed to, and in fact did, result in the payment of No-Fault benefits from Allstate to and on behalf of the defendants.

14.    In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract applicable in the State of Michigan was the platform upon which the defendants perpetrated their fraudulent scheme.

15.    By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

16.    Allstate's claim for compensatory damages includes: (1) payments made by Allstate to and for the benefit of the defendants in reliance upon the false representations that the Defendant Entities were eligible to receive reimbursement under the Michigan No-Fault Act, (2) treble damages, (3) statutory interest, (4) costs, including but not limited to the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants, and (5) attorney's fees.

17.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to receive payment for any previously-denied and pending bills submitted to Allstate whereas (1) the defendants billed Allstate for services that were not rendered; (2) the defendants billed Allstate for services and treatment that were not reasonably necessary; (3) the defendants billed Allstate for unlawful services and treatment that resulted from illegal solicitation; and (4) the defendants engaged in a pervasive pattern and practice of submitting false medical documentation through interstate wires and the U.S. Mail demanding payment from Allstate.

18.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of $952,248 to them related to the patients at issue in this Complaint.

## II.     THE PARTIES

### A.     PLAINTIFFS

19.     Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are each corporations duly organized and existing under the laws of the State of Illinois.

20.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company are each corporations duly organized and existing under the laws of the State of Wisconsin.

21.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company have their respective principal places of business in Northbrook, Illinois.

22.    Esurance Insurance Company and Esurance Property and Casualty Insurance Company have their respective principal places of business in San Francisco, California.

23.    At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

B.    **DEFENDANTS**

1.    **Mercyland Health Services, PLLC**

24.    Mercyland Health Services, PLLC is a Michigan professional limited liability company organized under the laws of the State of Michigan.

25.    Mercyland is owned and controlled by defendant Abraham, and Abraham is responsible for all actions of Mercyland described throughout this Complaint.

26.    Defendants Tox Testing, Paragon, Scan Clear, Michigan Technology, Cure Imaging, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, ISpine, Block Billing, Angelo, Sinha, and Pribil also participated in the control and operation of Mercyland.

27.    Mercyland's principal place of business is located in Clinton Township, Michigan.

28.    Mercyland billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 1.

### 2.    Tox Testing, Inc.

29.    Tox Testing, Inc. is a Delaware corporation organized under the laws of the State of Delaware and registered to conduct business and transact affairs in the State of Michigan.

30.    Tox Testing is owned and controlled by defendant Angelo, and Angelo is responsible for all actions of Tox Testing described throughout this Complaint.

31.    Defendants Mercyland, ISpine, Block Billing, Sinha, Pribil, and Abraham also participated in the control and operation of Tox Testing.

32.    Tox Testing's principal place of business is located in Clinton Township, Michigan.

33.    Tox Testing also purports to do business using the registered fictitious name Paragon Diagnostics, which submitted bills to Allstate using the tax identification number of defendant Paragon Labs, LLC.

34.     Tox Testing and Paragon Diagnostics billed Allstate for services that were not rendered, were unlawful and medically unnecessary (to the extent services were provided at all), and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 2.

### 3. Paragon Labs, LLC

35.     Paragon Labs, LLC is a Michigan limited liability company organized under the laws of the State of Michigan.

36.     Paragon is owned and controlled by defendant Angelo, and Angelo is responsible for all actions of Paragon described throughout this Complaint.

37.     Defendants Mercyland, ISpine, Block Billing, Sinha, Pribil, and Abraham also participated in the control and operation of Paragon.

38.     Paragon's principal place of business is located in Clinton Township, Michigan.

39.     Paragon billed Allstate for services that were not rendered, were unlawful and medically unnecessary (to the extent services were provided at all), and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 3.

### 4. Scan Clear, LLC

40.     Scan Clear, LLC is a Michigan limited liability company organized under the laws of the State of Michigan.

41.     Scan Clear is owned and controlled by defendant Ruefiel, and Ruefiel is responsible for all actions of Scan Clear described throughout this Complaint.

42.     Defendants Mercyland, Angelo, Sinha, and Abraham also participated in the control and operation of Scan Clear.

43.     Scan Clear's principal place of business is located in Clinton Township, Michigan.

44.     Scan Clear billed Allstate at excessive rates for unlawful and unnecessary diagnostic services in relation to several patients at issue herein, including the patients set out in Exhibit 4.

### 5.     Michigan Technology Partners, LLC and Cure Imaging, LLC

45.     Michigan Technology Partners, LLC is a Michigan limited liability company organized under the laws of the State of Michigan.

46.     Defendant Cure Imaging submitted charges to Allstate using Michigan Technology's tax identification number, and therefore Michigan Technology and Cure Imaging are hereinafter referred to collectively as "Michigan Technology."

47.     Michigan Technology is owned and controlled by defendant Angelo, and Angelo is responsible for all actions of Michigan Technology described throughout this Complaint.

48.     Defendants Mercyland, Omega Rehab, Block Billing, Sinha, Abraham, and Ruefiel also participated in the control and operation of Michigan Technology.

49.    Michigan Technology's principal place of business is located in Dearborn, Michigan.

50.    Michigan Technology billed Allstate at excessive rates for unlawful and unnecessary diagnostic services in relation to several patients at issue herein, including the patients set out in Exhibit 5.

### 6.    US Health Pharmaceuticals, LLC d/b/a Meds Direct

51.    US Health Pharmaceuticals, LLC d/b/a Meds Direct is a Michigan limited liability company organized under the laws of the State of Michigan.

52.    Meds Direct is owned and controlled by defendant Angelo, and Angelo is responsible for all actions of Meds Direct described throughout this Complaint.

53.    Defendants Mercyland, Block Billing, Sinha, and Abraham also participated in the control and operation of Meds Direct.

54.    Meds Direct's principal place of business is in Clinton Township, Michigan.

55.    Meds Direct billed Allstate at excessive rates for unlawful and unnecessary medications allegedly distributed to several patients at issue herein, including the patients set out in Exhibit 6.

### 7.    Livonia Care Pharmacy, Inc.

56.    Livonia Care Pharmacy, Inc. is a Michigan corporation incorporated under the laws of the State of Michigan.

57.     Livonia Care is owned and controlled by defendant Patel, and Patel is responsible for all actions of Livonia Care described throughout this Complaint.

58.     Defendants Mercyland, Angelo, Sinha, and Abraham also participated in the control and operation of Livonia Care.

59.     Livonia Care's principal place of business is in Livonia, Michigan.

60.     Livonia Care billed Allstate at excessive rates for unlawful and unnecessary medications allegedly distributed to several patients at issue herein, including the patients set out in Exhibit 7.

### 8.     Omega Rehab Services, LLC

61.     Omega Rehab Services, LLC is a Michigan limited liability company organized under the laws of the State of Michigan.

62.     Omega Rehab is owned and controlled by defendant Ruefiel, and Ruefiel is responsible for all actions of Omega Rehab described throughout this Complaint.

63.     Defendants Mercyland, Angelo, Sinha, and Abraham also participated in the control and operation of Omega Rehab.

64.     Omega Rehab's principal place of business is in Rochester Hills, Michigan.

65.     Omega Rehab billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was

rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 8.

### 9.  **Prime Rehabilitation Services, LLC**

66.    Prime Rehabilitation Services, LLC is a Michigan limited liability company organized under the laws of the State of Michigan.

67.    Prime Rehabilitation is owned by and controlled by defendant Ruefiel, and Ruefiel is responsible for all actions of Prime Rehabilitation described throughout this Complaint.

68.    Defendants Mercyland, Angelo, Sinha, and Abraham also participated in the control and operation of Prime Rehabilitation.

69.    Prime Rehabilitation's principal place of business is located in Dearborn, Michigan.

70.    Prime Rehabilitation billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 9.

### 10.  **ISpine, PLLC**

71.    ISpine, PLLC is a professional limited liability company organized under the laws of the State of Florida.

72.    ISpine is owned and controlled by defendant Pribil, and Pribil is responsible for all actions of ISpine described throughout this Complaint.

73.    Defendants Mercyland, Angelo, Sinha, and Abraham also participated in the control and operation of ISpine.

74.    ISpine's principal place of business is located in Clinton Township, Michigan.

75.    ISpine billed Allstate at excessive rates for unlawful and unnecessary treatment in relation to several patients at issue herein, including the patients set out in Exhibit 10.

### 11.    **Block Billing Solutions, LLC**

76.    Block Billing Solutions, LLC is a limited liability company organized under the laws of the State of Delaware.

77.    Block Billing is owned and controlled by defendant Angelo, and Angelo is responsible for all actions of Block Billing described throughout this Complaint.

78.    Defendants Mercyland, Tox Testing, Paragon, Scan Clear, Michigan Technology, Meds Direct, Sinha, Pribil, and Abraham also participated in the control and operation of Block Billing.

79.    Block Billing's principal place of business is in Clinton Township, Michigan.

80.     Block Billing billed Allstate for services that were not rendered and treatment, diagnostic testing, and medications that were unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 11.

### 12.     Michael Angelo

81.     Michael Angelo is a resident and citizen of the State of New Jersey.

82.     At all times relevant to this Complaint, Angelo owned and controlled Tox Testing, Paragon, Michigan Technology, Meds Direct, and Block Billing and participated in the control and operation of Mercyland, Scan Clear, Livonia Care, Omega Rehab, Prime Rehabilitation, and ISpine.

83.     Due to his control over Mercyland, Tox Testing, Paragon, Scan Clear, Michigan Technology, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, ISpine, and Block Billing, Angelo was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to the patients at issue in this Complaint, including the patients listed in Exhibits 1 through 11.

### 13.     Chitra Sinha, M.D.

84.     Chitra Sinha, M.D. is a resident and citizen of the State of Michigan.

85.     At all times relevant to this Complaint, Sinha participated in the control and operation of Mercyland, Tox Testing, Paragon, Scan Clear, Michigan

Technology, Meds Direct, Livonia Care, Omega Rehab, Prime Rehab, ISpine, and Block Billing.

86.    Sinha rendered and caused to be rendered medically unnecessary and unlawful treatment and services to several of the patients at issue in this Complaint, including the patients listed in Exhibits 1, 2, 3, 4, 6, 7, 8, 9, 10, and 11.

### 14.    Joseph Ruefiel, P.T.

87.    Joseph Ruefiel, P.T. is a resident and citizen of the State of Michigan.

88.    At all times relevant to this Complaint, Ruefiel owned and controlled Scan Clear, Omega Rehab, and Prime Rehabilitation and participated in the control and operation of Michigan Technology.

89.    As the owner and manager of Scan Clear, Michigan Technology, Omega Rehab, and Prime Rehabilitation, Ruefiel was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to the patients at issue in this Complaint, including the patients listed in Exhibits 4, 5, 8, and 9.

### 15.    Stefan Pribil, M.D.

90.    Stefan Pribil, M.D. is a resident and citizen of the State of Florida.

91.    At all times relevant to this Complaint, Pribil owned and controlled ISpine, and participated in the control and operation of Mercyland, Tox Testing, Paragon, and Block Billing.

92.     Pribil rendered and caused to be rendered medically unnecessary and unlawful treatment and services to several of the patients at issue in this Complaint, including the patients listed in Exhibits 1, 2, 3, 4, 6, 7, 10, and 11.

**16.    Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

93.     Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. is a resident and citizen of the State of Michigan.

94.     At all times relevant to this Complaint, Abraham was the owner of Mercyland and participated in the control and operation of Tox Testing, Paragon, Scan Clear, Michigan Technology, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, ISpine, and Block Billing.

95.     As the owner of Mercyland, Abraham was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to the patients at issue in this Complaint, including the patients listed in Exhibits 1 through 11.

**17.    Nilesh Patel**

96.     Nilesh Patel is a resident and citizen of the State of Michigan.

97.     At all times relevant to this Complaint, Patel owned Livonia Care.

98.     Patel also owns and controls an entity called LG Transportation and Management, Inc., which purported to provide medical transportation services to patients at issue in this Complaint, and submitted charges to Allstate using Mercyland's tax identification number.

17

99.    As the owner of Livonia Care, Patel was responsible for the unlawful, medically unnecessary, and unreasonably charged medications dispensed to the patients at issue in this Complaint, including the patients listed in Exhibit 7.

## III.    **JURISDICTION AND VENUE**

100.    Jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

101.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1967.

102.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are citizens of the State of Illinois for purposes of 28 U.S.C. § 1332.

103.    Esurance Insurance Company and Esurance Property and Casualty Insurance Company are citizens of the States of Wisconsin and California for purposes of 28 U.S.C. § 1332.

104.    Mercyland is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332, as it is a professional limited liability company organized under the laws of the State of Michigan and all of its members are citizens of and reside in Michigan.

105.    Tox Testing is a citizen of the States of Michigan and Delaware for purposes of 28 U.S.C. § 1332 as it is incorporated under the laws of the State of

Delaware and its principal place of business is located in Clinton Township, Michigan.

106.   Paragon is a citizen of the State of New Jersey for purposes of 28 U.S.C. § 1332, as it is a limited liability company organized under the laws of the State of Michigan and Angelo, its sole member, is a citizen of and resides in New Jersey.

107.   Scan Clear is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332, as it is a limited liability company organized under the laws of the State of Michigan and all of its members are citizens of and reside in Michigan.

108.   Michigan Technology is a citizen of the State of New Jersey for the purposes of 28 U.S.C. § 1332, as it is a limited liability company organized under the laws of the State of Michigan and Angelo, its sole member, is a citizen of and resides in New Jersey.

109.   Cure Imaging is a citizen of the State of New Jersey for the purposes of 28 U.S.C. § 1332, as it is a limited liability company organized under the laws of the State of Michigan and Angelo, its sole member, is a citizen of and resides in New Jersey.

110.   Meds Direct is a citizen of the State of New Jersey for purposes of 28 U.S.C. § 1332, as it is a limited liability company organized under the laws of the State of Nevada and Angelo, its sole member, is a citizen of and resides in New Jersey.

111.   Livonia Care is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332, as it was incorporated under the laws of the State of Michigan and its principal place of business is in Livonia, Michigan.

112.   Omega Rehab is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332, as it is a limited liability company organized under the laws of the State of Michigan and all of its members are citizens of and reside in Michigan.

113.   Prime Rehabilitation is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332, as it is a limited liability company organized under the laws of the State of Michigan and all of its members are citizens of and reside in Michigan.

114.   ISpine is a citizen of the State of Florida for the purposes of 28 U.S.C. § 1332, as it is a professional limited liability company organized under the laws of the State of Florida and Pribil, its sole member, is a citizen of and resides in Florida.

115.   Block Billing is a citizen of the State of New Jersey for purposes of 28 U.S.C. § 1332, as it is a limited liability company organized under the laws of the State of Delaware and Angelo, its sole member, is a citizen of and resides in New Jersey.

116.   Angelo is a resident and citizen of the State of New Jersey.

117.   Sinha is a resident and citizen of the State of Michigan.

118.   Ruefiel is a resident and citizen of the State of Michigan.

119.   Pribil is a resident and citizen of the State of Florida.

120.   Abraham is a resident and citizen of the State of Michigan.

121.   Patel is a resident and citizen of the State of Michigan.

122.   Further, the amount in controversy as to each defendant, exclusive of interest and costs, exceeds $75,000, the sum set forth in 28 U.S.C. § 1332.

123.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   MICHIGAN'S NO-FAULT ACT

124.   Allstate underwrites automobile insurance in Michigan.

125.   Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents.  Mich. Comp. Laws § 500.3107(1)(a).

126.   Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident.  Id.

127.   "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the product or service itself is not reasonably necessary."  Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 49 (1990).

128.   A claimant who seeks to hold an insurer liable for No-Fault benefits has the burden of proving that the service claimed is reasonably necessary and the charge for the service is reasonable.  Id.

129.   Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of a motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of the loss sustained."  Mich. Comp. Laws § 500.3142(2).

130.   The Michigan No-Fault Act provides that "[a] physician, hospital, clinic or other person or institution" may only charge a "reasonable amount" for personal injury protection (PIP) benefits for treatment/services which have been "lawfully render[ed]" to an injured person who has sustained bodily injury in an automobile accident.  Mich. Comp. Laws § 500.3157.

131.   "If the treatment was not lawfully rendered, it is not a no-fault benefit and payment for it is not reimbursable."  Cherry v. State Farm Mut. Auto. Ins. Co., 195 Mich. App. 316, 310 (1992).

132.   The Michigan No-Fault Act further provides that an insurer "may be allowed by a court an award of reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation."  Mich. Comp. Laws § 500.3148(2).

133.   As alleged in this Complaint, the defendants submitted and caused to be submitted bills to Allstate seeking reimbursement for services and treatment that were not actually provided, were not lawfully rendered, and were not reasonably necessary for the care, recovery, or rehabilitation of the defendants' patients.

## V.   BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME TO DEFRAUD

### A.   ANGELO HISTORY

134.   Michael Angelo has been involved in solicitation of victims of motor vehicle accidents and schemes to defraud automobile insurers for more than twenty-five (25) years.

135.   Angelo created Pacific Marketing Company on July 17, 1991, which he used to solicit motor vehicle accident victims through the use of the toll-free phone number 800-US-LAWYER.

136.   Although Angelo claims to conduct advertising through toll-free numbers such as 800-US-LAWYER, his primary methods of soliciting motor vehicle accident victims involve identifying accident victims through police reports and towing companies, and using runners to improperly contact the accident victims and induce them into undergoing unnecessary and excessive medical treatment.

137.   Angelo has ownership interests in the medical facilities to which patients he solicits are referred.

138. In 2008, Angelo acquired a building at 16100 W. 19 Mile Road, Clinton Township, MI 48038 (the "16100 building"), along with a certificate of need ("CON") for a then-existing ambulatory surgery center.

139. Since 2008, Angelo has used the 16100 building to operate numerous businesses that purport to provide medical treatment to individuals who claim to have been injured in motor vehicle accidents, including defendants Mercyland, Tox Testing, Paragon, Scan Clear, Michigan Technology, Meds Direct, and ISpine.

140. Angelo has also leased space in the 16100 building to other medical providers who allowed Angelo to influence and direct patient referrals, including to Angelo's businesses.

141. Medical providers associated with Angelo, including defendant Mercyland and the other entities located in the 16100 building, knowingly benefit from his unlawful solicitation of motor vehicle accident victims.

142. Angelo has a long history of insurance fraud and the unlawful solicitation of motor vehicle accident victims, including he and his family employing the same fraudulent scheme of unlawful solicitation and unnecessary medical treatment as at issue herein.

143. Indeed, Angelo's sister, Rosina Angelo, claimed in correspondence to other unlawful solicitors in Michigan that "my family created the business and taught [a competing patient solicitor] everything he learned . . . ."

24

144.   An article published by the Sun-Sentinel in 2000 describes the solicitation tactics used in Florida by Angelo's father, William Angelo, Jr., for a chiropractic clinic owned by Angelo's brother, John Angelo, which included threats of physical violence, offers of payments to undergo treatment, and improper and illegal solicitation within hours of alleged motor vehicle accidents. *See* Exhibit 12.

145.   Several of Angelo's associates have testified regarding his use of police reports to identify alleged motor vehicle accident victims to solicit, including Anthony Sereno ("Sereno"), who was a childhood friend of Angelo and who moved to Michigan to help Angelo begin operations in the state.

146.   On April 18, 2018, Sereno was indicted on federal charges related to obtaining stolen police reports as part of a scheme to "use[] the personal identifying information of crash victims listed on the Police Reports to solicit those crash victims and refer them for treatment at certain medical and chiropractic facilities . . . ." United States v. Joseph DeSanto, *et al.*, 18-cr-20268-LVP-SDD (E.D. Mich.).

147.   Angelo's control over the treatment and referrals of patients of clinics in his building is illustrated by the email reproduced below, in which he discusses multiple arrangements for patients to be referred for physical therapy, orthopedic treatment, surgeries, and pain management without any discussion of medical necessity:

-----Original Message-----
From: Ybana Agrelo <yba98@aol.com>
To: david Jankowski <djanko1@aol.com>; bregma <bregma@yahoo.com>
Sent: Fri, Feb 10, 2012 9:06 am
Subject: Michael Angelo

Dear David & Aria.

I should have everything for my new company ( for the center in Clinton Township) today. I will be applying for the Medicare license by the end of the month.

I currently send Auto to the following PT:

Summer PT
Akmed's PT
Mike in Dearborn
Ali Macki PT

Also, Dr. Muffareh is already working with James at Endo, and we will begin to send McNeil work. I would expect all patients from these PT's should be done at my center, in Clinton Township. Dr. Macki has some side relations with other referral sources, so I do not expect to get 100% of his work. Please do not discuss this with the PT's, because they all fight and are jealous of each other. Please make sure all the necessary equipment is ready for both of you as well as the ortho at my center, in order to perform procedures. All major med will be done out of Doctor's Hospital & Todd's place. (This pertains to my referral sources including the television ads).

I also have several patients ready for surgery and pain management in the Flint area. Please let me know how you like the Flint patients handled.

David, James will refer you the ortho work from Murrareh's office directly. He has several patients ready to go.

Thank you,

Michael

148.    Angelo is a layperson, does not have any medical training, and in fact has testified variously that he dropped out of school after 6th grade, dropped out of school during 8th grade, and graduated high school and completed two (2) years of business courses at a community college.

149.    When Angelo was unable to find physicians in Michigan to perform procedures at his 16100 building, he arranged for them to be brought in from out of state.

150.    One such out-of-state physician was Aria Sabit, M.D. ("Sabit"), whom Angelo recruited from California.

151. On January 8, 2017, Sabit was sentenced to more than nineteen (19) years in federal prison for a healthcare fraud scheme that involved, *inter alia*, submitting charges to insurers for spinal surgeries that he did not actually perform.

152. Sabit described the scheme Angelo operated in Michigan, testifying that Angelo described Michigan as a "wild west atmosphere and you can make millions."

153. Upon his arrival in Michigan, Sabit realized that having patients undergo surgery was better for their personal injury cases, which was the reason that Angelo and the attorneys with whom he worked had so many patients who purportedly required surgery:

> The *quid pro quo* ultimately came down to patients that were sent to [an attorney who worked with Angelo] would be represented by [that attorney], and then those patients were distributed to chiropractors, physical therapists, primary care physicians, pain management physicians, and surgeons all of whom would, and this is later that I understood this, all of whom would in some way benefit Michael Angelo and his company, which would be to either have some kind of side arrangement where there was an exchange of money directly, or that it would be performed in a certain surgery center.

154. The agreed-upon arrangement between Sabit and Angelo involved Angelo (a layperson) running Sabit's practice, for which Angelo received twenty-five percent (25%) of the practice's revenue.

155. Sabit reported that within weeks of moving to Michigan, he received a phone call from Angelo telling him that he had to perform more services on patients,

and that patients needed electrodiagnostic testing, vestibular testing, epidural steroid injections, and other expensive treatments that are not typically part of a neurosurgery practice.

156.   Sabit described Angelo's role as "hands-on," and that he frequently reviewed individual patient charts and attempted to steer their treatment, notwithstanding that Angelo is not a healthcare professional.

157.   Like Sereno, Sabit also confirmed that use of police reports was the primary method used by Angelo to solicit patients.

158.   Angelo's model of having a pain management clinic located in the 16100 building to direct referrals, as defendant Mercyland does, started with Summit Medical Group, PLLC ("Summit").

159.   Summit is owned by David Jankowski, D.O. ("Jankowski"), who was a physician Angelo recruited to perform procedures at the 16100 building.

160.   Jankowski has also been indicted for conspiracy to commit healthcare fraud (18 U.S.C. § 1349).   United States v. Jankowski, 17-cr-20401-BAF-DRG (E.D. Mich.).

161.   Numerous emails by and between Angelo, Jankowski, and third parties confirm that Angelo was involved in the establishment of a predetermined treatment protocol that did not take into account medical necessity or any patient-specific

considerations, but rather was utilized to "make a very profitable number for all involved [as] the numbers are staggering and well worth the effort."  *See* Exhibit 13.

162.   The emails further confirm that Angelo and Jankowski participated in several *quid pro quo* relationships whereby they referred patients and received patient referrals solely to generate profits for themselves (as stated by one of the emailers, to "fill[] [their] pants full of money").  *See, e.g.,* Exhibit 14.

163.   In another email exchange, Angelo (a layperson) tells Jankowski that "We cannot afford to refer patients to doctors/facilities/medical groups who do not refer work back to us anymore.  We need to work with doctors/facilities/medical groups that will send work to you and Dr. Sabit."  *See* Exhibit 15.

164.   Following Jankowski's indictment, he was hired by defendant Mercyland where he is currently purporting to treat patients while he awaits his criminal trial.

165.   Laran Lerner, D.O. ("Lerner") also participated in Summit's operations at the 16100 building.

166.   Lerner is currently serving a forty-five (45) month sentence in federal prison for a healthcare fraud scheme that involved billing for services and testing that were not actually performed.

167.   Specifically, Lerner pleaded guilty to healthcare fraud for "bill[ing] and caus[ing] Medicare to be billed for a variety of unnecessary prescriptions, tests, and

office visits to make it appear as though he was providing legitimate medical services instead of medically unnecessary controlled substances. Dr. Lerner conducted unnecessary office visits and tests and prescribed the patients the unnecessary controlled substances along with a number of other unnecessary expensive name brand prescriptions." United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 26, p. 4.

168. Summit was replaced in the 16100 building by a practice named Orthopedic, P.C., which was owned by Muhammad Awaisi, M.D. ("Awaisi").

169. Awaisi formerly practiced medicine in Massachusetts until his license was revoked on June 7, 2006.

170. According to a consent order agreed to by Awaisi, his license was revoked after he improperly accessed records for more than 250 emergency room patients at Baystate Medical Center, where he worked as an associate physician.

171. Awaisi used the contact information of those patients to solicit them to treat at U.S. Rehab, an entity he owned and operated.

172. In revoking his medical license, the Massachusetts Board of Registration in Medicine concluded that "[Awaisi] has engaged in conduct that undermines the public confidence in the integrity of the medical profession" and "[Awaisi] has practiced medicine deceitfully, or engaged in conduct which has the capacity to deceive or defraud in violation of [state regulations]."

173.   Angelo's association with physicians who have histories of committing fraud is not accidental or coincidental; he has testified that he knew Awaisi for twenty (20) years, that he provided "marketing" services to Awaisi in Massachusetts, and that when he heard Awaisi was moving to Michigan, Angelo decided he wanted to go into business with him.

174.   Awaisi has been subject to multiple disciplinary proceedings and investigations since moving to Michigan, including for soliciting elderly patients at a nursing home and prescribing medication with an expired license.

175.   Defendant Sinha began treating patients at the 16100 building while the pain management practice therein was still Orthopedic, P.C.

176.   After Awaisi's departure from the 16100 building, Sinha took over management of the pain management practice, including the treatment of several patients at issue herein who had previously been patients of Orthopedic, P.C.

177.   The defendant Mercyland entity was formed by Abraham on October 28, 2016, more than three (3) weeks after Sinha began submitting bills to Allstate using the Mercyland name.

178.   Angelo exercised control over the patients of each pain management clinic that was located in the 16100 building, including defendant Mercyland, by directing referrals to his other businesses and to associates with whom he had *quid pro quo* patient referral arrangements, including defendants Tox Testing, Paragon,

Scan Clear, Michigan Technology, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, and ISpine.

### B.   STRUCTURE OF THE DEFENDANTS' SCHEME TO DEFRAUD

179.   The defendants' fraudulent scheme intentionally targeted automobile insurers to take advantage of the unlimited medical benefits available under the No-Fault Act.

180.   In order to obtain patients whose treatment would be subject to No-Fault insurance, the defendants engaged in unlawful solicitation to obtain patients who did not actually need medical treatment.

181.   Many of the patients at issue herein have reported to Allstate that they were solicited by tow truck drivers who responded to the scene of their alleged motor vehicle accident or by phone calls from representatives of the defendants, often within hours of their alleged motor vehicle accidents, seeking to set up immediate medical appointments.

182.   Once solicited, patients were prescribed excessive and predetermined treatments and testing that were not medically necessary and were not tailored to the individual needs of each patient.

183.   To ensure patients underwent the unnecessary treatment and testing, the defendants offered cash payments, narcotic drug prescriptions, and other benefits to induce patients to continue their courses of treatment.

184.   At Mercyland, patients, regardless of their ages, injury histories, and comorbidities, were nearly always prescribed medications, usually including narcotics and compounded creams; restricted from working for four (4) weeks; restricted from household activities for four (4) weeks; restricted from driving for four (4) weeks; given urine drug tests; given clinically useless P-Stim devices; referred for MRI imaging; and prescribed physical therapy at least three (3) times a week for four (4) weeks.

185.   Many patients underwent their prescribed physical therapy at defendants Omega Rehab and Prime Rehabilitation where, regardless of their ages, injury histories, and comorbidities, patients were purportedly given a physical examination that almost always found significantly diminished range of motion and muscle strength that was used to justify a lengthy course of therapy involving between five (5) and seven (7) separate modalities per patient on every visit.

186.   Urine drug tests ordered by Mercyland physicians (and by physicians at previous pain management practices in Angelo's 16100 building) were almost invariably performed by Tox Testing and Paragon.

187.   Orders for prescription medications by Mercyland physicians were nearly always filled at Meds Direct and Livonia Care.

188.   Surgical procedures of Mercyland patients were performed by Pribil and billed through his ISpine entity.

189.   MRIs of patients referred by physicians in the network controlled by Angelo were performed at Michigan Technology and Scan Clear.

190.   The defendants referred patients to each other to further increase the unlawful and unnecessary treatment allegedly rendered.

191.   The majority of patients solicited and allegedly treated were involved in low-level motor vehicle accidents that resulted in, at most, minor sprain/strain injuries.

192.   By their referrals to one another, the defendants sought to bolster the appearance of injury and, therefore, inflate the amount of treatment for which Allstate was billed.

193.   The defendants attempted to conceal the identity of the physicians and entities who provided treatment and testing to the patients at issue herein, if treatment and testing was provided at all, by submitting charges through Block Billing.

194.   Block Billing never provided any actual patient evaluation, testing, treatment, or other services; it merely submitted bills for services allegedly provided by the other defendants under Block Billing's own tax identification numbers.

195.   When the defendants were unable to procure payment from automobile insurers due to their fraudulent and unreasonable charges, they sold their accounts receivable to third parties for a fraction of the amount billed to insurers.

196.   Purchasers of the defendants' accounts receivable include Echelon Medical Capital, LLC, Medlien Manager, LLC, and HMRF Fund III, LLC.

197.   Angelo has sent multiple letters to Allstate through the U.S. Mail attempting to induce Allstate to remit payment to the address of HMRF Fund III, LLC in Midlothian, Virginia, for the fraudulent charges described herein.

198.   These actions of the defendants resulted in the submission of millions of dollars of charges for unlawful alleged medical treatment that was rendered indiscriminately and without medical necessity, if it was provided at all.

### 1.   __Mercyland__

199.   Mercyland was organized by Abraham on October 28, 2016, but it began submitting charges to Allstate for dates of service beginning October 6, 2016.

200.   As detailed below, Mercyland obtained patients through illegal payments to patients, illegal solicitation, and improper referrals from the network of unscrupulous physicians developed by Angelo.

201.   Defendant Sinha testified that Mercyland was "paying drivers to bring patients, and you know, things like that or sometimes paying patients" to undergo treatment at the clinic.

202.   Mercyland has submitted charges using its tax identification number for alleged transportation services provided by defendant Patel's LG Transportation and Management, Inc.

203.   Since its formation, Sinha was the primary physician who allegedly evaluated and provided treatment to patients of Mercyland.

204.   Sinha practiced as an OB-GYN until she decided to start pain management in 2014.

205.   Sinha does not have any formal training in pain management, and has testified that she does not need it because "basically I'm a doctor, and I know how to treat pain."

206.   As set forth throughout this Complaint, Sinha consistently ignored all applicable standards of care regarding evaluation and treatment of patients with musculoskeletal pain complaints.

207.   Courts have taken notice of Sinha's lack of training, with one decision stating that it is "inexplicabl[e]" that Sinha, who has no background in pain medicine, was providing rehabilitative care.  Dean v. Allstate Ins. Co., 2017 U.S. Dist. LEXIS 151337, *12 (E.D. Mich., Sep. 19, 2017).

208.   Sinha has testified that some of the medically unnecessary treatment and testing prescribed and performed by Mercyland was pursuant to protocols established by Abraham, who also has no apparent formal training in pain management.

209.   Indeed, Sinha testified that she does not believe that Abraham is actually a doctor, but nevertheless followed his protocols, including forced

prescriptions of dangerous narcotic drugs and ordering tens of thousands of dollars of treatment and testing for each patient.

210.   Specifically, Sinha testified that Abraham's control over Mercyland included "making a doctor to do [sic] certain things which they don't want to do . . . [l]ike writing medications, because the patient wanted higher than - - doses of opioids, and he will request or, in fact, sometimes threaten the doctors to write it."

211.   Other than Sinha, the Mercyland physician who allegedly provided the most treatment to patients at issue in this Complaint was Christina Kimbrough, M.D. ("Kimbrough").

212.   Kimbrough is a family medicine practitioner who had no experience or training in pain management before joining Mercyland.

213.   Nevertheless, Kimbrough faithfully executed the Mercyland predetermined treatment protocol, including prescribing extreme amounts of narcotic pain medications, urine drug tests, diagnostic imaging, and clinically useless P-Stim devices.

214.   On June 29, 2017, Kimbrough was indicted on federal healthcare fraud charges in relation to a scheme in which she provided her NPI number and signatures to laypersons, who then wrote prescriptions using her identity.  United States v. Kimbrough, et al., 16-cr-20437-RHC-APP (E.D. Mich.), Docket No. 63.

215.   On November 14, 2017, Kimbrough pleaded guilty to conspiracy to commit healthcare fraud.  Id. at Docket No. 126.

216.   On September 28, 2018, Kimbrough was sentenced to twenty-seven (27) months in federal prison, followed by three (3) years of supervised release, and ordered to pay more than $1.1 million in restitution.  Id. at Docket No. 219.

217.   Kimbrough continued to purportedly treat patients at Mercyland even after pleading guilty to felony fraud charges, with records bearing her name dated as recently as November 28, 2017, and bills purportedly signed by Kimbrough dated as recently as January 4, 2018.

218.   Like Angelo associates Sabit, Jankowski, and Lerner before her, Kimbrough's charges (and guilty plea) included billing for services that were not actually rendered.

219.   Other Mercyland physicians who have allegedly examined and treated patients at issue in this Complaint include:

- Monik Lala, M.D. ("Lala"), a radiologist who also interprets MRIs allegedly performed by several of the MRI facilities to which Mercyland patients are referred;

- Lawrence Safadi, M.D. ("Safadi"), an anesthesiologist who formerly practiced with Sinai Diagnostic Services, PLLC ("Sinai Diagnostic"). Safadi has testified that he sought out a position with Sinai Diagnostic so that he could gain experience applying P-Stims, the clinically useless acupuncture devices promoted by Mercyland, discussed in detail below;

- Mustafa Shukr, M.D. ("Shukr"), an anesthesiologist who just obtained his medical license on January 11, 2017;

- Sanford J. Rautbort, M.D. ("Rautbort"), an 83-year-old pulmonologist with no apparent background in pain management;

- Reese James, D.O., a radiologist whose osteopathic license was suspended on February 24, 2017 after a finding that his overprescription of dangerous narcotic medications required emergency action;

- Marc Orlewicz, M.D., an anesthesiologist who entered into a consent order with the Michigan Board of Medicine on January 21, 2015, by which he was required to be supervised by another doctor, after he was convicted of aggravated assault for using force or coercion to engage in sexual conduct with a co-worker;

- Louis Radden, D.O. ("Radden"), an osteopath who has been sued for fraud by Allstate and who has previously been disciplined by the Michigan Board of Osteopathy for performing excessive and unreasonable injection procedures;

- Roberto Quizon, M.D. ("Quizon"), a general practitioner who is permanently barred from submitting charges to Medicaid due to a history of fraudulent submissions, and who entered into a consent order with the Board of Medicine in 2003 after undercover investigators were prescribed controlled substances, including opioids, by non-licensed personnel at a clinic he owns and operates;

- Jason Bitkowski, D.O. ("Bitkowski"), an osteopath who has previously been required to practice under the direct supervision of another physician due to disciplinary issues; and

- Emmitt Spradlin, R.N., N.P., a registered nurse who was placed on probation for a period of two (2) years by consent order with the Michigan Board of Medicine on November 5, 2015 for prescribing controlled substances without proper authority.

220.   Mercyland billed Allstate for high level examinations and P-stim acupuncture devices, each of which is addressed in detail *infra*.

221.   The application of P-Stim devices for every patient was mandated by Abraham and Angelo, and further incentivized by improper payments of $100 to physicians for each P-Stim they applied to patients at issue herein.

222.   Each patient of Mercyland was prescribed nearly identical treatment plans, including physical therapy three (3) times per week for four (4) weeks; MRI referrals; work, driving, and household activity restrictions; prescription medications; and urine drug testing, regardless of patients' ages, injury histories, and comorbidities.

223.   Each of the treatments allegedly rendered and referrals made by Mercyland were designed to maximize the amounts charged to Allstate by the defendants and their network.

224.   For example, more than 91% of the patients at issue herein who were allegedly evaluated and treated at Mercyland had urine specimens allegedly tested by Tox Testing and Paragon.

225.   Indeed, both Sinha and the laboratory manager of Tox Testing and Paragon have testified that it was the explicit policy of Mercyland to order urine drug testing for every patient of the clinic, even if medications are not prescribed and even in the absence of a patient-specific reason to do so.

226.   As documented by the emails between Angelo and his associates, MRI referrals are a particularly valuable commodity and an integral aspect of Mercyland's predetermined treatment protocol.  *See* Exhibits 13, 14, and 15.

227.   Not surprisingly, Sinha is one of the most prolific referrers of MRIs in the State of Michigan.

228.   The State of Michigan requires all MRI facilities to submit certain information regarding MRI scans performed on a quarterly basis, including the license number of the physician who made each referral and the number of scans performed on each patient at each appointment.

229.   In 2016, Sinha made 281 patient referrals for MRI imaging, of which more than 83% were for MRIs of multiple body parts:



230.   Sinha's practice of referring almost all patients for MRIs of more than one body part means that she alone accounted for a total of 800 MRI scans performed in Michigan in 2016.

231.   The number of MRIs prescribed by Sinha is particularly egregious when compared to the MRI referral patterns reported for all other physicians in Michigan.

232.   In 2016, a total of 841,236 MRIs were performed in Michigan, of which only 484 involved patients who underwent five (5) or more MRIs on the same date.

233.   In other words, just 0.05% of all MRI referrals in Michigan in 2016 were for five (5) or more body parts, a figure which includes referrals made by physicians treating the most critically ill and injured patients in the state.

234.   Sinha, who almost exclusively treats soft-tissue injuries and always provides treatment on a non-emergent basis, singularly accounted for 4.1% of all referrals for MRIs of five (5) or more body parts in Michigan in 2016.

235.   Sinha was the physician with the second highest number of referrals of patients for five (5) or more MRIs in Michigan in 2016.

236.   The physician with the highest number of referrals of patients for five (5) or more MRIs in Michigan in 2016 was Awaisi, Angelo's long-time associate and the owner of Orthopedic, P.C., the prior pain management clinic located at the 16100 building.

237.   It is not a coincidence that both of these physicians, each of whom referred far more MRIs than the statewide average, were all closely associated with Angelo and the practices he controls.

238.   The facilities to which Sinha made referrals have also been implicated in various fraudulent schemes, including payment of kickbacks to referring providers and over-reading MRI images to make it appear that patients' injuries are more significant than actually documented by the scans.

239.   As discussed below, there was rarely, if ever, a medical justification for the MRI referrals made by Sinha or any other physician at Mercyland.

240.   Sinha is also one of the most prominent prescribers of controlled substances in Michigan.

241.   According to ProPublica (which maintains data regarding prescriptions for controlled substances), 94% of Sinha's patients filled at least one prescription for an opioid in 2015, as compared to a national average of just twelve percent (12%).

242.   The drug prescribed most frequently by Sinha in 2015 was Oxycodone, a highly-potent and dangerous narcotic.

243.   The third-highest prescribed drug by Sinha in 2015 was Hydrocodone-Acetaminophen, which is also a potent and dangerous narcotic.

244.   The Michigan Board of Medicine has taken notice of Sinha's dangerous prescription practices, as it filed an administrative complaint on July 24, 2017

alleging that according to the Michigan Automated Prescription System ("MAPS") data, prescriptions for "commonly abused and diverted controlled substances" issued by Sinha were filled 17,169 times in Michigan pharmacies from January 1, 2014 to July 10, 2017.

245.   This amounted to 75.2% of the total controlled substances prescriptions written by Sinha.

246.   Moreover, the Board of Medicine alleged that Sinha commonly prescribed opioids in conjunction with benzodiazepines, which carries a substantial overdose risk and is discouraged by authorities, including the Centers for Disease Control and Prevention.

247.   The MAPS data also reveals that Sinha prescribed controlled substances to many persons who were simultaneously receiving the same or similar prescriptions from other providers.

248.   The MAPS numbers evaluated by the Michigan Board of Medicine do not reflect the true number of narcotic prescriptions issued by Sinha.

249.   Several patients at issue herein transferred care from Mercyland to different facilities who included MAPS printouts in records submitted to Allstate, and the MAPS records reveal that Mercyland and Meds Direct rarely, if ever, properly reported the medications they prescribed and distributed.

250.   The dangerous prescription of excessive amounts of narcotics that is documented by the ProPublica data and alleged by the Michigan Board of Medicine is also applicable to the patients at issue herein.

251.   Sinha has admitted in sworn testimony that she orders medications for every patient who presents at Mercyland, even though the vast majority of such patients have only minor injuries that are diagnosed as sprains and strains.

252.   Sinha and Mercyland prescribed these high levels and dosages of narcotics to entice patients to present (and to return regularly) to the clinic, so that Mercyland and the entities to which it referred the patients could generate charges to Allstate.

253.   Overprescription of dangerous substances is a common practice for physicians associated with Angelo.

254.   The indictments and, where applicable, the plea agreements of Angelo-associated physicians Jankowski, Lerner, and Kimbrough also each reference overprescription of medication as a key aspect of their respective fraudulent schemes.

255.   The predetermined treatment plans used by Mercyland ensured that Allstate would be charged by multiple providers for treatment and testing that was medically unnecessary.

2. **Angelo Entities**

256. Angelo has had ownership and control over multiple healthcare providers in Michigan, though he and others have intentionally taken steps to conceal his role.

257. For example, in or about 2012, Angelo arranged for a CON to operate a mobile MRI host site to be transferred from an entity in bankruptcy to Michigan Technology, which had been organized by a consultant named David Williams ("Williams").

258. It was not until several entities owned by and associated with Angelo served discovery responses to Allstate in a separate matter years later that Angelo's ownership of Michigan Technology was disclosed.

259. At a clinic inspection of Tox Testing and Paragon, it was alleged that a consultant named Reginald Samuels was the owner of the defendant laboratories.

260. In reality, Angelo is the owner of both Tox Testing and Paragon, and Reginald Samuels is an associate who assisted Angelo with setting up their fraudulent testing and billing practices.

261. Defendant Meds Direct was organized in Nevada by a holding company controlled by Angelo called Alleycat Holdings, LLC, which itself is a New Jersey limited liability company.

262.   The defendants attempted to conceal Angelo's ownership and control over the Defendant Entities because they were aware that his lengthy history of participation in healthcare fraud schemes would raise suspicion with Allstate.

263.   After Angelo's ownership and involvement in the Defendant Entities became apparent, he created defendant Block Billing to further obscure the source of the charges submitted to Allstate.

264.   Block Billing improperly submits charges to Allstate using multiple tax identification numbers in an attempt to create further confusion as to the source of the bills submitted for payment.

265.   Block Billing also submits charges to Allstate for facility fees for procedures allegedly performed at Greater Lakes Ambulatory Surgical Center, LLC ("Greater Lakes"), the ambulatory surgery center owned and operated by Angelo out of the 16100 building, despite Greater Lakes not being allowed to submit charges to Allstate.

266.   Despite the defendants' attempts at obfuscation, Allstate's investigation has revealed that Angelo used his 16100 building to house multiple entities that he owned and controlled for the purpose of submitting fraudulent bills to auto insurers.

267.   Defendant Tox Testing was formed in 2015 and its fictitious name Paragon Diagnostics was registered in 2016, both of which are located in Suite 800 of the 16100 building.

268.   Defendant Paragon was organized in 2016, approximately two (2) months before the Paragon Diagnostics fictitious name was registered.

269.   The records submitted by the defendants to Allstate use the Paragon Diagnostics fictitious name and the Paragon entity interchangeably.

270.   Both Tox Testing and Paragon received nearly all of their referrals for urine drug testing from the pain management clinics located in the 16100 building, including former occupant Orthopedic, P.C. and defendant Mercyland, both located in Suite 300 of the 16100 building.

271.   The urine drug test referrals by Mercyland and Orthopedic, P.C. to Tox Testing and Paragon were directed by Angelo for his own personal financial benefit.

272.   Defendant Meds Direct, located in Suite 500 of the 16100 building, was formed in 2014 for the purpose of filling medically unnecessary prescriptions written by physicians of the pain management practices located in the 16100 building.

273.   The excessive and medically unnecessary prescriptions written by Mercyland and Orthopedic, P.C., which were filled by Meds Direct, were directed by Angelo for his own personal financial benefit.

274.   Defendant Scan Clear, which is located in Suite 200 of the 16100 building, was formed in 2016 by Angelo's co-conspirator Ruefiel for the purpose of performing medically unnecessary MRI imaging of patients who were primarily

referred by physicians of the pain management practices located in the 16100 building.

275.   The CON obtained by Scan Clear to serve as a mobile MRI route host site originated with defendant Michigan Technology, which is currently located in Suite 700 of the 16100 building and which is currently using its tax identification to submit bills as defendant Cure Imaging.

276.   The excessive and medically unnecessary referrals for MRI imaging by Mercyland and Orthopedic, P.C., which were performed by Scan Clear, were directed by Angelo for his own personal financial benefit.

277.   Each of the entities owned and controlled by Angelo acted in concert with each other, and with the other individuals and entities named as defendants herein, to illegally solicit patients for medically unnecessary treatment and testing, to the extent such treatment and testing was provided at all, for the sole purpose of developing and maximizing charges submitted to Allstate.

### 3.   **Ruefiel Entities**

278.   Omega Rehab, Prime Rehabilitation, and Scan Clear are each owned and controlled by defendant Ruefiel.

279.   Omega Rehab was organized by Ruefiel on March 17, 2009.

280.   Ruefiel subsequently organized and acquired several other physical therapy businesses, including defendant Prime Rehabilitation on or about December 11, 2013.

281.   Ruefiel currently owns at least five (5) Omega Rehab and Prime Rehabilitation clinic locations that primarily bill Allstate for physical therapy modalities.

282.   Omega Rehab also submitted bills to Allstate for providing transportation to patients, primarily to and from Angelo's Michigan Technology.

283.   In addition to being the beneficiaries of the excessive and unnecessary physical therapy prescriptions made by Mercyland \ as part of the predetermined treatment protocol, and as discussed further below, Omega Rehab and Prime Rehabilitation offered patients compensation in exchange for undergoing physical therapy.

284.   The bills submitted to Allstate by Omega Rehab and Prime Rehabilitation were nearly always for multiple physical therapy modalities performed over long courses of treatment with almost never a patient re-evaluation.

285.   This means that Omega Rehab and Prime Rehabilitation rarely, if ever, made any independent assessment of whether the copious amounts of treatment for which they were billing Allstate were having any impact on the treatment and recovery of their patients.

286. Scan Clear began submitting charges to Allstate on May 13, 2017, after Ruefiel obtained a CON that was formerly owned by defendant Michigan Technology.

287. Scan Clear was the beneficiary of the medically unnecessary and excessive orders for MRI imaging made by Mercyland physicians as part of their predetermined treatment protocol.

288. At least three-quarters of all patients for whom Scan Clear has submitted bills to Allstate underwent multiple MRIs.

289. The excessive treatment and testing allegedly provided by each of the Ruefiel entities was designed solely to maximize claims for No-Fault benefits submitted to Allstate.

290. Like Mercyland and the Angelo entities, Omega Rehab has sold interest in its accounts receivable, including to Surgical Capital Solutions, Inc.

### 4. Livonia Care

291. Livonia Care was incorporated on January 24, 2012 by defendant Patel.

292. Livonia Care did not begin submitting charges to Allstate until May 2017, at which point it began charging Allstate primarily for compounded medications ordered almost exclusively by Mercyland, despite being located more than 40 miles away from Mercyland.

293.   On December 6, 2017, Livonia Care's controlled substance license was summarily suspended and its controlled substances were seized by the Michigan Board of Pharmacy after a finding that Livonia Care posed an imminent threat to the public.

294.   The administrative complaint filed by the Board of Pharmacy alleges that Livonia Care was among the largest distributors of several dangerous and addictive controlled substances in the State of Michigan, including carisoprodol and codeine syrup.

295.   The administrative complaint filed by the Board of Pharmacy also indicates that more than twenty percent (20%) of Livonia Care patients paid cash for their prescriptions, which is more than double the statewide average and suggests that drugs were being diverted rather than being used by patients.

296.   One of the patients whose file was reviewed by the Board of Pharmacy died of an overdose caused by drugs obtained from Livonia Care.

297.   The final count of the administrative complaint against Livonia Care alleges that it failed to maintain clean, orderly, and sanitary conditions after an inspection revealed the presence of expired and misbranded drugs in Livonia Care's active inventory, along with a disorganized and unsanitary environment.

298.   A pharmacist employed by Livonia Care named Apoorva Pandit also had his license summarily suspended by the Board of Pharmacy on December 6, 2017 in relation to the same conduct.

299.   Livonia Care continued filling prescriptions for compounded creams after its license suspension.

### 5.   ISpine

300.   ISpine was organized in Florida by defendant Pribil on June 22, 2017.

301.   Pribil is currently the medical director of Angelo's surgical center located in the 16100 building.

302.   ISpine submitted one (1) bill to Allstate for a purported patient evaluation performed in Florida, and all charges thereafter have been for purported evaluation and treatment of patients in Michigan.

303.   ISpine primarily performs surgical procedures at Angelo's 16100 building that are referred by Mercyland.

304.   Pribil has testified that he "had an agreement to provide some injections for Mercyland" and that he flies to Michigan several days each week to perform surgeries.

305.   ISpine's billing is prepared by Angelo's employee DeShawn Mitchell, who also prepares bills for Block Billing and other defendant entities.

## VI.   BILLING FOR SERVICES NOT RENDERED

306.   The defendants frequently billed Allstate for services that were not actually rendered.

307.   The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

308.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for treatment that never occurred are fraudulent.

309.   Therefore, Allstate is not required to compensate the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

310.   In addition to the specific instances of billing for services not rendered identified in section VI.C. *infra*, which exemplify the types of fraudulent submissions made relevant to the patients at issue in this Complaint, certain charges for services that were never performed that were submitted by Tox Testing, Paragon, and Omega Rehab were so pervasive that they are addressed separately below.

### A.    TOX TESTING AND PARAGON BILLED FOR SERVICES NOT RENDERED

311.   Nearly all of the charges submitted to Allstate by Tox Testing contain bills for urine drug tests that were not actually performed.

312.  Tox Testing primarily submitted bills to Allstate for quantitative/definitive urine drug testing, which is performed using specialized laboratory equipment to detect the presence of various drugs and analytes in urine specimens, as detailed *infra*.

313.   Tox Testing's laboratory manager, Rick Askar ("Askar"), testified that Tox Testing did not actually acquire the laboratory equipment needed to perform urine drug testing until March 2018.

314.   Prior to purchasing laboratory equipment in March 2018, Tox Testing contracted with other laboratories to perform quantitative/definitive urine drug tests.

315.   Tox Testing paid these other laboratories a flat rate to perform the quantitative/definitive urine drug tests and retained the right to submit charges to insurers itself, which it did at amounts that are many times what it actually paid for the testing to be conducted.

316.   When Tox Testing submitted bills to Allstate for quantitative/definitive urine drug tests performed by third-party laboratories, it almost invariably represented that tests were performed for: (1) alcohols; (2) five or more amphetamines; (3) barbiturates; (4) benzodiazepines; (5) buprenorphine; (6)

cannabinoids; (7) cocaine; (8) methadone; (9) five or more opioids and opiate analogs; (10) oxycodone; and (11) phencyclidine.

317.   However, the vast majority of the laboratory reports associated with the urine drug tests for which Tox Testing claimed that the above-listed eleven (11) separate drugs/analytes were tested show that testing was actually only performed to detect cocaine, opiates, oxycodone, and heroin.

318.   In other words, of the eleven (11) drugs/analytes for which Tox Testing nearly always billed Allstate, only three (3) were actually tested.

319.   Each charge submitted by Tox Testing for drugs/analytes that were not actually tested constitutes billing for services that were not rendered.

320.   Tox Testing and Paragon each also submitted bills to Allstate for qualitative/presumptive screening tests performed on each urine specimen collected.

321.   Both Tox Testing and Paragon formerly submitted charges to Allstate for qualitative/presumptive urine screening tests using Current Procedural Terminology ("CPT") [1] Code 80301, which was deleted from the CPT Code Book for 2017.

322.   CPT Code 80301 describes a urine drug test screen that was performed using a device, such as a dipstick, that is read using direct optical observation.

---

[1] CPT Codes are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

323. Askar has testified that, until Tox Testing and Paragon purchased laboratory equipment in or about March 2018, all screening tests were in fact performed using a dipstick only.

324. CPT Code 80301 was replaced by CPT Code 80305, which describes a urine drug screening test performed using a reagent dipstick.

325. After CPT Code 80301 was deleted, Tox Testing and Paragon submitted charges to Allstate using CPT Code 80307, which describes urine drug screening tests performed using "instrument chemistry analyzers."

326. Tox Testing and Paragon could not and did not perform any urine drug testing using instrument chemistry analyzers prior to March 2018, as they did not possess the necessary laboratory equipment to do so.

327. Each charge submitted to Allstate by Tox Testing and Paragon using CPT Code 80307 prior to their purchase of laboratory equipment was for a service that was not actually provided. *See* Exhibits 2 and 3.

## B. OMEGA REHAB BILLING FOR SERVICES NOT RENDERED

328. As discussed in greater detail below, Omega Rehab submitted charges to Allstate for excessive and unnecessary physical therapy treatments.

329. Omega Rehab also submitted charges to Allstate for allegedly transporting patients to and from its clinics to undergo such treatments.

330.   The records submitted by Omega Rehab in connection with its medical transportation services include the times that the patients arrived and departed the clinic.

331.   The records of the physical therapy treatments allegedly performed by Omega Rehab include the length of each individual exercise and modality.

332.   These records are important to the bills submitted by Omega Rehab, because many of the treatments allegedly rendered by Omega Rehab are billed using timed CPT Codes.

333.   Each fifteen (15) minute unit of the CPT Codes used by the defendants requires a minimum of eight (8) defined minutes of treatment to be performed before a single unit can be properly billed.

334.   For many of the patients at issue herein, the records and bills submitted by Omega Rehab represent that treatment was provided for far longer than the patient was actually present at the clinic, based on Omega Rehab's own transportation logs. *See* Exhibit 8.

335.   Billing for treatments that were mathematically impossible to perform while patients were present at the clinic constitutes billing for services not rendered.

C.     **SPECIFIC EXAMPLES OF BILLING FOR SERVICES NOT RENDERED**

    1.     **Patient K.A. (Claim No. TXA-0174728)[2]**

336.    Patient K.A. was allegedly involved in a motor vehicle accident on August 24, 2016.

337.    K.A. was transported to the 16100 building on November 4, 2016.

338.    K.A. testified that when she arrived at the building she decided that she did not want to stay for the appointment, so she left without being seen by anyone.

339.    Mercyland nevertheless submitted charges, supported by falsified records, claiming to have performed a level 5 examination and a P-Stim application on K.A.

340.    The record submitted by Mercyland contains numerous purported objective findings that are identical to those used for nearly every patient at issue herein, and which would be impossible to determine for a patient who was not actually examined, including alleged findings of "muscle spasms, paraspinal and PVMs tenderness dROM" in every spinal region. *See* Exhibit 16.

341.    K.A. specifically testified that she has never received a P-Stim device.

342.    Tox Testing and Paragon submitted charges, supported by falsified records, claiming to have performed extensive urine drug testing on a urine specimen that was never provided by K.A.

---

[2] To protect the privacy of its insureds, Allstate refers to each by his or her initials and Allstate claim number.

343.   Meds Direct submitted charges claiming to have dispensed six (6) different prescription medications to K.A., including codeine, a narcotic drug susceptible to abuse.

344.   Together, the charges submitted by Mercyland, Tox Testing, Paragon, and Meds Direct relative to K.A., who was never even seen by a physician, totaled $21,936.13.

345.   Mercyland, Tox Testing, Paragon, and Meds Direct submitted claims for payment and accompanying medical records relative to K.A. to Allstate through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

346.   Allstate is not required to pay Mercyland, Tox Testing, Paragon, and Meds Direct for treatment that was never rendered to K.A.

## 2.   Patient R.W. (Claim No. TXA-0188788)

347.   Patient R.W. was allegedly involved in a motor vehicle accident on July 17, 2017.

348.   Following the alleged accident, a tow truck with the word "Extreme" printed thereon arrived at the scene.

349.   The driver of the tow truck, named Eli, drove R.W. home, then to an emergency room where she decided not to seek treatment, then home again.

350.   Eli did not charge R.W. for his services, but told her to call 248-632-PAIN, which is the phone number used by an auto body shop named Somerset Auto Body of MI, Inc. ("Somerset Auto").

351.   Somerset Auto referred R.W. to Michigan Accident Attorneys, who in turn referred R.W. to Mercyland.

352.   On July 18, 2017, the day after her alleged motor vehicle accident, R.W. presented to Mercyland.

353.   Before R.W. saw a doctor or was examined in any way, she was told to provide blood and urine specimens, which were used to perform numerous medically unnecessary tests, including a pregnancy test.

354.   Mercyland submitted a charge claiming to have applied a P-Stim device at the July 18, 2017 appointment.

355.   R.W. testified that she never received a P-Stim device.

356.   The purported evaluation by Kimbrough includes false statements, including that R.W.'s pain was improved by physical therapy despite the fact that the alleged accident had occurred the previous day and R.W. had not attempted any such treatment.

357.   Based on her fabricated examination results, Kimbrough prescribed the Mercyland predetermined treatment protocol, including physical therapy three (3)

times per week for four (4) weeks, six (6) different medications, urine drug tests, and P-Stim application.

358. Tox Testing and Paragon submitted charges for thousands of dollars for urine drug testing despite a lack of any narcotics or other potentially-abused substances prescribed.

359. R.W. returned to Mercyland once, on August 18, 2017, at which point she reported that she had recovered and was returning to work and stopping treatment.

360. Despite reporting an intention to discontinue treatment, and not being prescribed any medications, Kimbrough again ordered urine drug testing for which Tox Testing and Paragon billed Allstate thousands of dollars.

361. The medically unnecessary examination and treatment prescribed by Mercyland was a direct result of the illegal solicitation by the defendants.

362. Mercyland, Tox Testing, and Paragon submitted claims for payment and accompanying medical records relative to R.W. to Allstate through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

363. Allstate is not required to pay Mercyland, Tox Testing, and Paragon for treatment that was never rendered to R.W. nor for unnecessary treatment that derived from illegal solicitation.

### 3.     Patient L.F. (Claim No. TXA-0182563)

364.   Patient L.F. was allegedly involved in a motor vehicle accident on December 15, 2016.

365.   Following the alleged accident, L.F. was solicited by an attorney in violation of Michigan law.

366.   After an extensive course of alleged treatment, urine drug testing, and MRI imaging, L.F. was evaluated by Shukr at Mercyland on May 10, 2017.

367.   Shukr made no reference to the prior treatment and testing performed on L.F., and instead ordered the same predetermined treatment protocol used for all Mercyland patients.

368.   Shukr did not prescribe any medications, but he nevertheless ordered urine drug testing that was allegedly performed by Tox Testing and Paragon.

369.   Paragon submitted a charge of $3,796 using CPT Code 80307 representing that it performed instrumented analysis of L.F.'s urine specimen, which it did not do.

370.   Tox Testing forwarded L.F.'s urine specimen to a contractor that purportedly tested for nine (9) drugs and analytes, only two (2) of which were among the eleven (11) separate drugs and analytes that Tox Testing's bill claimed were tested.

371.   This practice of submitting bills for urine drug testing that was not actually performed was repeated on at least ten (10) subsequent dates of service relative to patient L.F., including two (2) occasions on which alleged testing was performed less than a week after a previous test result.

372.   The Mercyland physicians ordering the excessive urine drug testing of patient L.F. never indicated that there was a concern of drug abuse or misuse.

373.   L.F. was eventually evaluated by defendant Pribil on October 6, 2017, and he almost immediately scheduled L.F. for a surgical procedure.

374.   On October 21, 2017, L.F. allegedly underwent a laminotomy of the L5-S1 level of her spine.

375.   However, both ISpine and Block Billing (which submitted facility fee charges in an attempt to conceal that the procedure was performed at Angelo's Greater Lakes, which is not permitted to submit bills to Allstate as discussed above) submitted charges representing that surgery was performed on a second vertebral level, at L4-L5.

376.   The false charge submitted by Block Billing was for $135,000.

377.   The false charge submitted by ISpine was for $45,000.

378.   Pribil admitted during deposition testimony that he never performed surgery on a second level of L.F.'s spine, despite charges totaling $180,000 representing otherwise.

379.   Mercyland then submitted multiple charges for purported office examinations during the period following L.F.'s surgery during which follow-ups are included in the cost of the surgical procedure.

380.   Mercyland, Tox Testing, Paragon, ISpine, and Block Billing submitted claims for payment and accompanying medical records relative to L.F. to Allstate through the U.S. Mail and interstate wires, and Allstate relied upon the same in adjusting the claims.

381.   Allstate is not required to pay Mercyland, Tox Testing, Paragon, ISpine, and Block Billing for treatment and testing that was never rendered to L.F. nor for unnecessary treatment and testing.

### 4.   Patient M.K. (Claim No. 0453333890)

382.   Patient M.K. was allegedly involved in a motor vehicle accident on May 13, 2016.

383.   M.K. was purportedly evaluated by defendant Sinha just four (4) days after the alleged accident, on May 17, 2016, for Orthopedic, P.C. at Angelo's 16100 building.

384.   Sinha then submitted a claim for a second "initial evaluation" on behalf of Mercyland, on October 10, 2016.

385.   The record of Sinha's second "initial evaluation" makes no reference to the extensive treatment she had previously provided to M.K., and instead Sinha

simply prescribed Mercyland's predetermined protocol of excessive and medically unnecessary treatment and testing.

386.   The testing prescribed by Sinha and other Mercyland physicians relative to M.K. included urine drug testing performed by Tox Testing and Paragon on at least thirteen (13) different dates of service.

387.   On each date of service, Paragon falsely submitted claims using CPT Code 80307 representing that it performed instrumented analysis of urine specimens, a service that was never actually performed.

388.   On each date of service involving urine drug testing, Tox Testing falsely represented the specific drugs and analytes that were purportedly evaluated.

389.   On March 31, 2017, M.K. allegedly underwent an injection performed by Mercyland.

390.   M.K. testified that the injection was to her low back.

391.   Nearly a year later, on January 26, 2018, Block Billing submitted a bill to Allstate totaling $46,997 representing that the March 31, 2017 procedure was actually an arthrogram and injection performed on M.K.'s shoulder.

392.   The procedure report submitted by Block Billing states that M.K. had a previously repaired rotator cuff tear, with surgical clips, which was not mentioned in previous Mercyland evaluation records nor in a report of an MRI performed on M.K.'s shoulder that had been ordered by Sinha.

393. The urine drug testing billed by Tox Testing and Paragon, and the injection procedure allegedly done by Mercyland and billed by Block Billing, were never actually performed.

394. Mercyland, Tox Testing, Paragon, and Block Billing submitted claims for payment and accompanying medical records relative to M.K. to Allstate through the U.S. Mail and interstate wires, and Allstate relied upon the same in adjusting the claims.

395. Allstate is not required to pay Mercyland, Tox Testing, Paragon, and Block Billing for treatment and testing that was never rendered to M.K.

### 5.   Patient T.W. (Claim No. TXA-0192335)

396. Patient T.W. was allegedly involved in a motor vehicle accident on September 16, 2017.

397. T.W. presented to Mercyland on September 18, 2017, where she was purportedly evaluated by Kimbrough.

398. T.W. testified that an assistant at Mercyland unsuccessfully attempted to obtain a blood specimen.

399. T.W. also testified that she did not provide a urine specimen.

400. Tox Testing and Paragon nevertheless submitted bills to Allstate claiming to have performed extensive testing on a urine specimen that T.W. did not actually provide.

401.   Mercyland, Tox Testing, and Paragon submitted claims for payment and accompanying medical records relative to T.W. to Allstate through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

402.  Allstate is not required to pay Mercyland, Tox Testing, and Paragon for medically unnecessary treatment and testing and treatment and testing that was never rendered to T.W.

### 6.   Patient M.A. (Claim No. 0454781790)

403.  Patient M.A. was involved in an alleged motor vehicle accident on April 29, 2017.

404. M.A. presented to Mercyland and was purportedly evaluated by Kimbrough on May 15, 2017, whereupon he was prescribed Mercyland's normal predetermined protocol of treatment and testing, including unnecessary urine drug testing performed by Tox Testing and Paragon and unnecessary medications dispensed by Meds Direct.

405.  Mercyland and Block Billing submitted charges to Allstate claiming that Mercyland physicians applied P-Stim devices to M.A. on June 14, 2017, July 15, 2017, and August 19, 2017, with charges totaling more than $40,000 for these purported applications.

406.  However, M.A. provided a statement to Allstate in which he reported that he actually only received one (1) P-Stim device application, in June 2017.

407. Thus, Mercyland and Block Billing submitted charges to Allstate for services that were never actually performed.

408. Mercyland and Block Billing submitted claims for payment and accompanying medical records relative to M.A. to Allstate through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.

409. Allstate is not required to pay Mercyland and Block Billing for treatment that was never rendered to M.A.

## 7.     Patient A.S. (Claim No. 0441593829)

410. Patient A.S. was involved in an alleged motor vehicle accident on December 11, 2016.

411. A.S. was referred for physical therapy treatment to defendant Omega Rehab, and began a course of treatment on January 27, 2017.

412. On at least twenty-four (24) separate alleged dates of service through May 8, 2017, Omega Rehab submitted charges to Allstate representing that it had performed, among other excessive treatments, at least two (2) units of therapeutic exercises.

413. Each unit of therapeutic exercise signifies fifteen (15) minutes of direct one-on-one treatment, and at least eight (8) minutes must be performed in order to properly submit a charge.

414.  To bill multiple units, a provider must actually perform treatment for the full amount of time for all but the final unit, which must meet the eight-minute rule.

415.  In other words, each bill submitted by Omega Rehab relative to the treatment of A.S. represented that it performed at least twenty-three (23) minutes of direct, one-on-one therapeutic exercises for each date of service.

416.  A.S. provided a statement to Allstate during which he reported that the therapeutic exercises purportedly performed by Omega Rehab consisted only of him riding a stationary bike for fifteen (15) minutes.

417.  The treatment described by A.S. does not qualify for multiple units of billing for therapeutic exercises, and thus, the treatment for which Omega Rehab submitted charges to Allstate never actually occurred.

418.  Omega Rehab submitted claims for payment and accompanying medical records relative to A.S. to Allstate through the U.S. Mail and interstate wires, and Allstate relied upon the same in adjusting the claims.

419.  Allstate is not required to pay Omega Rehab for treatment that was never rendered to A.S., and is entitled to repayment of monies it paid in reliance on Omega Rehab's fraudulent submissions.

## VII.  **KICKBACKS TO PATIENTS**

420.   The defendants used multiple methods to ensure that patients who were solicited or referred into their network actually presented for the medically unnecessary treatment and testing used to generate claims to Allstate.

421.   These methods included aggressive solicitation tactics, representations regarding settlement value of claims against insurers, promises of prescriptions for narcotic drugs, and, perhaps most egregiously, offers of cash and in-kind payments in exchange for undergoing treatment.

422.   As noted above, Sinha has testified under oath that it is her belief that Abraham and Mercyland paid patients in exchange for their agreement to undergo treatment at Mercyland.

423.   Ruefiel and his entities also made cash payments to patients to induce them to undergo medically unnecessary treatment.

424.   For example, patients Q.C. and T.W. (Claim No. TXA-0190398) each testified that they were offered cash payments in exchange for continuing their physical therapy at Prime Rehabilitation.

425.   Patient Q.C. testified that after he decided to stop treatment at Prime Rehabilitation because it was not helping him, a representative of Prime Rehabilitation named Abdul offered to pay him $200 per week that he continued treatment.

426. Patient T.W. testified that she was offered between $150 and $200 to undergo physical therapy at Prime Rehabilitation.

427. Both Q.C. and T.W. were also offered cash payments for each MRI scan they would agree to undergo.

428. This practice of cash payments to patients to induce treatment was also discussed by an October 27, 2016 decision of the Michigan Court of Appeals in Omega, PT, LLC, *et al.* v. Auto-Owners Insurance Co., 14-000264-NF, which found that the insurer was entitled to sanctions against Omega Rehab because the evidence developed in the circuit court established that in addition to illegally soliciting the patient at issue and submitting bills for services not rendered, both of which are discussed herein, Omega Rehab paid the patient $40 each time he presented to Omega Rehab for treatment.

429. Allstate has also received an independent report that patient R.Y. (Claim No. 0374511251) was being paid $500 for every twelve (12) treatments at Omega Rehab, and that his appointments only lasted for ten (10) minutes.

430. In addition to cash payments, the defendants offer other types of benefits and compensation to induce patients to undergo treatment.

431. Mercyland promised patients opioid drugs, which are easily abused and which have a street value of thousands of dollars, in exchange for undergoing treatment that was billed to Allstate.

432.   The website used by both Omega Rehab and Prime Rehabilitation advertises that its equipment "is available to [patients] for use even after discharge from our care."

433.   Somerset Auto, one of the most prolific patient solicitors used by the defendants (as detailed below) also offered to "waive" deductible payments for repairs performed on patients' vehicles when they underwent treatment at its direction, which was almost always started at Mercyland.

434.   Patients who require monetary or other inducement in order to undergo evaluation and treatment do not actually require medical treatment, and all charges submitted by the defendants related to such patients are fraudulent.

## VIII. **UNLAWFUL SOLICITATION**

### A.    MICHIGAN'S ANTI-SOLICITATION LAWS

435.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

436.   Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such

activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

437.  It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, and to use police reports to solicit any person identified in the report, Mich. Comp. Laws § 750.429.

438.  Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157.

439.  As set forth more fully below, the defendants participated in and willingly benefited from schemes to solicit patients through conduct prohibited under Michigan law.

## B.  IMPROPER AND UNLAWFUL METHODS USED TO SOLICIT PATIENTS

440.  Despite Michigan's prohibition on patient solicitation, the defendants actively employed a number of unlawful and improper methods to obtain patients.

441.  Multiple patients at issue in this Complaint have reported that they received unsolicited phone calls within hours or days of their alleged motor vehicle accident.

442.  The individuals who made calls applied high pressure tactics to the targets of their unlawful solicitation, including by offering to immediately pick up

the patients at their homes so they could begin a course of treatment with the defendants.

443.   Patient D.D. (Claim No. TXA-0210538) reported that the individual who called her to solicit her to undergo evaluation and treatment at Mercyland used the phone number (586) 212-1973 and falsely represented that he was employed by the hospital at which she had undergone evaluation.

444.   When Allstate investigated the owner of the phone number that placed the solicitation call to patient D.D., it discovered a van registered to defendant Patel with Patel's "LG Transportation and Management" printed on the side parked in the solicitor's driveway.

445.   The defendants also used tow truck companies and auto body shops to obtain personal information of patients and direct them to their clinics, including Somerset Auto.

446.   Several patients at issue herein reported that they were approached by tow truck drivers who responded to accident scenes and were told that the tow truck drivers could arrange medical treatment.

447.   Somerset Auto was among the most prolific members of the defendants' network of illegal solicitors, and used offers of cash payments and other tactics to induce patients to report to the Defendant Entities for medically unnecessary treatment and testing.

448.   Somerset Auto is owned and controlled by Norman Dehko ("Dehko"), along with other members of his family.

449.   In 2007, Dehko, along with his mother, Latifa Dehko, and his brother, Dickow Dehko, were arrested and charged with insurance fraud in connection with a scheme that involved falsification of reports and enhancing collision damage.

450.   Dehko, who was described as the ringleader of the scheme, was charged with forty (40) felonies, and was alleged to have used as many as twelve (12) separate auto body shops to perpetrate the fraud.

451.   In 2012, Dehko pleaded guilty to insurance fraud conspiracy.

452.   Dehko has also been implicated in a scheme in which a former Detroit police officer was convicted of misconduct in office for, *inter alia*, creating falsified police reports for Dehko and others.  *See* State of Michigan v. Schuh, LC No. 08-013141-FH, Wayne Circuit Court.

453.   The convicted officer admitted that he had received between five and seven thousand dollars in "loans" from collision shop owners that had no payback arrangement, and that were not in fact paid back.

454.   Somerset Auto monitored reports of motor vehicle accidents so that it could send tow trucks to the scene, which often arrived even before emergency responders.

455.   The tow truck drivers either towed the involved vehicle to Somerset Auto, or they obtained the contact information of the accident victims so that Dehko and Somerset Auto could solicit them.

456.   Somerset Auto also operates a phone number – (248)-632-PAIN – that solicits alleged motor vehicle accident victims.

457.   The Facebook page of (248)-632-PAIN advertises that is a physical therapy clinic, and states:



458.   After Somerset Auto towed vehicles to its lot, it used its control over the accident victims' vehicles to induce them to come to its shop where Dehko, a layperson, pressured them to undergo medical evaluation and treatment.

459.   In several cases, patients reported that seemingly simple repairs performed at Somerset Auto took weeks, during which time Dehko repeatedly arranged for the patients to present at Somerset Auto where they were pressured to be transported to Mercyland for evaluation and treatment.

460.   In fact, several patients have reported that their vehicles seemed to have incurred additional damage while under the control of Somerset Auto.

461.   Somerset Auto maintains a van at its lot that is used to transport these patients to Mercyland and other providers.

462.   Somerset Auto also induced patients to undergo medically unnecessary treatment with offers to "waive" collision deductible payments, which Dehko explained to at least one patient would be recouped by Somerset Auto by adding charges to the bill submitted to the insurer.

463.   Treatment directed by tow truck drivers, auto body shops, and other laypersons rather than by licensed medical professionals is unlawful, unreasonable, and unnecessary, and Allstate has no obligation to pay any charges associated therewith.

464.   Unlawful solicitation and unqualified referrals by laypersons to the defendants negate the validity of the medical treatment purportedly provided by the defendants.

465.   Referrals of solicited patients to the defendant clinics and physicians bore no relation to actual medical necessity, as the patients at issue in this Complaint would not have sought treatment but for the unlawful solicitation.

466.   By steering patients to the Defendant Entities, the defendants knew that the patients would receive excessive and medically unnecessary treatment according to a predetermined treatment protocol, as set forth more fully below, to maximize the charges for medical treatment.

467.   Accordingly, the defendants' treatment of the solicited patients was unlawful and led directly to unreasonable and unnecessary care.

### C.   SPECIFIC EXAMPLES OF PATIENT SOLICITATION

468.   Patients at issue in this Complaint have confirmed that they were solicited to treat by and with the defendants.

469.   The following representative patients exemplify the fact and extent of the defendants' illegal solicitation efforts.

### 1.   Patient D.P. (Claim No. 0438836835)

470.   Patient D.P. was allegedly involved in a motor vehicle accident on December 9, 2016.

471.   D.P. reported to Allstate that shortly after her alleged motor vehicle accident she received a phone call from someone who identified himself as "Mr. White," soliciting her to undergo treatment at Mercyland.

472.   "Mr. White" arranged for D.P. to be transported in an Uber to Mercyland on December 16, 2016.

473.   D.P. was under the impression that the individual who called her was associated with her disability insurer.

474.   Defendant Sinha allegedly evaluated D.P. at Mercyland, and diagnosed her with the same non-specific "pain" as every other patient at issue herein, including, *inter alia*, right leg pain.

475.   Defendant Sinha prescribed Mercyland's predetermined treatment protocol, discussed further *infra*, including physical therapy to be performed three (3) times per week for four (4) weeks.

476.   In fact, D.P. actually had a broken right leg that had required surgical intervention just five (5) days prior, on December 11, 2016.

477.   Sinha claimed that D.P.'s pain was improving with physical therapy, which suggests that D.P. was never actually examined at all, as she had not undergone any such treatment in the days immediately following her surgery.

478.   Sinha also did not note that D.P.'s surgeon prohibited her from bearing weight on her right leg, which would prevent her from performing the prescribed physical therapy.

479.   Sinha prescribed seven (7) separate medications, including the opioid Norco, despite the fact that D.P. had just been prescribed opioid pain medications

by a separate physician days beforehand and in disregard of a positive point-of-care urine screen that tested positive for opioids and oxycodone.

480.   Sinha did not evaluate any of the medications D.P. was already taking, thus resulting in not only the distribution of unnecessary and dangerous opioids, but also the possibility that the patient could be harmed by contraindicated pharmaceuticals.

481.   Mercyland ordered the unnecessary medication prescriptions filled by defendant Meds Direct.

482.   Based upon her evaluation and interactions at Mercyland, D.P. believed it was a "scam" and did not return.

483.   The medically unnecessary examination and treatment prescribed by Sinha was a direct result of the illegal solicitation by the defendants.

484.   Mercyland, Tox Testing, Paragon, and Sinha submitted claims for payment and medical records relative to D.P. to Allstate through interstate wires and the U.S. Mail, upon which Allstate relied in adjusting the claims.

485.   Allstate is not required to pay Mercyland, Tox Testing, and Paragon for unnecessary treatment and testing that derived from illegal solicitation.

### 2.   Patient R.M. (Claim No. 0447864299)

486.   R.M. was allegedly involved in a motor vehicle accident on March 3, 2017.

487.   Following the alleged accident, R.M. took his vehicle to Somerset Auto, where Dehko offered to direct R.M.'s medical treatment.

488.   Somerset Auto arranged for R.M. to be transported to US Healthcare MI, P.C., the pain management clinic operated by Awaisi after he left Angelo's 16100 building and was replaced by Mercyland.

489.   Allstate has never received any record of examination or bill from US Healthcare MI, P.C., but did receive a bill for more than $35,000 for MRIs of seven (7) different body parts that were purportedly ordered by a physician at the practice and were performed on April 13, 2017 and April 14, 2017.

490.   Following the performance of these MRIs, Somerset Auto directed R.M. to begin treatment at Mercyland instead, and the MRI results were never used to inform R.M.'s treatment plan.

491.   On April 28, 2017, R.M. was purportedly evaluated at Mercyland by Kimbrough, who prescribed Mercyland's predetermined treatment protocol, discussed further *infra*, including physical therapy to be performed three (3) times per week for four (4) weeks, driving and housework restrictions, urine drug testing, and seven (7) separate medications.

492.   The urine drug testing aspect of the predetermined treatment protocol was allegedly performed by Tox Testing and Paragon.

493.   Tox Testing billed for testing a litany of drugs and analytes that were never actually performed.

494.   Paragon inexplicably submitted a charge for blood tests allegedly performed on a specimen collected on May 3, 2017, a date on which there is no record of R.M. undergoing treatment, and for which there is absolutely no explanation or medical indication.

495.   Tox Testing and Paragon both submitted charges, again including for testing that was not actually performed, relative to a urine specimen purportedly provided by R.M. on May 26, 2017.

496.   There is no indication that this urine drug testing was ever ordered, as there is no record of R.M. undergoing any treatment on that date.

497.   R.M. returned to Mercyland on June 29, 2017, where he was allegedly evaluated by both Paul Lewis, D.O. and Shukr.

498.   Mercyland submitted two (2) separate charges of $500 for this appointment, both representing that a level 4 office visit was performed.

499.   It is patently unreasonable for two (2) physicians in the same office to undertake the same extensive patient history and evaluation necessary to bill for a level 4 office visit on the same date.

500.   The medically unnecessary examination and treatment prescribed by Mercyland and performed by Mercyland, Tox Testing, and Paragon was a direct result of the illegal solicitation by the defendants.

501.   Mercyland, Tox Testing, and Paragon submitted claims for payment and medical records relative to R.M. to Allstate through the U.S. Mail, upon which Allstate relied in adjusting the claims.

502.   Allstate is not required to pay Mercyland, Tox Testing, and Paragon for unnecessary treatment and testing that derived from illegal solicitation.

### 3.   Patients Q.C. and T.W. (Claim No. TXA-0190398)

503.   Patients Q.C. and T.W. were allegedly involved in a motor vehicle accident on August 21, 2017.

504.   Q.C. and T.W. each testified that shortly after the alleged accident a tow truck that they had not called arrived at the scene and referred them to Dehko at Somerset Auto.

505.   Q.C. further testified that he was told that Somerset Auto would waive his deductible.

506.   Dehko informed Q.C. that he "had his own doctors," and arranged transportation to Mercyland for Q.C. and T.W.

507.   On August 22, 2017, Q.C. and T.W. drove themselves to Somerset Auto where they were then provided with medically unnecessary transportation services to Mercyland.

508.   At Mercyland, Q.C. and T.W. were forced to give blood and urine specimens before seeing a physician and were not told why.

509.   Q.C. reported that he was "forced" to accept application of a P-Stim device, which took four (4) minutes to apply in a back room of the clinic.

510.   When Q.C. and T.W. returned to Somerset Auto, Dehko told Q.C. that the P-Stim is "basically just to get money" and suggested that Q.C. throw it away, which he did.

511.   Dehko then gave Q.C. and T.W. money for lunch at Red Lobster.

512.   T.W. testified that she and Q.C. were sent back to Mercyland again the following day, where they were given prescriptions for physical therapy.

513.   Both Q.C. and T.W. testified that they were offered cash in exchange for undergoing MRI imaging and physical therapy.

514.   The cash offer for physical therapy, which was performed at Prime Rehabilitation, were $150 to $200 per week.

515.   Q.C. and T.W. were both given medications that they could not identify by Meds Direct.

516. The medically unnecessary examination, treatment, and testing prescribed by Mercyland and performed by Mercyland, Tox Testing, Paragon, Meds Direct, and Prime Rehabilitation was a direct result of the illegal solicitation by the defendants.

517. Mercyland, Tox Testing, Paragon, Meds Direct, Block Billing, and Prime Rehabilitation submitted claims for payment and medical records relative to Q.C. and T.W. to Allstate through the U.S. Mail, upon which Allstate relied in adjusting the claims.

518. Allstate is not required to pay Mercyland, Tox Testing, Paragon, Meds Direct, Block Billing, and Prime Rehabilitation for unnecessary treatment and testing that derived from illegal solicitation.

### 4. Patient L.B. (Claim No. 0488209685)

519. Patient L.B. was allegedly involved in a motor vehicle accident on January 11, 2018.

520. L.B. provided a statement to Allstate in which she reported that a tow truck driver who claimed to be just driving around the area responded to the scene and took her car to Somerset Auto.

521. Somerset Auto then arranged for L.B. to undergo examination at Mercyland.

522.   At Mercyland, a physician assistant inexplicably ordered both urine and blood testing without any indication, which was allegedly performed by Tox Testing and Paragon.

523.   After Mercyland attempted to make a physical therapy referral, L.B. decided that the arrangement did not seem "correct," had her car towed to a different shop, and did not return to Mercyland.

524.   The medically unnecessary examination and testing prescribed by Mercyland and performed by Mercyland, Tox Testing, and Paragon was a direct result of the illegal solicitation by the defendants.

525.   Mercyland, Tox Testing, and Paragon, submitted claims for payment and medical records relative to L.B. to Allstate through the U.S. Mail, upon which Allstate relied in adjusting the claims.

526.   Allstate is not required to pay Mercyland, Tox Testing, and Paragon for unnecessary testing and treatment that derived from illegal solicitation.

### 5.   Patient H.M. (Claim No. TXA-0186036)

527.   Patient H.M. was allegedly involved in a motor vehicle accident on May 15, 2017.

528.   H.M. testified that his car was towed from the scene of the alleged accident to Somerset Auto, although he had not called a tow truck.

529.   At Somerset Auto, H.M. was transported to Mercyland.

530. H.M. reported that his first three (3) visits at Mercyland were conducted by Sinha, and thereafter he was examined by Kimbrough.

531. Kimbrough ordered H.M. to undergo MRI imaging, which was performed at Scan Clear.

532. The bills submitted by Scan Clear claim that the MRI imaging was performed on July 1, 2017, but the radiology reports provided with the bills claim that the MRI imaging was performed on June 24, 2017.

533. All of the treatment and testing ordered by Mercyland was premised on false records, including false statements that H.M. had been improving with physical therapy despite no record that he underwent any such treatment.

534. The medically unnecessary examination, treatment, and testing prescribed by Mercyland and performed by Mercyland and Scan Clear was a direct result of the illegal solicitation by the defendants.

535. Mercyland and Scan Clear submitted claims for payment and medical records relative to H.M. to Allstate through the U.S. Mail, upon which Allstate relied in adjusting the claims.

536. Allstate is not required to pay Mercyland and Scan Clear for unnecessary treatment and testing that derived from illegal solicitation.

## IX.    UNREASONABLE AND UNNECESSARY MEDICAL TREATMENT

537.   The defendants' willingness to bill Allstate for services that were (1) never rendered and (2) not lawfully provided demonstrates their willingness to also bill for treatment that was unnecessary and unreasonable.

538.   Moreover, but for the defendants' illicit solicitation and payments of cash and other consideration to patients in exchange for treatment, as discussed *supra*, the patients at issue herein would not have sought treatment with or by the defendants.

539.   The defendants' goal in treating patients was to perform as much treatment as possible, regardless of whether such treatment was reasonably necessary to the patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills submitted to Allstate.

540.   As set out below, the defendants grossly overutilized physical therapy, P-Stim devices, MRI scans, urine drug testing, and medications in wanton disregard for standards of care.

541.   The defendants' treatment violated established standards of care in the medical community, as the vast majority of testing, diagnostics, referrals, and treatment were not indicated, redundant, excessive, and repeated without any objective documented benefit to patients.

542.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

543.   The unnecessary treatment rendered by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 11.

544.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for unnecessary, unlawful, and unreasonable treatment are fraudulent.

A.   PREDETERMINED TREATMENT PROTOCOL

545.   Allstate's investigation revealed a strikingly similar pattern of alleged diagnoses and treatment across all patients, including the discovery of a pattern by the defendants in (1) routinely recording substantially similar diagnoses regardless of each patient's reported injuries; (2) providing mirrored treatment plans further indicating that patients were subjected to a predetermined treatment protocol; and (3) failing to indicate short- and/or long-term goals for patients.

546.   Each patient was assessed as having extremely similar reports of complaints, objective findings, and assessments regardless of the type of accident and regardless of each patient's age, sex, and pre-accident condition.

### 1.   **Mercyland Predetermined Treatment Protocol**

547.   The records of Mercyland, Sinha, Pribil, and other physicians employed by Mercyland are remarkably similar in all relevant respects and nearly always used identical language that was pre-printed before a patient was even evaluated.

548.   For example, in the "objective" findings section of Mercyland office notes, nearly every patient who reported any degree of neck discomfort has a finding recorded of "midline tenderness associated with muscle spasm and stiffness with DROM."

549.   Similarly, nearly every patient of Mercyland who reported low back pain has a finding recorded of "positive muscle spasms, PVMs tenderness dROM."

550.   These are almost always the only "objective" findings contained in the Mercyland records when patients report neck or low back pain; there is rarely any indication that such findings were supported by any actual physical or orthopedic testing or evaluation.

551.   The inconsistent capitalization of the "D" in "DROM" and "dROM" is seen across multiple patient files, and is evidence that this alleged finding is copied

into Mercyland medical records without regard to any actual evaluation that may have been performed.

552.   The meaningless template findings of Mercyland are illustrated by the excerpts copied below, which were allegedly created by different physicians addressing different patients with a wide variety of injuries and conditions:

- Patient D.G. (Claim No. 0445715709) – record purportedly created by Quizon on February 14, 2017:

    Cx Spine: Skin is normal , tender PMVs, midline tenderness associated with muscle spasm and stiffness with DROM...
    Thoracic Back: Normal curvature, + muscle spasms, paraspinal and PVMs tenderness dROM..
    Lumbar Back: Normal curvature, + muscle spasms, paraspinal and PVMs tenderness dROM...
    Shoulder Pain; On inspection, Skin is [x] Normal [] Healed surgical scar, Fluids [] Notice [x] Not Notice on examination, Tenderness, Painful ROM...

- Patient J.B. (Claim No. 0412718918) – record purportedly created by Jankowski on December 18, 2017:

    Abdomen: Soft, no tenderness, no masses, BS normal... Thoracic Back: Normal curvature, + muscle spasms, paraspinal and PVMs tenderness dROM..
    Lumbar Back: Normal curvature, + muscle spasms, paraspinal and PVMs tenderness dROM...
    Shoulder Pain; On inspection, Skin is [x] Normal [] Healed surgical scar, Fluids [] Notice [x] Not Notice on examination, Tenderness, Painful ROM...

- Patient M.A. (Claim No. 0447933821) – record purportedly created by Kimbrough on March 18, 2017:

    Cx Spine: Skin is normal , tender PMVs, midline tenderness associated with muscle spasm and stiffness with DROM...
    Thoracic Back: Normal curvature, + muscle spasms, paraspinal and PVMs tenderness dROM..
    Lumbar Back: Normal curvature, + muscle spasms, paraspinal and PVMs tenderness dROM...

- Patient B.T. (Claim No. 0453484032) – record purportedly created by Shukr on August 10, 2017:

    Cx Spine: Skin is normal , tender PMVs, midline tenderness associated with muscle spasm and stiffness with DROM...
    Thoracic Back: Normal curvature, + muscle spasms, paraspinal and PVMs tenderness dROM..
    Lumbar Back: Normal curvature, + muscle spasms, paraspinal and PVMs tenderness dROM...

553.   Further illustrating the fact that the defendants' records were pre-printed and have no correlation to the actual complaints or evaluation of patients are

repeated references to patients claiming to have pain relieved by treatments that had

not yet occurred at the time of the evaluation.  For example:

- Patient M.C. (Claim No. 0424541365) was reported to have experienced specific percentages of relief from physical therapy at each examination purportedly performed at Mercyland, including forty percent (40%) relief claimed by Sinha at his initial evaluation, despite never actually undergoing any physical therapy treatment.

- Patient M.K. (Claim No. 0453333890) was reported to have experienced relief from physical therapy at eleven (11) separate examinations purportedly performed at Mercyland after she had ceased physical therapy treatment.

- Patient E.Y. (Claim No. 0440126950) was reported to experience relief with physical therapy at his initial evaluation purportedly performed by Sinha, despite never having undergone any such treatment.

- Patient J.W. (Claim No. 0423099091) was reported to have had a 70% reduction in pain with physical therapy at his initial evaluation purportedly performed by Sinha, but he had not actually attempted any such treatment.

554.   Each of the records containing the false representations cited above,

along with the corresponding bills seeking payment from Allstate, were submitted

to Allstate through interstate wires or the U.S. Mail, and Allstate relied on such

records in adjusting the claims of each patient.

555.   In addition to identical objective findings and subjective findings that

are completely unrelated to the actual complaints of patients, nearly every patient of

Mercyland received identical, nonspecific diagnoses of their alleged injuries,

including "cervicalgia," "pain in thoracic spine," "low back pain," and "pain" in various extremities and joints.

556.   Despite these boilerplate findings and diagnoses that are clearly pre-printed and so generic as to be rendered meaningless, Sinha and other Mercyland physicians almost invariably prescribed the same exact unnecessary and extensive treatment, including:

- Medications;
- Physical therapy three (3) times per week for four (4) weeks;
- Total disability from work for four (4) weeks;
- Replacement household services for four (4) weeks;
- Driving restriction for four (4) weeks;
- Application of P-Stim devices;
- MRIs; and
- Urine drug testing.

557.   To further illustrate the lack of individualization of treatment plans, the following representative patients all received prescriptions and restrictions identical to those listed above:

- B.T. (Claim No. 0453484032) – a 76-year-old male.

- J.W. (Claim No. 0423099091) – an 18-year-old male.

- D.P. (Claim No. 0438836835) – a 63-year-old female who had leg surgery less than a week prior.

- D.D. (Claim No. 0439360462) – a 27-year-old female who had already undergone eight (8) months of therapy in relation to her alleged motor vehicle accident before her initial evaluation at Mercyland.

558.    A key component of the defendants' protocol was to issue disability certificates, both to bolster the appearance of a legitimate claim and also as an incentive to keep patients treating with them.

559.    Because the defendants issued the same restrictions for every patient, regardless of their injury or status, such restrictions were rarely, if ever, appropriate. For example, the defendants issued the following restrictions:

- R.M. (Claim No. 0447864299) was issued a work restriction despite being retired.

- C.A. (Claim No. 0433138302) was issued work restrictions even after he reported that he had in fact returned to work.

- J.W. (Claim No. 0423099091) was issued work restrictions despite being 18-years-old and not giving any indication that he was employed at the time he was evaluated.

- J.H. (Claim No. FXP-038126) reported that she never discussed her ability to drive with any physician.  Mercyland nevertheless issued driving restrictions to allow its medical transportation associates to bring J.H. to and from appointments.  J.H. reported that she used the transportation on several occasions, but became annoyed when they were untimely and transported multiple other patients at the same time, and started driving herself to appointments instead.

560.    As set out further below, the predetermined treatment plans used by Mercyland resulted in a gross overutilization of physical therapy, medications, urine drug testing, and MRI scans in clear disregard for standards of care for almost every patient at issue herein.

561.  The vast majority of testing, diagnostics, referrals, and treatment were not indicated, redundant, excessive, and repeated without any benefit to the patient or influence on the predetermined course of treatment.

562.  The boilerplate and template medical records created by Sinha, Abraham, and Mercyland were used to prescribe and perform the medically unnecessary treatment and testing by Mercyland and its associates described throughout this Complaint, application of the medically useless acupuncture device P-Stim, urine drug testing, MRI imaging, prescription medications, injection therapy, and surgical procedures, each of which is discussed further below.

### 2.  Omega Rehab and Prime Rehabilitation Predetermined Treatment Protocol

563.  Nearly every patient of Mercyland was directed to undergo physical therapy three (3) times per week for four (4) weeks, at every appointment.

564.  Physicians at Mercyland almost never evaluated the efficacy of physical therapy, and rarely altered or discontinued their predetermined physical therapy prescriptions.

565.  The protocol prescription of physical therapy for nearly every patient was designed to, and did in fact, financially benefit associates of Angelo, Abraham, and Mercyland, including Omega Rehab, Prime Rehabilitation, and Ruefiel.

566.   In most cases, the physical therapy prescriptions signed by Mercyland physicians simply instructed the therapist to perform "Evaluation & Treatment," leaving the physical therapist to choose the physical therapy modalities to perform.

567.   Omega Rehab and Prime Rehabilitation allegedly performed initial evaluations of patients that always included the same vague statements of pain and limitation, and results of several purported physical tests.

568.   The tests that were most consistently recorded by Omega Rehab and Prime Rehabilitation were range of motion ("ROM") and motor muscle tests ("MMT"), the latter of which are scored using the Oxford Scale, as described on the chart below:

| Grade | Observation |
|---|---|
| 0 | No muscle contraction is detected. |
| 1 | A trace contraction is noted in the muscle by palpating the muscle while the patient attempts to contract it. |
| 2 | The patient is able to move the muscle when gravity is eliminated. |
| 3 | The patient may move the muscle against gravity but not against resistance from the examiner. |
| 4 | The patient may move the muscle group against some resistance from the examiner. |
| 5 | The patient moves the muscle group and overcomes the resistance of the examiner.  This is normal muscle strength. |

569.   The MMT scores reported by Omega Rehab and Prime Rehabilitation reflect patients who allegedly presented with crippling injuries, not the (at most) minor soft-tissue injuries that were reported by other physicians treating the patients and the patients themselves.

570.   Both the ROM and MMT results reported by Omega Rehab and Prime Rehabilitation include highly unlikely findings of the exact same diminishment of motion and strength across all body parts for nearly all patients.

571.   The purported findings recorded by Omega Rehab and Prime Rehabilitation were often contradicted by findings recorded by physicians who had made referrals for physical therapy treatment.

572.   For example, patient A.T. (Claim No. 0340049832) purportedly underwent an initial evaluation at Omega Rehab on September 9, 2014 and was noted to have "3" or "3-" muscle strength in all tests of her neck, shoulders, elbows, trunk, obliques, hips, and knees.

573.   Radden, the physician who referred A.T. to Omega Rehab, performed muscle strength testing on September 11, 2014, which was inexplicably two (2) days after A.T.'s initial evaluation at Omega Rehab despite Omega Rehab reporting that Radden had already made a referral as of September 9, 2014.

574.   Radden performed muscle strength testing and noted that it was "good" and "5/5" in all muscle groups.

575.   The significantly diminished muscle strength reported by Omega Rehab was used solely to create the appearance of necessity for the excessive course of physical therapy it performed on A.T.

576.   Most of the patients who were purportedly evaluated at Omega Rehab and Prime Rehabilitation were reported to have the exact same MMT results in each body part and across all planes of motion.

577.   For example, a family of six (6) patients (Claim No. 0410041271) who all claimed to be injured in the same accident, ranging in age from 20 to 58, and only two (2) of whom were actually evaluated by a physician prior to treatment, were each reported to have 3/5 muscle strength for all muscles tested in their necks, trunks, and obliques, and just one (1) of the patients was found to have any difference in muscle strength in a shoulder.

578.   Similarly, each of these six (6) patients purportedly had exactly 75% of normal ROM in all planes in their lumbar spines except H.D. and S.S., who allegedly had 60% of normal ROM with forward bending.

579.   These highly improbably examination results were used to justify the exact same excessive prescription for therapy for each patient, including therapeutic exercises, therapeutic activities, manual therapy, massage, electrical stimulation, ultrasound, and hot packs three (3) times per week for four (4) weeks.

580.   Omega Rehab and Prime Rehabilitation also attempted to justify the excessive amounts of treatment purportedly rendered by always documenting a several point decrease in pre- and post-treatment pain scores that was identical on every date of service.

581.   Alleged treatment at Omega Rehab and Prime Rehabilitation often continued far beyond the four (4) weeks noted in the patient's plan of care.  For example:

- Patient N.Q. (Claim No. 0379556342) allegedly had 83 treatment appointments over a period of seven (7) months.

- Patient A.S. (Claim No. 0382910719) allegedly had 135 treatment appointments over a period of more than eleven (11) months.

- Patient S.N. (Claim No. 0382398567) allegedly had 68 treatment appointments over a period of eight (8) months.

582.   Despite allegedly providing patients with physical therapy for extreme lengths of time, Ruefiel's clinics almost never conducted any type of re-evaluation of patients to confirm that the course of treatment was and remained effective.

583.   Omega Rehab has never billed Allstate for performing a patient re-evaluation, and Prime Rehabilitation has billed for re-evaluations of just four (4) patients at issue herein.  *See* Exhibits 8 and 9.

584.   The full extent and pattern of Ruefiel's, Omega Rehab's, and Prime Rehabilitation's misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of Omega Rehab and Prime Rehabilitation's pattern of predetermined overtreatment.

585.   Allstate is not required to compensate Ruefiel, Omega Rehab, and Prime Rehabilitation for treatment that was rendered based on a predetermined

treatment protocol that was not patient-specific, and therefore medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

### 3. **Specific Examples of the Defendants' Use of a Predetermined Treatment Protocol**

586. The defendants' use of boilerplate examination findings and a predetermined treatment protocol to order and perform medically unnecessary physical therapy, injections, P-Stim devices, urine drug testing, and other services is exemplified by the following representative patients.

### a. **Patient A.S. (Claim No. 0382910719)**

587. Patient A.S. was involved in an alleged motor vehicle accident on August 18, 2015.

588. On September 17, 2015, A.S. was purportedly evaluated by Radden, the physician who later became associated with Mercyland, and was prescribed a course of physical therapy to be performed at Omega Rehab.

589. On the same day, an evaluation was allegedly performed at Omega Rehab which reported that A.S. had the exact same 50% reduction in range-of-motion in all planes of movement in his cervical and lumbar spine, and 3/5 muscle strength in his neck, bilateral shoulders, trunk, and bilateral hips.

590. On the same date, Radden had found normal 5/5 strength in all muscle groups.

591.   Omega Rehab used its boilerplate findings, which were contradicted by the referring physician, to recommend a course of therapy including therapeutic exercises, manual therapy, electrical stimulation, ultrasound, hot pack application, and massage, to be performed two (2) to three (3) times per week for six (6) weeks.

592.   A.S.'s course of treatment actually lasted for 135 separate dates of service.

593.   Omega Rehab also claimed to provide medical transportation to A.S. to his physical therapy appointments even though Radden had not restricted A.S. from driving.

594.   Each transportation log submitted by Omega Rehab relative to A.S. indicated that he was present at the Omega Rehab clinic for exactly one (1) hour.

595.   A.S. confirmed through testimony that his appointments lasted for one (1) hour.

596.   Nevertheless, Omega Rehab routinely submitted records and charges that claim to have performed more than one (1) hour of treatment to A.S.

597.   Further, Omega Rehab claims to have performed therapeutic exercises at all but one (1) of A.S.'s appointments, but A.S. reported to Allstate that such exercise was not performed at every visit.

598.   Omega Rehab never submitted a charge for re-evaluation of the extensive course of treatment prescribed to A.S.

599.   All of the treatment performed by Omega Rehab was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient A.S.

600.   Omega Rehab submitted claims for payment and accompanying medical records relative to A.S. to Allstate through the U.S. Mail for unreasonable and unnecessary treatment rendered pursuant to a predetermined protocol, and Allstate relied upon the same in adjusting the claims.

601.   Allstate is not required to pay Omega Rehab for the fraudulent, unnecessary, and unreasonable treatment rendered to A.S.

**b.     Patient D.M. (Claim No. TXA-0155563)**

602.   Patient D.M. was involved in an alleged motor vehicle accident on August 26, 2015.

603.   D.M. began treatment at Orthopedic, P.C., the pain management clinic that preceded Mercyland in the 16100 building, on November 25, 2015, and transferred his care to defendant Sinha at Mercyland on November 3, 2016.

604.   Between November 25, 2015 and November 17, 2017, Tox Testing and Paragon submitted claims for testing performed on D.M.'s urine specimens on at least thirty (30) separate dates of service.

605.   Twenty (20) of the urine drug tests performed were ordered by physicians at Mercyland, including defendants Sinha and Pribil.

606. On several occasions, urine drug testing ordered by Mercyland physicians was performed just one (1) week after a prior identical test.

607. The total amount billed by Tox Testing and Paragon for this excessive and unnecessary purported drug testing exceeds $141,514.

608. As discussed further below, it is never medically necessary to perform urine drug testing at the frequency prescribed by Mercyland and performed by Tox Testing and Paragon.

609. Throughout the period of time that Mercyland was ordering, and Tox Testing and Paragon were allegedly performing, these medically unnecessary urine drug tests, D.M. was prescribed with opioid pain medications.

610. However, D.M.'s urine specimens repeatedly tested negative for the dangerous narcotic drugs he was prescribed.

611. The results of the urine drug tests performed were never used by Mercyland to alter the medications prescribed to D.M.

612. Thus, all of the urine drug testing ordered by Mercyland and billed by Tox Testing and Paragon relative to D.M. was based on a predetermined protocol that did not have any clinical utility.

613. Mercyland, Tox Testing, and Paragon submitted claims for payment and accompanying medical records relative to D.M. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing rendered

pursuant to a predetermined protocol, and Allstate relied upon the same in adjusting the claims.

614. Allstate is not required to pay Mercyland, Tox Testing, and Paragon for the fraudulent, unnecessary, and unreasonable treatment and testing rendered to D.M., and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

### c. Patient R.A. (Claim No. 0450357958)

615. Patient R.A. was allegedly involved in a motor vehicle accident on March 14, 2017.

616. R.A. presented to Mercyland on May 9, 2017 and was purportedly evaluated by Kimbrough, who noted that R.A. had undergone MRIs at a hospital previously and proceeded to order Mercyland's predetermined protocol of restrictions, physical therapy, urine drug testing, and medications.

617. Kimbrough did not note that R.A. had any comorbidities, although R.A. did in fact suffer from diabetic polyneuropathy, which is clearly relevant to evaluating whether pain complaints were related to the alleged motor vehicle accident.

618. As with many other patients at issue herein, Kimbrough inexplicably ordered a series of blood tests that had nothing to do with the evaluation or treatment of R.A. for the soft tissue injuries diagnosed.

619.   The blood testing revealed a glucose level of 529, five (5) times higher than the normal range of 70-105.

620.   Neither Kimbrough nor any other Mercyland physician made mention of this dangerous finding and it had no influence on the treatment she prescribed to R.A.

621.   R.A. returned to Mercyland on June 10, 2017 and reported that her pain had decreased from 8/10 to 5/10 in her neck, and 8/10 to 4/10 in her thoracic and lumbar spine.

622.   Despite the clear improvement with conservative therapy, Kimbrough ordered full spine MRIs to be performed at Scan Clear.

623.   Kimbrough ordered these MRIs despite her awareness that MRIs had already been conducted, which she made no effort to obtain.

624.   The MRIs were ordered solely to permit Scan Clear to submit claims to Allstate, which it did in the amount of $11,250.

625.   In addition to the medically unnecessary MRIs ordered by Mercyland and performed by Scan Clear, bills for medically unnecessary urine drug testing were submitted by Tox Testing and Paragon for at least seven (7) separate dates of service, all of which involved billing for procedures that were not actually performed, as discussed *supra*.

626.   Mercyland's unnecessary protocol orders also resulted in bills totaling $18,427 submitted by Livonia Care for unnecessary compounded cream medication and $9,763 for other unnecessary medications from Meds Direct.

627.   All of the treatment and testing ordered by Mercyland and performed by Mercyland, Tox Testing, Paragon, Scan Clear, Meds Direct, and Livonia Care relative to R.A. was based on a predetermined protocol that did not have any relation to the individual needs of patient R.A.

628.   Mercyland, Tox Testing, Paragon, Scan Clear, Meds Direct, and Livonia Care submitted claims for payment and accompanying medical records relative to R.A. to Allstate through the U.S. Mail for unreasonable and unnecessary treatment and testing rendered pursuant to a predetermined protocol, and Allstate relied upon the same in adjusting the claims.

629.   Allstate is not required to pay Mercyland, Tox Testing, Paragon, Scan Clear, Meds Direct, and Livonia Care for the fraudulent, unnecessary, and unreasonable treatment and testing rendered to R.A., and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

### d.   Patient J.K. (Claim No. 0460991185)

630.   Patient J.K. was involved in an alleged motor vehicle accident on June 19, 2017.

631.   J.K. presented to a hospital emergency room and was diagnosed with a left wrist fracture and directed to follow up with an orthopedic surgeon.

632.   Instead, J.K., at the alleged direction of a "cousin," presented to Mercyland for evaluation on June 22, 2017.

633.   J.K. was allegedly examined by Mercyland physician Shukr, who diagnosed "pain in left wrist" and prescribed the normal Mercyland predetermined treatment protocol of physical therapy, urine drug testing, MRIs, and five (5) separate medications.

634.   The MRIs ordered by Shukr were of J.K.'s cervical spine, lumbar spine, brain, and right knee, but not his fractured wrist.

635.   The urine drug testing ordered by Shukr was purportedly performed by Tox Testing and Paragon; the MRIs ordered by Shukr were purportedly performed by Scan Clear.

636.   Because Mercyland's predetermined treatment protocol is designed to generate claims and not to provide actual individualized patient treatment, J.K.'s fractured wrist remained untreated.

637.   On July 13, 2017, J.K. required open surgery to repair the fractures in his left wrist that had been ignored by Mercyland, despite having been clearly diagnosed.

638.   J.K. returned to Mercyland on August 18, 2017 and was purportedly evaluated by Kimbrough, who failed to make note of the surgical repair.

639.   Instead, Kimbrough re-prescribed the Mercyland predetermined protocol designed only to generate insurance claims, including an order for physical therapy without evaluation as to whether such treatment was contraindicated by J.K.'s recent surgical procedure.

640.   Kimbrough also prescribed J.K. with opioid pain medications despite J.K. receiving similar opioid medications from his surgeon.

641.   Kimbrough also ordered the application of a clinically useless P-Stim device, which J.K. reported was applied in an office by a male, and not in an operating room by Kimbrough (a female) as represented by Mercyland's records.

642.   Mercyland's   unnecessary   predetermined   protocol,   including unnecessary P-Stim device application, was re-prescribed a third time by Shukr on September 21, 2017.

643.   All of the evaluations, treatment, and testing ordered by Mercyland and performed by Mercyland, Tox Testing, Paragon, and Scan Clear relative to J.K. was based on a predetermined protocol that did not have any relation to the individual needs of patient J.K.

644.   Mercyland, Tox Testing, Paragon, Scan Clear, and Block Billing submitted claims for payment and accompanying medical records relative to J.K. to

Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing rendered pursuant to a predetermined protocol, and Allstate relied upon the same in adjusting the claims.

645. Allstate is not required to pay Mercyland, Tox Testing, Paragon, Scan Clear, and Block Billing for the fraudulent, unnecessary, and unreasonable treatment and testing rendered to J.K., and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

### B. UNNECESSARY AND EXCESSIVE APPLICATION OF USELESS P-STIM DEVICES

646. The defendants' scheme included repeated applications of the clinically worthless P-Stim device to patients without any clinical indications or signs of improvement from treatment.

647. Sinha, Abraham, Angelo, and Mercyland routinely pressured patients into receiving useless P-Stims at their very first evaluation, and continued to do so throughout treatment.

648. As noted above, Abraham, Angelo, Sinha, and Mercyland pressured patients into receiving P-Stims by the promise of a $100 bonus for each P-Stim applied.

649. Patient Q.C. (Claim No. TXA-0190398) testified that Mercyland "forced" him to agree to application of a P-Stim device, and that he removed it as

soon as he left the clinic at the direction of Dehko, who had solicited him to obtain the treatment.

650.   Dehko told Q.C. that the P-Stims were "basically just to get money."

651.   Patient J.W. (Claim No. 0423099091) reported that defendant Sinha lied to him about the use of the P-Stim device and told him it was a monitor.

652.   When J.W. attempted to return the P-Stim to Sinha, she refused to take it and J.W. removed the device in the parking lot.

653.   Angelo has directed the use of P-Stims at clinics he controls, including Mercyland, since at least April of 2011, at which point he informed his physician associates that he had negotiated a deal to obtain P-Stim devices at wholesale rates.

654.   Each of the pain management facilities in Angelo's 16100 building has heavily promoted the use of P-Stims in order to maximize the amount of charges submitted to Allstate.

655.   Angelo has testified that he purchases P-Stim devices for approximately $175 per device.

656.   Mercyland submitted charges of at least $3,975 for each P-Stim device applied to patients at issue herein, and Angelo's Greater Lakes facility and Block Billing frequently submitted charges of several times that amount in connection with the same device application.

657.   The use of P-Stim by Angelo, Abraham, Sinha, and Mercyland is designed solely to increase the amount of charges submitted to Allstate as there is no acknowledged therapeutic benefit for the use of the devices in this context.

### 1.   P-Stim Is Not Generally Accepted by the Medical Community

658.   As an initial matter, P-Stim is not an accepted treatment in the medical community.

659.   The P-Stim device is a miniaturized, battery-powered, transcutaneous electrical nerve stimulator with pre-programmed frequency, pulse, and duration for the stimulation of auricular acupuncture points.

660.   The P-Stim device provides a form of acupuncture combined with electrical stimulation where all of the acupuncture points are located behind a patient's ear.

661.   The P-Stim device is held behind the patient's ear by an adhesive dressing.

662.   The P-Stim device connects via three (3) stainless steel wires to acupuncture needles applied to three (3) points behind a patient's ear, as illustrated by the photograph below:



663.    The P-Stim operates until its battery runs out of power, typically three (3) days after application, at which point patients remove the device themselves and throw it away.

664.    P-Stim treatment has not been shown to be beneficial or more beneficial than traditional forms of treatment modalities.

665.    P-Stim is not considered reimbursable by the Centers for Medicare & Medicaid Services ("CMS") under any Medicare Benefit Category.

666.    The majority of the patients at issue herein received P-Stim devices manufactured by a company called ANSi.

667.    The device sold by ANSi has only been reviewed by the FDA through its "Premarket Notification" 510(k) review program.

668.    Under the 510(k) program, a device manufacturer submits a premarket notification submission to the FDA at least 90 days before a device is introduced into interstate commerce for commercial distribution.  21 U.S.C. § 360(k).

669.   The FDA determines whether devices meet the criteria for market clearance within ninety (90) days, on the basis of whether the device is "substantially equivalent" to a legally marketed "predicate" device.  21 U.S.C. §§ 360(n), 360c(i).

670.   ANSi was compared to a predicate device called the Acu-Stim.

671.   The FDA's determinations were not based on any clinical or scientific data submitted in relation to the P-Stim device.

672.   Further, the FDA's 510(k) determination in relation to Acu-Stim makes clear that the P-Stim's predicate device was not reviewed for treatment of pain at all. *See* Exhibit 17.

673.   Instead, the "Acu-Stim" identified by the FDA as a predicate device to the P-Stim is in fact the "Acuslim" electro-acupuncture device, which is intended for weight loss.  Id.

674.   Angelo, Abraham, Sinha, and Mercyland applied P-Stim devices to the patients at issue herein despite a dearth of reputable studies supporting the use of P-Stim solely as a means to increase the amounts charged to Allstate.

### 2.   Unnecessary Use of Surgical Centers

675.   As discussed above, P-Stim devices are designed and approved for use only as an acupuncture treatment.

676. The FDA approval documents for the devices by Mercyland state that each device is approved "for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states." *See* Exhibit 17.

677. In other words, the FDA has determined that P-Stim devices can be safely applied by individuals who have no surgical training whatsoever.

678. Former Greater Lakes medical director Sam Hakki ("Hakki") testified:

"[I]t has a sharp end and you put it on the skin and it's – it sits on the skin itself, and we put a tape on it and sometimes it pierces the skin. Sometimes patient gets excited, they sleep on, sometimes it goes to the subcutaneous and sometimes it goes even deeper and they have a drop or two of blood with it . . . ."

679. In other words, Hakki testified that the most serious complication during application of a P-Stim device is merely a drop or two of blood.

680. In fact, Hakki has never even seen this "complication" arise, stating "[o]f the two years [using P-Stim], I haven't seen of my patient [sic]. . . ."

681. Hakki agreed that the risk of P-Stim application is minimal, and is "about the same" as getting ears pierced.

682. Mercyland physician Bitkowski has also testified that the "main risks" of the P-Stim procedure are "local adhesive irritation to the skin, numbness to the side of the face where the device is applied."

683.   In a year and a half of applying P-Stim devices, Bitkowski testified he had encountered complications only twice, each time involving "[s]kin irritation from the adhesive dressing."

684.   Defendant Sinha, discussing the unreasonable amount charged by the defendants, specifically testified that P-Stim application is not a surgical procedure:

> Michael [Angelo] was charging $15,000.  I could not believe it . . . there's no way you can charge $15,000 for a procedure that takes about a half hour to do, and it does not involve any anesthetic or any surgical procedure.

685.   The manufacturer of ANSi devices has represented to CMS that "[t]he device is best suited to be used in a physician's office" and that the "device can be placed on the patient in a patient's home."  *See* Exhibit 18.

686.   A routine shot administered in a physician's office penetrates a patient's skin further than a P-Stim device.

687.   P-Stim application is also less intrusive than regular blood sugar tests and insulin injections performed at home and without supervision by millions of diabetic patients every day.

688.   In fact, despite Mercyland referring to the individual who applies P-Stim devices as a "surgeon" in its records, many of the P-Stims applied to Mercyland patients at issue herein were actually applied by a nurse practitioner.

689.   Mercyland's practice of having nurse practitioners apply P-Stim devices confirms that it is a minor and non-invasive procedure for which there is no

justification for performing in surgical suites or for charging the exorbitant rates submitted to Allstate by Mercyland.

690.   In all cases, patients are instructed to remove the P-stim devices on their own and do not need the direction or supervision of any medical professional to do so.

691.   Patient Q.C. (Claim No. TXA0190398) testified that it took just four (4) minutes for his P-Stim device to be applied.

692.   Despite the minor, non-surgical nature of P-Stim device application, Mercyland invariably reported that it used surgical facilities at Greater Lakes to apply these acupuncture devices.

693.   The surgical suites at Greater Lakes were used by the defendants to provide the opportunity for Greater Lakes to submit additional facility fee charges, which were frequently submitted to Allstate by defendant Block Billing as an attempted end-run of Greater Lakes's prohibition on billing Allstate.

694.   The unnecessary application of P-Stim devices in surgical suites was also designed to make P-Stim appear as a much more serious medical procedure than the acupuncture device that it actually is.

695.   This manufactured appearance of a serious medical procedure rather than the simple device application it is led to Angelo, Abraham, Sinha, and Mercyland routinely submitting charges of $3,975 for a single P-Stim application.

696.   Similar unreasonable and grossly excessive charges are present with respect to each of the patients at issue herein who received P-Stim devices from the defendants.  *See* Exhibits 1 and 11.

### C.   UNNECESSARY AND EXCESSIVE URINE DRUG TESTING

697.   Tox Testing and Paragon billed Allstate for a litany of urine drug testing that was not actually performed; was medically unnecessary, unreasonable, excessive; and was not performed in accordance with established standards of care for urine drug testing.

698.   Sinha, Pribil, and Mercyland routinely ordered, and Tox Testing and Paragon routinely billed for, testing for dozens of substances for the same patient on a regular schedule, often within just days or weeks of each other, which violates the standard of care for urine drug testing.

### 1.   **Medically Unnecessary Urine Drug Test Orders**

699.   Sinha, Pribil, and other Mercyland physicians ordered definitive urine drug testing to be performed for every patient at issue in this Complaint who was allegedly evaluated or treated by Mercyland.

700.   Sinha confirmed this policy in testimony:

Q:   Is lab testing done as a matter of routine on all patients?

A:   All the patients, yes.

Q:   Is it done whether or not you're going to order medication?

118

A:      Yes it is done.

701.   Each urine drug test referral made by Sinha, Pribil, and other Mercyland physicians was to defendants Tox Testing and Paragon.

702.   Urine drug testing was ordered by the defendants as a matter of course and without regard to medical necessity.

703.   The use of urine drug testing as a means to generate claims rather than render care to patients is reflected by the defendants' practice of submitting charges for such testing before it is even performed.

704.   Urine drug test orders by Sinha, Pribil, and Mercyland resulted in both presumptive/qualitative screens and definitive/quantitative laboratory tests, although it was never clear that physicians intended both types of testing to be performed.

705.   Tox Testing and Paragon laboratory manager Askar confirmed in testimony that Mercyland has a "standing order authorization" to perform both screening and confirmation testing on all specimens obtained from every patient of the clinic.

706.   It is almost never proper to order both a screening test and a confirming laboratory test at the same time.

707.   Instead, the standard of care for urine drug testing first directs that screening be performed to detect the presence or absence of substances.

708.   Only when screening shows unexpected results, such as the presence of an illicit drug or a medication that was not prescribed, should confirmatory testing be performed.

709.   This standard is documented by the Substance Abuse and Mental Health Services Administration (SAMHSA), a federal agency within the Department of Health and Human Services that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation is not always necessary. Clinical correlation is appropriate . . . .  In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test.  However, if the patient disputes the unexpected findings, a confirmatory test should be done" (emphasis added).

710.   Thus, SAMHSA confirms that, at most, only unexpected initial screening results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

711.   The level of confirmation Sinha, Pribil, and Mercyland ordered, and Tox Testing allegedly performed (including through its contracts with other laboratories), on the specimens of patients undergoing pain management treatment after involvement in predominately low-level motor vehicle accidents significantly

exceeded the level of confirmation required by the Nuclear Regulatory Commission's policy on drug testing confirmation.

712.   Persons authorized to operate a nuclear power reactor under the scope of the Nuclear Regulatory Commission ("NRC") are required to submit to drug and alcohol testing as part of their continued duties.  10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

713.   The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested."  10 C.F.R. § 26.31(d)(3).

714.   The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory testing."  10 C.F.R. § 26.5.

715.   Thus, the NRC does not require that confirmatory testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

716.   In comparison, Sinha, Pribil, and Mercyland ordered, and Tox Testing caused to be performed, unnecessary confirmatory testing for almost every patient at issue herein, all of which involve patients purportedly injured in low-level motor vehicle accidents and none of whom are known to maintain and/or operate nuclear power reactors.

717.   The automatic ordering of definitive urine drug testing for nearly every patient at nearly every appointment illustrates the lack of consideration of individual medical necessity for such testing.

718.   In fact, the defendants routinely ordered and performed urine drug tests on patients even when the patient was not prescribed any medications, which has no medical basis, as exemplified by the following patients:

- Patient J.E. (Claim No. 0435944129) was allegedly evaluated at Mercyland by defendant Sinha on November 16, 2016.  Sinha reported that she was unable to prescribe narcotics because J.E. was breastfeeding an infant at the time.  Sinha nevertheless ordered extensive urine drug testing to be performed by Tox Testing and Paragon, all of which was medically unnecessary and could not have been used to guide the non-existent prescription medication treatment of J.E.  Paragon submitted a charge of $3,796 for an alleged qualitative/presumptive screen and Tox Testing submitted charges totaling $1,636.51 for alleged tests for nine (9) different drugs/analytes and tests for specimen validity.   Of the drugs/analytes that Tox Testing claims to have tested, only two (2) – cocaine and opiates – appear on the laboratory report.  The same unnecessary testing was ordered by Sinha, and performed by Tox Testing and Paragon (to the extent it was performed at all), on December 16, 2016, January 12, 2017, and February 9, 2017.  Tox Testing and Paragon submitted the bills and records relative to this purported testing through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.  Allstate has no obligation to pay for urine drug testing that was medically unnecessary.

- Patient J.B. (Claim No. 0412718918) was allegedly evaluated at Mercyland on February 15, 2017 and purportedly provided a urine specimen that was sent to Tox Testing and Paragon.  J.B. was not prescribed any medications on February 15, 2017.  Moreover, J.B. had at least five (5) urine specimens allegedly tested by Tox Testing and Paragon over the previous seven (7) months, including one just two (2) weeks prior on January 31, 2017.  Mercyland nevertheless ordered urine drug testing to be performed, and Paragon submitted a charge of $3,796 for an alleged qualitative/presumptive screen and Tox Testing submitted charges totaling $1,575.15 for alleged tests for nine (9) different drugs/analytes and tests for specimen validity.   Of the

drugs/analytes that Tox Testing claims to have tested, only two (2) – cocaine and opiates – appear on the laboratory report.  There was no medical basis to perform any urine drug testing on J.B. just two (2) weeks after prior testing, and without any medications being prescribed at all.  Tox Testing and Paragon submitted the bills and records relative to this purported testing through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.  Allstate has no obligation to pay for urine drug testing that was medically unnecessary.

- Patient D.C. (Claim No. 0461245755) was allegedly evaluated at Mercyland on October 17, 2017 and purportedly provided a urine specimen that was sent to Tox Testing and Paragon.  The record from Mercyland states "no medication given at this time."  Elsewhere, the record from Mercyland states that the patient was given several over-the-counter medications that are apparently used to treat side-effects of prescription drugs, including Pepcid and Colace.  Regardless of this contradiction, D.C. was not prescribed any controlled substances on October 17, 2017 that would justify the performance of urine drug testing.  Paragon nevertheless submitted a charge of $3,796 for an alleged qualitative/presumptive screen and Tox Testing submitted charges totaling $1,575.15 for alleged tests for nine (9) different drugs/analytes and tests for specimen validity.   Of the drugs/analytes that Tox Testing claims to have tested, only two (2) – cocaine and opiates – appear on the laboratory report.  There was no basis to perform any urine drug testing on D.C.  Tox Testing and Paragon submitted the bills and records relative to this purported testing through the U.S. Mail, and Allstate relied upon the same in adjusting the claims.  Allstate has no obligation to pay for urine drug testing that was medically unnecessary.

719.   The defendants also routinely re-ordered and re-performed definitive urine drug testing at every patient evaluation despite the lack of any unexpected test results or change in medication prescribed.

720.   Even on the rare occasion that a patient's urine drug test revealed an unexpected result, Mercyland did not use the results to make any change to further prescription of medications.

721.   For example, patient C.A. (Claim No. 0433138302) was prescribed Norco at appointments at Mercyland on October 6, 2016, November 7, 2016, December 10, 2016, and January 7, 2017.

722.   At each appointment, C.A. purportedly provided a urine specimen that was sent to Tox Testing and Paragon.

723.   Each urine specimen provided by C.A. on the dates listed above tested negative for all opiates, including hydrocodone, which is the opiate used in the Norco C.A. was prescribed at each appointment.

724.   Each of C.A.'s appointments at Mercyland was allegedly conducted by Sinha, who never mentioned that he was testing negative for the narcotic pain medication that she was repeatedly prescribing.

725.   The lack of change of prescriptions to C.A. upon receipt of evidence that he was potentially diverting his medication confirms that the results of the urine drug testing ordered by Mercyland and allegedly performed by Tox Testing and Paragon had no effect on patient treatment plans.

726.   Tests that have no bearing on patient treatment are clinically useless and not medically necessary, and are therefore not compensable under the No-Fault Act.

727.   Mercyland nevertheless ordered urine drug testing at every patient appointment, because it permitted to Tox Testing and Paragon to submit charges to Allstate exceeding thousands of dollars on each occasion.

### 2. Medically Unnecessary Urine Drug Testing Billed by Tox Testing and Paragon

728.   Tox Testing and Paragon knew that the urine drug testing ordered by Sinha, Pribil, Mercyland, Angelo, and Abraham was medically unnecessary, but they nevertheless performed testing so that they could submit charges to Allstate.

729.   As discussed above, the testing that was actually performed (or contracted out) by Tox Testing and Paragon was far less extensive than the testing they represented to have performed on the charges submitted to Allstate.

730.   Billing for services that are not medically necessary for each patient's care, recovery, or rehabilitation is prohibited under the Michigan No-Fault Act.

731.   Allstate reasonably relied on Tox Testing and Paragon's bills to contain truthful and accurate representations regarding the urine drug testing allegedly performed and the necessity for the same.

732.   Abusive laboratory practices, including non-patient-specific testing and the use of pre-printed forms that encourage excessive testing, have been condemned by authorities.

733.   Although all of the non-patient-specific tests for which Tox Testing and Paragon submitted bills were improper, Tox Testing's routine submission of bills for pregnancy tests is particularly egregious.

734.   Tox Testing has submitted charges to Allstate claiming to have performed pregnancy tests on urine specimens supplied by:

- Patient E.Y. (Claim No. 0440126950), a 32-year old male;

- Patient R.M. (Claim No. 0447864299), a 61-year old male;

- Patient R.A. (Claim No. 0450357958), a 58-year old female;

- Patient E.A. (Claim No. 0498721869), a 77-year old female;

- Patient D.P. (Claim No. 0438836835), a 63-year old female.

735.   The federal government has expressly stated that it holds laboratories responsible for unnecessary testing and does not allow laboratories to blame excessive urine drug testing on the referring provider.  63 Fed. Reg. 45080 (Aug. 24, 1998).Further, the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill."

736.   The defendants rarely submit copies of requisition forms to Allstate, but to the extent such forms are used by Mercyland at all, they are meaningless.

737.   At a clinic inspection performed by Allstate, representatives of Mercyland and Tox Testing explicitly admitted that urine specimens collected at Mercyland are subjected to a predetermined battery of tests, regardless of the circumstances of individual patients.

738.   Use of such a predetermined slate of tests is necessarily not patient-specific as the drugs/analytes to be tested are established prior to the patient's urine drug testing referral.

739.   By way of example, phencyclidine (PCP) was routinely billed to Allstate by Tox Testing without the referring provider indicating the medical necessity of testing for such an illicit substance that has not been commonly used in decades.

740.   Tox Testing's use of predetermined testing violates established standards of practice that demand that only medically necessary urine drug testing be performed, as decided on a patient-by-patient and visit-by-visit basis by a licensed healthcare professional.

741.   Moreover, and as discussed above, Tox Testing submits bills for testing the same drugs/analytes for each urine specimen, regardless of which tests are actually performed by the laboratories with which it contracts.

742.   By testing for the same exact substances for each patient, regardless of age, medications prescribed, comorbidities, or other factors, Tox Testing and

Paragon knowingly submitted claims that could not have been medically necessary for each patient's clinic condition.

743.   It is the responsibility of Tox Testing and Paragon to assure that they are performing only tests that are reasonable and medically necessary.

744.   Tox Testing and Paragon laboratory manager Askar has testified that neither entity makes any effort to review orders for medical necessity.

745.   The OIG also guides that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable, and necessary for the beneficiary, given his or her clinical condition." *See* 63 Fed. Reg. at 45079.

746.   Instead of taking steps to ensure that they were only submitting claims for necessary urine drug testing, Tox Testing and Paragon (by and through their owners and managers, including Angelo) intentionally worked to increase the number of medically unnecessary tests referred by physicians and billed to payors like Allstate.

747.   Further, even if a requisition form was provided to Tox Testing by Mercyland, there is no indication that Tox Testing forwarded the same to the laboratories that actually performed the testing.

748. The laboratory reports created by the facilities to which Tox Testing sent urine specimens rarely, if ever, accurately listed the medications that were prescribed to the patients whose urine specimens they tested.

749. Instead, the laboratory reports nearly always assumed that the patients were not prescribed any medications at all, since Tox Testing failed to provide any patient information along with the urine specimens.

750. In other words, the urine specimens collected by Mercyland were tested by laboratories that had no information regarding the medications that were prescribed or whether any medications were prescribed at all.

751. None of the records submitted to Allstate by Mercyland, Tox Testing, or Paragon contain any indication that the Mercyland physicians ordering urine drug tests made any determination as to what type of testing should be performed or what substances should be tested for.

752. No physician or testing facility can properly make a blanket determination across all patients and all dates of service as to what constitutes reasonable definitive urine drug testing in all cases.

753. Instead, the individual provider must determine the reasonableness and necessity of urine drug testing on a patient-by-patient and visit-by-visit basis.

754. Tox Testing and Paragon performed, and caused to be performed, all of the urine drug tests at issue herein without such determination.

755.   Moreover, despite the standard of care for clinical laboratories like Tox Testing and Paragon that expected screening results do not need to be confirmed, the defendants nonetheless billed Allstate for confirmatory testing of expected screening results.

756.   As discussed above, in clinical urine drug testing, confirmatory testing is not always done and certainly should not be done automatically.

757.   Absent extenuating circumstances (as found and documented by the treating provider), confirmatory testing by any methodology is not necessary where the screening test indicates that a drug is not present in the patient's urine (i.e., the test is negative).

758.   In rare instances dependent on the individual patient's clinical situation, confirmatory drug testing may be medically necessary when the results of the screening test are presumptively positive or when the results of the screening test are negative and the negative finding is inconsistent with the patient's medical history.

759.   However,   for   confirmatory   testing   on   a   negative presumptive/qualitative test to be appropriate, the referring provider, and not the testing laboratory, must determine if confirmatory testing is necessary after taking into consideration all known facts at the time the specimen is collected.

760.   Tox Testing used excessive and unjustifiable confirmatory testing to confirm the absence of a drug that was clearly reported as "negative," or not present, in point-of-care screens performed by the treating provider.

761.   For all of these reasons, the procedures developed and used by Tox Testing and Paragon facilitated and encouraged excessive and unnecessary urine drug testing.

762.   Allstate is not required to reimburse Tox Testing and Paragon for urine drug testing that is not patient-specific and that is unnecessary.

763.   Allstate is entitled to a return of monies it paid to Tox Testing and Paragon for these medically unnecessary urine drug tests.

### 3.   <u>Medically Unnecessary Blood Tests</u>

764.   Angelo, Abraham, Sinha, and Mercyland also inexplicably ordered, and Tox Testing and Paragon allegedly performed, routine blood tests of patient at issue herein.

765.   Askar testified that Mercyland's standard order includes multiple blood test panels as a matter of course.

766.   Blood tests performed on patients at issue herein include (1) comprehensive metabolic panels, (2) lipid panels, (3) complete blood counts, (4) glycosylated hemoglobin, and (5) thyroid stimulating hormone.

767.   None of these tests are reasonable to perform as a matter of course while treating patients who allegedly sustained (at most) minor injuries in motor vehicle accidents.

768.   For example, CMS National Coverage Determination (NCD) 190.23 addresses proper indications for performance of lipid panels, which include evaluation for conditions such as atherosclerotic cardiovascular disease, pancreatitis, and gastrointestinal disorders, but does not include any approved indication that is related to the types of injuries sustained in motor vehicle accidents, much less the low-impact motor vehicle accidents at issue herein.

769.   Even if a unique, patient-specific situation called for performance of blood tests that would otherwise be unnecessary for the treatment of a soft-tissue injury, the rationale for such testing must be discussed and explained in the medical record, which was never done by Mercyland.

770.   Moreover, the results of the blood tests were ignored and meaningless to the treatment and prescriptions written by the defendants.

771.   Allstate is under no obligation to pay for any of the blood tests allegedly performed by Tox Testing and Paragon as they were medically unnecessary, if performed at all, and were not used to inform the treatment of patients.

### D.    EXCESSIVE AND UNNECESSARY USE OF PRESCRIPTION MEDICATION

772.    Angelo, Abraham, Sinha, and Mercyland further violated established standards of care by aggressively prescribing medications, including narcotics, following the initial examination of the patients at issue in this Complaint.

773.    Nearly every patient at issue herein was prescribed the same drugs at their initial appointment at Mercyland, which were re-filled at nearly every appointment thereafter, including: (1) a narcotic pain medication; (2) a muscle relaxer; (3) an anti-inflammatory; (4) a pain relieving patch or gel; (5) an antacid; (6) a stool softener/laxative; and (7) vitamins.

774.    The defendants then pressured patients to have these excessive prescriptions filled by defendant Meds Direct, which dispensed identical medications to each patient in pre-packaged brown bags.

775.    As discussed further below, Meds Direct generally filled each prescription with generic medications that cost very little to acquire, and charged Allstate hundreds of times more than other retail pharmacies.

### 1. Reckless Prescriptions for Narcotics

776.    Former Greater Lakes medical director Hakki, who moved to Michigan from Florida and immediately began working for Angelo, testified "I notice [sic] since I came to Michigan, people use narcotics like chewing gum."

777.   At least one patient of defendant Sinha, R.H. (Claim No. 0150229401), testified that his physicians used the promise of prescription drugs to pressure him to undergo additional treatment.

778.   Specifically, R.H. stated that he was informed that he would be required to undergo an epidural steroid injection to continue receiving his medications.

779.   The medications used to lure R.H. for medically unnecessary treatments were dispensed by defendant Meds Direct.

780.   The urine drug testing purportedly performed on urine specimens provided by R.H. was billed by defendant Tox Testing.

781.   As discussed above, defendant Sinha was named as a defendant in an administrative complaint filed by the Michigan Board of Medicine regarding her reckless use of prescription medications, including dangerous and addictive narcotics.

782.   Mercyland physician Kimbrough pleaded guilty in November 2017 to healthcare fraud charges involving her writing prescriptions for excessive amounts of dangerous drugs.

783.   Mercyland physician Jankowski is currently awaiting trial on felony healthcare fraud charges that involve his writing prescriptions for excessive amounts of dangerous narcotics.

784. The other physicians at Mercyland who treated patients at issue in this Complaint prescribed narcotic medications to patients of the defendant clinics with at least the same frequency as Sinha, Kimbrough, and Jankowski.

785. The standard predetermined treatment protocol used by Mercyland included prescription of medications, reflecting the defendants' lack of regard for cost-effective and conservative care.

786. In many cases, the medications were not indicated at all for the treatment of the patient's purported condition.

787. The defendants' default frequent prescription of opioid pain medication is particularly egregious, as it contributed to a significant public health crisis in Michigan.

788. On October 26, 2015, a bipartisan task force formed by Michigan Governor Rick Snyder issued a report "addressing the growing prescription drug and opioid problem in Michigan."

789. The task force reported:

Prescription drug abuse has reached epidemic proportions. The increased availability of prescription drugs, coupled with general misperceptions regarding the safety of physician-prescribed medications, has led to exponential growth of drug users and drug abusers. In Michigan, the number of drug overdose deaths – a majority of which are from prescription drugs – has tripled since 1999.

790. It has been estimated that the risk of addiction for patients receiving long-term prescriptions for opioid painkillers is as high as 56% of all such patients.

Bridget A. Martell, *et al.*, *Systematic Review: Opioid Treatment for Chronic Back Pain: Prevalence, Efficacy, and Association with Addiction*, 146(2) Ann. Intern. Med. 116-27 (2007).

791.   The defendants prescribed narcotic medications as a matter of course at the expense of the proper care and safety of their patients and the safety of the community at large.

792.   Further, and as discussed above, Mercyland did not alter prescription plans even when presented with evidence of unexpected urine drug test results.

793.   Neither Meds Direct nor Mercyland evaluated whether patients were already receiving medication from different physicians.

794.   Nor did Meds Direct or Mercyland perform pill counts or otherwise confirm that patients actually needed re-fills of narcotics before prescribing and filling prescriptions for these dangerous drugs.

795.   Mercyland and Meds Direct also failed to report narcotic prescriptions to the Michigan Automated Prescription System ("MAPS"), which further enabled them to write and dispense prescriptions for high amounts and dosages of narcotics without detection.

796.   For example, patient T.N. (Claim No. 0451998420) was undergoing treatment at a separate pain management clinic at the same time she was purportedly being treated by Mercyland.

797.   T.N.'s other pain clinic submitted copies of MAPS reports for T.N. with its claims for benefits.

798.   T.N. was prescribed Norco by Mercyland physicians Kimbrough and Shukr on at least four (4) occasions.

799.   The separate pain management clinic submitted a MAPS report to Allstate that does not list any of the narcotic prescriptions written by Mercyland physicians, but does indicate that T.N. was also getting narcotic drug prescriptions from other providers during the same period she was treating at Mercyland.

800.   Mercyland's failure to utilize MAPS resulted in narcotic prescriptions being written that were redundant and medically unnecessary, in addition to potentially dangerous to the patient and the community.

801.   Many of the prescriptions for narcotics issued by Mercyland physicians and filled by Meds Direct were for the highest dosages manufactured.

802.   Meds Direct also filled prescriptions that were not ordered by physicians.

803.   For example, patient W.H. (Claim No. 0470157116) reported that on at least one occasion Meds Direct informed him that it ran out of his prescribed medication, oxycodone, and gave him Norco instead, which he reported was not effective in managing his pain.

804.   One of the most common narcotic prescriptions ordered by Mercyland physicians and filled by Meds Direct was for oxycodone 30 milligram pills, which is one of the highest dosages of oxycodone available.

805.   According to recent estimates, the street value of an oxycodone pill is approximately $1.00 per milligram.

806.   However, a 30 milligram oxycodone can have a street value as high as $50.00 per pill.

807.   Mercyland and Sinha routinely ordered, and Meds Direct routinely dispensed, prescriptions for 60 to 90 pills of oxycodone 30 milligrams.

808.   Thus, the street value of a single prescription ordered by Mercyland and filled by Meds Direct could reach as high as $4,500.

809.   Despite the obvious danger that these addictive drugs would be diverted rather than taken as directed, Mercyland ordered and Meds Direct repeatedly filled prescriptions that were (1) ordered long before patients should have run out of their previous supply if taken as directed, and (2) ordered even as patients' urine specimens were repeatedly testing negative for the drugs prescribed.

### 2.   Medically Unnecessary Compounded Medications

810.   In or about July 2017, Mercyland added compounded cream medications to its predetermined protocol of prescriptions.

811.   The compounded creams prescribed by Mercyland physicians were invariably filled at defendant Livonia Care, which is located more than forty (40) miles away from Mercyland.

812.   Mercyland's orders for compounded medications were identified by indecipherable names (e.g., "Formula 8F-A") and were not accompanied by any instruction to patients.

813.   There is little to no research to support the use of topical compounded products and they are therefore largely considered experimental.

814.   In order to establish any medical necessity for compounded topical agents, one (1) or more of the following must be established: (1) intolerance to commercially available products, (2) failure to improve in spite of commercially available products, (3) avoidance of gastrointestinal problems from oral intake; (4) need to reduce systematic exposure; or (5) documented difficulties ingesting oral medication.

815.   The defendants never documented any justification for the use of compounded medications.

816.   Rather, the use of compounded medications was part of the predetermined slate of drugs prescribed as a matter of course, without any analysis of the efficacy or tolerance of other commercially-available options.

817. The improper use of compounded medications as a matter of course rather than as a response to patient-specific contraindications for commercially-available products is evidenced by the preprinted prescription forms used by Mercyland and Livonia Care, which confirm that compounds were not prescribed and created to address unique patient problems:



818. The same compounded formulas were also filled by Livonia Care for other physicians, further establishing that they were not used to address unique conditions that are not served by commercial products.

819. Among the other physicians for whom Livonia Care filled prescriptions for compounded medications was Johnny Ray Trotter, M.D. ("Trotter"), who was convicted on April 28, 2017 on four (4) felony counts related to a healthcare fraud scheme involving charges of more than $28 million for procedures that he did not actually perform.

820. Livonia Care filled Trotter's prescriptions for unnecessary compounded medications written through at least October 10, 2017, nearly six (6) months after his conviction.

821. Patients were also nearly always prescribed many of the drugs included in the compounded creams independently at the same time, including Lidocaine ointment, further evidencing that resort to experimental and untested compounds was never necessary.

822. Mercyland physicians failed to even attempt evaluation of whether the compounded medications prescribed were efficacious at all or how they compared to the FDA-approved and tested commercially available products.

823. It also appears that Livonia Care added additional components to the creams dispensed to the patients at issue herein that are not listed on the preprinted prescription form (put differently, Livonia Care added components not actually prescribed by the treating physician).

824. For example, a record produced in connection with a compounded cream dispensed to patient E.Y. (Claim No. 0440126950) indicated that capsaicin, a component of chili peppers, was included in the mixture.

825. It is unclear whether Mercyland physicians were even aware of the ingredients of the compounded medications they prescribed, as there was never a reason for the use of the active agents articulated in patient records.

826.   Formulas 8F and 8A, the most commonly prescribed compounded agents by Mercyland, both include diclofenac among the combination of more than a half dozen medications.

827.   Diclofenac is a non-steroidal anti-inflammatory that is only approved for use in peripheral joints.

828.   Another ingredient in Formulas 8F and 8A is cyclobenzaprine, a muscle relaxer that is only available in oral tablets and has no topical formulation or indication.

829.   Any use of cyclobenzaprine in a cream medication is necessarily experimental.

830.   When compounded medications were prescribed to the patients at issue herein, it was never clear what body part(s) the cream was intended to treat.

831.   It is unlikely that any of the ingredients in Formulas 8F or 8A could penetrate deeply enough to provide therapeutic benefit to a shoulder or spine, which were the source of the most commonly documented pain complaints by Mercyland.

832.   The owner of Livonia Care admitted that he has never sent these compounded creams for independent testing to assure quality, nor does he perform routine sampling or testing.

833.   Moreover, the unsanitary conditions alleged by the Michigan Board of Pharmacy's administrative complaint, including expired and misbranded drugs in

Livonia Care's active drug inventory, create a significant danger that compounded creams dispensed by Livonia Care were contaminated or otherwise adulterated from the substance intended to be ordered by prescribing physicians.

834.   Mercyland never provided patients with specific instructions as to where or how the compounded creams prescribed were to be applied.

835.   The owner of Livonia Care reported that he did not know how patients would even be able to measure the quantity of cream to apply from the containers in which it was dispensed.

836.   As with the other treatments and testing described herein, the compounded creams prescribed by Mercyland were designed solely to increase the total amount of charges submitted to Allstate and not for the actual medically necessary treatment of patients, as each prescription for compounded creams filled by Livonia Care was billed to Allstate at approximately $2,500 despite the component ingredients costing no more than $70.

837.   As discussed further below, the ingredients included in each compounded cream prescription filled by Livonia Care cost just a small fraction of the amount billed to Allstate.

### 3.   Other Medically Unnecessary Prescriptions

838.   As set forth above, the narcotics prescribed by Mercyland and dispensed by Meds Direct were rarely, if ever, medically necessary for the treatment

of the patients at issue herein, especially at the dosages and frequency used by the defendants.

839.   The other drugs included on Mercyland's predetermined slate of medications were also medically unnecessary.

840.   Sinha and Mercyland almost never articulated any reason for a medical need for the medications prescribed, and several are clearly unrelated to treatment of injuries sustained in automobile accidents.

841.   Antacids and stool softeners are used to treat conditions such as acid-reflux and constipation, which can be side-effects of other medications, but which were never documented as complaints actually made by the patients to whom they were prescribed.

842.   In the absence of any complaints of such side effects or any articulated reason for prescribing these drugs, they were medically unnecessary for the treatment of the patients at issue herein.

843.   The *pro forma* prescription of multi-vitamins has no relationship to treatment for injuries sustained in motor vehicle accidents, and thus was unnecessary in every instance they were prescribed by Mercyland and filled by Meds Direct.

844.   The defendants used these excessive prescriptions to (1) inflate the charges to Allstate by allowing Meds Direct and Livonia Care to charge exorbitant amounts for generic and over-the-counter medications; (2) create the appearance of

medical need for other treatments allegedly rendered by the defendants; and (3) justify the charges submitted to Allstate by Tox Testing and Paragon.

845.   Allstate has no obligation to pay for medications that are prescribed as a matter of course, nor for urine drug testing that is medically unnecessary and not used to inform patients' treatment.

### E.   EXCESSIVE AND MEDICALLY UNNECESSARY MRIs

846.   Another component of the predetermined treatment protocol used by the defendants was to immediately order MRIs.

847.   The defendants ordered these MRIs because they allowed their associates, including defendants Michigan Technology and Scan Clear, to submit tens of thousands of dollars of additional charges to Allstate for imaging studies that cost very little to perform.

848.   In one outrageous example, Mercyland physician Kimbrough noted during her initial evaluation of patient R.A. (Claim No. 0450357958) on May 9, 2017 that the patient had undergone MRIs at a hospital on April 21, 2017.

849.   Rather than attempt to obtain films or reports of the MRIs that had been conducted less than three (3) weeks prior, Kimbrough ordered a new round of MRIs of R.A.'s entire spine to be performed by defendant Scan Clear.

850.   Scan Clear performed the unnecessary and redundant MRIs ordered by Kimbrough on June 17, 2017, for which it submitted charges to Allstate totaling $11,250.

851.   As discussed above, defendant Sinha, along with other physicians who have been associated with Angelo through clinics at the 16100 building, are the most prolific referrers of MRIs in the entire State of Michigan.

### 1. Performance of Medically Unnecessary MRIs

### a. Standard of Care for MRI Testing

852.   Michigan Technology and Scan Clear had a responsibility to ensure that MRIs were properly ordered, but they intentionally chose not to do so in order to maximize the amount of charges it could submit to Allstate.

853.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

854.   According to the ACR, an MRI should only be ordered after the physician has thoroughly evaluated and examined the patient and recorded the findings in the patient's medical record.

855.   For musculoskeletal joint MRIs, a basic orthopedic examination of the applicable part of the body, including documentation of range of motion and

response to provocative maneuvers, should be performed and documented in the medical record.

856.   Prior to referring a patient for an MRI to rule out damage to spinal nerve roots or intervertebral discs, a physician should perform a basic neurological examination and document the findings of such testing, including the results of muscle stretch reflexes, pathological reflexes, muscle strength testing, and sensation (tested by using a pin prick or light touching).

857.   The ACR promulgates specific "Appropriateness Criteria" rating the appropriateness of various types of imaging studies in light of a patient's presenting symptoms and history.

858.   For example, ACR Appropriateness Criteria for cervical spine imaging guides that MRIs are "usually not appropriate" as the initial study for patients with chronic pain, including when the patient has a history of trauma or prior surgery.

859.   Instead, it is "usually appropriate" to perform x-rays, and it only becomes appropriate to move to an MRI when the x-ray is abnormal, or where there is documented "[p]ersistant pain following failure of conservative management only in select cases."

860.   Even when a cervical spine x-ray reveals degenerative changes, the ACR only guides that it "may be appropriate" (emphasis added) to perform an MRI, and again only when pain persists following failure of conservative care.

861.  The ACR states that "[p]atients with normal [cervical spine] radiographs and no neurologic signs or symptoms need no immediate further imaging."

862.  MRIs should not be ordered in violation of the ACR Practice Parameters unless there is an overriding clinical reason in the specific case and that reason must be documented in the patient's medical record.

863.  The physicians who made referrals to Michigan Technology and Scan Clear never documented an overriding clinical reason for the MRIs ordered outside of the ACR Practice Parameters.

864.  Defendant Sinha, who referred patients for more MRIs than nearly every other physician in the State of Michigan, testified that she is not aware of any recommendations issued by any professional organization regarding the proper use of MRIs.

865.  Sinha also confirmed in testimony that her MRI ordering practice is in direct contravention of the ACR guidelines, as she routinely orders MRIs to be performed at the outset of treatment and in the absence of subjective neurologic complaints or objective neurologic examination findings.

866.  Specifically, when asked what findings support her order of MRIs, Sinha testified: "[l]ike range of movement, like tenderness on my examination.  As I said, range of movement."

148

867.   These are precisely the types of vague, minor, and non-specific findings that the ACR Appropriateness Criteria are designed to remove from early resort to MRIs.

868.   The ACR also provides that MRI prescription forms should provide sufficient information to demonstrate the medical necessity of the MRI and allow for its proper performance and interpretation.

869.   If the prescription does not contain sufficient information to demonstrate the medical necessity of the examination and allow for its proper performance and interpretation, the radiologist should contact the referring practitioner (who should be familiar with the patient's clinic problem or question) to obtain the missing information.

870.   Only upon receiving such information is it appropriate for the radiologist to interpret the study and issue a radiology report setting forth the professional findings and interpretation.

871.   MRI findings may be misleading if not closely correlated with the patient's clinical history, clinical examination, or physiologic tests.

872.   The ACR mandates that the interpreting physician "shall have the responsibility for all aspects of the study including, but not limited to, reviewing all indications for the examination . . . ."

873.   Nevertheless, the MRIs at issue in this Complaint routinely lack any documentation of why the MRI was recommended or medically necessary, much less sufficient information to allow for proper performance and interpretation of the MRIs prescribed by referring physicians.

874.   Pursuant to the ACR guidelines, it is the responsibility of Michigan Technology and Scan Clear to assure that all MRIs referred are proper.

875.   As set forth below, rather than perform the duties required by the ACR, the defendants routinely performed excessive and medically unnecessary MRIs in order to increase the amount of reimbursement sought from Allstate.

### b.  MRIs Performed During Initial Stages of Treatment

876.   MRIs at issue herein were also routinely ordered at the onset of the patient's treatment, thus evidencing that MRIs were resorted to as a matter of course regardless of each patient's unique symptoms and each patient's response to initial treatment.

877.   Such a practice is belied by medical literature stating "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."  Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do

Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 942 (2012).

878.   Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  Id. at 945.

879.   At the onset of a soft-tissue injury (the type of injury claimed by almost all of the patients at issue herein), an MRI should only be ordered if there are objective neurological symptoms of spinal cord or other neurological injuries, including radiculopathy (severe back pain radiating into an extremity) or where the medical practitioner suspects the patient has suffered a fracture.

880.   Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

881.   Michigan Technology and Scan Clear routinely performed MRIs of patients who had only just initiated treatment.

882.   More than 62% of the patients at issue herein who allegedly underwent MRI imaging at Michigan Technology had such imaging performed within two (2) months of their alleged motor vehicle accidents.

883.   Patients of Michigan Technology had multiple MRIs performed as soon as five (5) days after their alleged motor vehicle accidents.

884.   For example, patient F.H. (Claim No. 0284978152) was allegedly involved in a motor vehicle accident on May 4, 2013, was allegedly examined by

now-imprisoned Angelo associate Lerner on May 6, 2013, and allegedly underwent MRI imaging of four (4) body parts on May 9, 2013, all of which were allegedly interpreted by Angelo associate James.

885.   It is not possible that patients who underwent MRIs just days or weeks after their alleged motor vehicle accidents attempted conservative treatment as required by the ACR before resorting to MRI imaging.

886.   The patients at issue herein who received MRIs at Michigan Technology and Scan Clear within the first days and weeks after their alleged motor vehicle injuries had non-emergent medical conditions, not the type of fracture or neurological injury that would justify overriding the ACR's directives to attempt conservative treatment before imaging.

### c.  Excessive MRI Scans

887.   In addition to performing MRIs as soon as possible after an alleged accident in violation of the standard of care, Michigan Technology and Scan Clear also sought to maximize the amount of the charges submitted to Allstate by performing far more MRIs than were medically necessary.

888.   MRIs should be limited to the symptomatic body part and it is uncommon to order MRIs on more than one region.

889.   The rarity of MRIs of multiple body parts of the same patient is confirmed by the data reported to the State of Michigan by all MRI providers in

2017, which documents that just 12.3% (101,714 of 826,502) of all patients underwent MRIs of multiple body parts during the same visit.

890.   This figure includes MRIs performed at hospitals, trauma centers, cancer treatment centers, and other facilities providing treatment to traumatically injured and gravely ill patients.

891.   By comparison, at least 83% of the patients at issue herein who underwent MRI imaging at Scan Clear received multiple MRIs.  *See* Exhibit 4.

892.   All but nine (9) of the patients at issue herein who underwent MRI imaging at Michigan Technology received multiple MRIs.  *See* Exhibit 5.

893.   Michigan Technology and Scan Clear never provided MRIs to patients seeking emergent diagnosis and treatment.

894.   As discussed above, in addition to the unnecessary MRI referrals ordered by Sinha and Mercyland, Michigan Technology, Scan Clear, Ruefiel, and Angelo intentionally cultivated relationships with unscrupulous providers who they knew would refer patients for multiple medically unnecessary MRIs.

## F.   EXCESSIVE AND MEDICALLY UNNECESSARY PHYSICAL THERAPY

895.   Angelo, Abraham, Sinha, and Mercyland played an indispensable role in the defendants' performance of excessive physical therapy as physical therapy treatment that exceeds twenty-one (21) days or ten (10) sessions, both of which are

shorter than the predetermined protocol used by Omega Rehab and Prime Rehabilitation, requires a prescription.  Mich. Comp. Laws § 333.17820(1)(a).

896.   Angelo, Abraham, Sinha, and Mercyland repeatedly made misrepresentations regarding the necessity for physical therapy in order to perpetuate unnecessary and expensive treatment.

897.   Moreover, these defendants continued renewing physical therapy prescriptions at every patient appointment, regardless of efficacy of treatment (or lack thereof) or updated examination findings.

898.   Physical therapy orders by Sinha and other Mercyland physicians were written during the initial evaluation for nearly every patient at issue in this Complaint.

899.   In approximately 90% of all motor vehicle accident cases, mild injuries will resolve by themselves within a few weeks without any treatment whatsoever.

900.   This fact further supports that immediate resort to physical therapy pursuant to the defendants' predetermined treatment plan was not related to the care, recovery, or rehabilitation of the patient, thus rendering such physical therapy medically unnecessary and not compensable under Michigan's No-Fault Act.

901.   Physical therapy must be objectively indicated for each individual patient.

902.   That is, a patient's subjective complaints of pain are not sufficient to justify more than a few weeks of physical therapy.

903.   Sinha and other Mercyland physicians rarely, if ever, recorded any objective orthopedic or other examination findings.

904.   As set forth above, the objective findings recorded by Omega Rehab and Prime Rehabilitation are boilerplate and meaningless, are contradicted by evaluations performed by referring physicians and other healthcare providers, and cannot justify the excessive amounts of treatment allegedly rendered to the patients at issue herein.

905.   The physical exams and findings made by Mercyland were in nearly all cases identical, and were always strikingly similar, indicating that the exams were *pro forma* and used only to justify unnecessary treatment, instead of to identify each patient's unique symptomology and clinical needs.

906.   The defendants also attempted to justify their medically unnecessary physical therapy referrals by falsifying office records to make it appear that patients were reporting a benefit from such therapy, examples of which are summarized below:

- Patient M.C. (Claim No. 0424541365) presented for treatment at Mercyland on November 3, 2016, and was allegedly evaluated by defendant Sinha. M.C. had not attempted any physical therapy before his initial evaluation at Mercyland. Despite this, Sinha reported that "[p]hysical therapy has helped reduce the patient's pain by 40% In addition consistent physical therapy helps the patient increase ROM . . . ." Sinha's claim of the benefit M.C. was

obtaining from physical therapy was completely fabricated; he had attempted no such treatment. Sinha directed M.C. to continue physical therapy, which M.C. never did. M.C. returned to Mercyland on eight (8) additional dates. At nearly every appointment, Mercyland falsely stated that M.C.'s pain was improving with physical therapy, usually with a fabricated percentage of improvement.

- Patient M.K. (Claim No. 0453333890) purportedly underwent evaluations by Mercyland from February 2017 to January 2018 and was reported to have experienced relief from physical therapy throughout the entire time period. This statement was false on each occasion, as M.K. had ceased physical therapy treatment in January 2017.

- Patient J.W. (Claim No. 0423099091) presented for treatment at Mercyland on December 15, 2016, and was allegedly evaluated by defendant Sinha. J.W. had not attempted any physical therapy before his initial evaluation at Mercyland. Despite this, Sinha reported that J.W.'s knee pain was improved with physical therapy. Defendant Sinha then ordered a course of physical therapy that began on January 4, 2017, but which did not involve J.W.'s knee at all.

907. Even when patients actually underwent physical therapy treatment, the reports of benefit by Mercyland were falsified in an attempt to justify excessive physical therapy orders.

908. For example, on June 2, 2017, patient D.M. (Claim No. TXA-0155563) was reported to have experienced a 35% reduction in pain through the course of physical therapy prescribed by Mercyland.

909. However, D.M. also purportedly reported that his pain was 10/10 in all body parts on June 2, 2017, which is the highest pain score possible.

910. The false statement regarding D.M.'s improvement with physical therapy illustrates that records were created by Mercyland solely in an attempt to

deceive Allstate and to justify the excessive therapies prescribed to the patients at issue herein.

911.   Nearly every patient at issue in this Complaint who underwent alleged evaluation at Mercyland was prescribed a course of physical therapy by operation of the predetermined treatment protocol used by the clinic.

912.   The prescribed courses of physical therapy rarely ended, as the same exact order was issued at each appointment regardless of the lack of documented benefit.

913.   As documented by the email from Angelo reproduced above, physical therapy referrals were also made as a matter of course because Angelo used them as a form of currency and expected that the physical therapy clinics would refer patients back to his entities for costly orthopedic and other treatment.

914.   Omega Rehab and Prime Rehabilitation were among the largest beneficiaries of the indiscriminate order of courses of physical therapy by Mercyland.

915.   Under accepted practices, a patient rarely should receive physical therapy for more than four to six weeks.

916.   After four to six weeks, the physical therapy will have reached its maximum benefit and the patient should either cease in-office physical therapy or be recommended for a different type of treatment.

917.   When a patient is no longer making objective progress in physical therapy, the treatment plan must be changed or the patient discharged.

918.   As documented by Exhibits 8 and 9, patients at Omega Rehab and Prime Rehabilitation were referred routinely continued physical therapy for dozens of appointments over a period of many months in order to continue generating claims for submission to Allstate.

919.   Allstate has no obligation to pay for physical therapy that was rendered pursuant to prescriptions made as a matter of course rather than based on individual needs of the patients at issue.

### G.   OTHER MEDICALLY UNNECESSARY TREATMENT

920.   In or about September 2017, defendant Angelo recruited defendant Pribil to perform injection and surgical procedures that were billed by Mercyland; by Pribil's own company, ISpine; and by several other associated entities, including defendant Block Billing.

921.   Pribil travels to Michigan from Florida solely to perform unnecessary surgical procedures to generate exorbitant bills to Allstate.

922.   For example, Pribil allegedly performed an initial evaluation of patient P.S. (Claim No. 0461166407) on April 25, 2018, which resulted in an opinion that the patient "needs to have an MRI done before a surgical decision."

923.   Nevertheless, Pribil allegedly performed a multi-level foraminotomy and laminotomy on P.S. the very next day, April 26, 2018.

924.   Obviously, the MRI required to properly evaluate surgical intervention was not performed.

925.   The lumbar laminotomy procedure allegedly performed by Pribil was the most common surgical procedure performed by ISpine and Pribil, as the defendants leveraged a relatively minor outpatient procedure into hundreds of thousands of dollars in bills for each patient, including billing for multiple assistants, intraoperative monitoring, anesthesia, and facility fees.

926.   As discussed further below, ISpine and Pribil further inflated charges to Allstate for these procedures by using esoteric coding practices to unbundle charges and submit charges for surgical procedures that were not actually performed.

927.   Injection procedures were also performed at Mercyland by other physicians, including Jankowski, the long-time associate of Angelo's who is currently awaiting trial on federal felony healthcare fraud charges.

928.   Mercyland physicians, including Jankowski and physician assistants and nurse practitioners he supervised, indiscriminately and repeatedly performed injections on patients at issue herein, for which Mercyland submitted outrageous and improperly billed charges, discussed *infra*.

929.   The performance of invasive procedures (such as injections) for the relief of pain must be based upon adequate diagnosis and legitimate medical necessity.

930.   As detailed above, Mercyland's purported patient evaluations were at most cursory, and rarely, if ever, resulted in specific actionable diagnoses.

931.   Mercyland never recorded medically appropriate findings to justify the performance of injection procedures.

932.   Mercyland rarely evaluated the efficacy of previously-performed injection procedures before ordering repeat performance.

933.   Consequently, the defendant medical providers' patients received unjustified invasive procedures that offered little therapeutic efficacy while subjecting the patients to unnecessary risks of infection and the risks associated with anesthesia.

934.   Injections were used by Mercyland solely as a means to generate charges for submission to Allstate, and had nothing to do with the actual medical needs of the patients at issue herein.

## X.    FRAUDULENT BILLING PRACTICES

935.   Providers like Mercyland, Tox Testing, Paragon, Michigan Technology, Scan Clear, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, ISpine, Sinha, Ruefiel, Pribil, and Patel have a responsibility to select

and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

936. Mercyland, Tox Testing, Paragon, Michigan Technology, Scan Clear, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, ISpine, Sinha, Ruefiel, Pribil, and Patel failed to meet this responsibility and instead submitted bills for unreasonable payments to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

937. With the exception of defendant pharmacies Meds Direct and Livonia Care, all of the medical records, bills, and invoices submitted to Allstate by, and on behalf of, the defendants contained CPT Codes.

938. The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms (HICF) approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

939. The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

940. Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

## A.   IMPROPER BILLING FOR URINE DRUG TESTING

941.   The AMA details the correct CPT Codes for definitive/quantitative urine drug tests.

942.   CPT Codes for definitive/quantitative testing are usually specific to the drug being measured in a specimen.

943.   The onus is on the laboratory to select the appropriate billing code based on the drug tested for or the type of urine drug test performed (i.e., presumptive/qualitative, semi-quantitative, or definitive/quantitative).

944.   As discussed above, for the vast majority of alleged urine drug tests at issue herein, the defendants submitted bills to Allstate for tests that were not actually performed.

945.   Even when the tests corresponded with the bills submitted, the CPT Codes used by the defendants were improper for the testing allegedly performed.

946.   Tox Testing routinely billed for specimen validity testing on urine specimens even when such testing was not ordered by the referring physician.

947.   As an initial matter, specimen validity testing is an internal control process that is not separately reportable unless it is ordered by a physician for the management of a patient's specific medical problem.

948.   Tox Testing billed for specimen validity testing using CPT Codes 81002 (*"urinalysis by dipstick PH, specific gravity; non-automated, without*

*microscopy"*); 81003 (*"urinalysis by dipstick PH, specific gravity; automated, without microscopy"*); 82570 (*"creatinine"*); 83986 (*"pH"*); and 84311 (*"spectrophotometry"*).

949.   CPT Code 82570 was deleted from the CPT Code book for 2017, but Tox Testing continues to submit bills for reimbursement for this alleged testing. *See* Exhibit 2.

950.   Even when CPT Code 82570 existed, it, along with CPT Codes 83986 and 84311 (both of which were also deleted from the CPT Code book for 2017), was not appropriate for specimen testing validity.

951.   CPT Codes 81002 and 81003 are all-encompassing codes that include tests for specific items such as pH.

952.   Tox Testing's separate charges for pH testing are improper and redundant of the pH testing included in CPT Codes 81002 and 81003.

953.   CPT Codes 83986 and 84311 were both meant to be used for testing bodily fluids other than urine.

954.   It was never proper for Tox Testing to submit charges for urine drug testing using CPT Codes 83986 and 84311.

955.   Thus, Tox Testing's use of these CPT Codes was intended only to improperly inflate the charges it submitted to Allstate for services that were already covered by other CPT Codes billed. *See* Exhibit 2.

**B.**   FRAUDULENT UNBUNDLING

### 1. Unbundled Physical Therapy Charges

956.   The National Correct Coding Initiative ("NCCI") was established to promote national correct coding methodologies and to control improper coding leading to inappropriate payment.

957.   There are two NCCI edit tables: "Column One/Column Two Correct Coding Edit Table" and "Mutually Exclusive Edit Table."

958.   Each NCCI edit table has a Column One and Column Two billing code.

959.   Each NCCI edit table contains edits, which are pairs of billing codes that cannot be reported together because the services (and reimbursement) for the Column Two code is subsumed by the services (and reimbursement) for the Column One code.

960.   Violation of the edits (billing a Column One code and a Column Two code on the same day for the same patient) is known as "unbundling," which occurs when a provider bills separately for individual components of a procedure that are included in another billing code also billed for the same date of service.

961.   Many procedure codes cannot be reported together because they are mutually exclusive of each other and mutually exclusive procedures cannot be performed at the same anatomic site or during the same patient encounter.

962.   Omega Rehab and Prime Rehabilitation routinely submitted bills to Allstate seeking payment for unbundled services.

963.   For each violation of the Column One and Column Two Edit Table, it is the procedure in Column Two that is unbundled from Column One and therefore is non-compensable.

964.   By way of example, Omega Rehab and Prime Rehabilitation submitted bills to Allstate for CPT Code 97124 ("*massage, including effleurage, petrissage and/or tapotement (stroking, compression, percussion)*") and CPT Code 97140 ("*manual therapy techniques (eg, mobilization/manipulation, manual lymphatic drainage, manual traction), 1 or more regions, each 15 minutes*") for the same patient on the same date of service.

965.   CPT Code 97124 is a Column Two code and CPT Code 97140 is a Column One code when billed on the same date of service for the same patient.

966.   For a significant number of the patients at issue in this Complaint, Omega Rehab and Prime Rehabilitation submitted bills to Allstate through interstate wires and the U.S. Mail seeking payment for unbundled services billed on the same date of service, as detailed in Exhibits 8 and 9.

967.   Omega Rehab and Prime Rehabilitation fraudulently unbundled charges to Allstate totaling over $113,000.  Id.

968. Allstate is not required to pay Omega Rehab and Prime Rehabilitation for fraudulently billed treatment.

### 2. **Unbundled Surgical and Injection Charges**

969. Mercyland, ISpine, and Pribil also submitted fraudulently unbundled bills for surgical and injection procedures allegedly performed.

970. The coding used by the defendants to submit charges for surgical and injection procedures is esoteric and complex, often involving multiple billing for relatively minor procedures in order to inflate charges submitted to Allstate to the maximum extent possible.

971. The most frequent method of unbundling used by the defendants is to submit charges for fluoroscopic guidance for procedures that have such guidance built into their descriptions.

972. For example, Pribil allegedly performed a procedure to remove a neuromuscular stimulator for patient C.S. (Claim No. 0349217083) on February 2, 2018.

973. ISpine and Pribil submitted a bill for the professional component of the procedure using CPT Codes 63662 ("*Removal of spinal neurostimulator electrode plate/paddle(s) placed via laminotomy or laminectomy, <u>including fluoroscopy</u>*") (emphasis added), 69990 ("*Microsurgical techniques, requiring use of operating microscope*"), and 77003 ("*Fluoroscopic guidance and localization of needle or*

166

*catheter tip for spine or paraspinous diagnostic or therapeutic injection procedures*").

974.   The procedure allegedly performed by Pribil and billed by ISpine was not an injection, and therefore CPT Code 77003 was not appropriate under any circumstances.

975.   The operative report submitted by ISpine and Pribil makes no reference to the use of an operating microscope, meaning using CPT Code 69990 is yet another example of a bill submitted to Allstate for services that were not performed at all.

976.   Moreover, as illustrated by the emphasized portion of the code description above, CPT Code 63662 includes fluoroscopic guidance.

977.   Thus, ISpine and Pribil's submission of a second CPT Code describing a procedure explicitly included the procedure described by CPT Code 63662 was a fraudulent attempt to induce Allstate to remit payment twice for the same alleged service.

978.   Similarly, Mercyland allegedly performed a steroid injection on patient W.H. (Claim No. 0470157116) on December 20, 2017, which it billed to Allstate using CPT Codes 64493 ("*Injection(s), diagnostic or therapeutic agent, paravertebral facet joint with image guidance (fluoroscopy or CT) lumbar or sacral, single level*") (emphasis added) and 77003.

979.   The separately billed CPT Code 77003, charged at a rate of $2,190.00, is again a fraudulent attempt to induce Allstate to pay for a service that is included in the description of the underlying procedure.

980.   Further, Jankowski, the physician who performed the alleged injection procedure on W.H., signed a record indicating that the procedure he actually performed should have been billed using CPT Code 62311, which is for an epidural rather than facet injection.

### C.   FRAUDULENTLY UPCODED OFFICE VISITS

981.   Physician examinations of patients are billed using CPT Codes that reflect the level of complexity involved in the examination.

982.   It is the responsibility of the medical provider to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

983.   As discussed above, the defendants made misrepresentations to Allstate by submitting documentation that included CPT Codes for medical services that (1) were not actually performed, (2) were not performed consistent with established standards of care, and/or (3) were wholly unwarranted and unnecessary.

984.   Moreover, the billing codes submitted to Allstate by, and on behalf of, Angelo, Abraham, Sinha, and Mercyland consistently exaggerated the level of services purportedly provided in order to inflate the charges submitted to Allstate.

985.   When an individual has been in a motor vehicle accident and complains of neck and back pain, a licensed healthcare professional must obtain a history and perform an examination to arrive at a legitimate diagnosis.

986.   The licensed healthcare professional must also engage in medical decision making to design a legitimate treatment plan that is tailored to the unique needs of each patient.

987.   The evaluation and management of a patient is usually billed through CPT Codes for office visits/examinations or office consultations.

988.   A legitimate examination has three (3) components: (1) the patient history; (2) the systems review; and (3) tests and measures.

989.   There are five levels at which an office visit/examination or office consultation can be billed using CPT Codes: levels one through five, with level one being the least involved examination and level five being the most complex.

990.   Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920."

991.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

992.   The criteria developed by the AMA to properly assign the CPT Code for an initial visit/examination include the components illustrated in the chart below:

|  | **HISTORY** | **EXAMINATION** | **MEDICAL DECISION-MAKING** | **FACE-TO-FACE TIME** |
|---|---|---|---|---|
| **99201** | Problem focused | Problem focused | Straight forward | 10 minutes |
| **99202** | Expanded problem focused | Expanded problem focused | Straight forward | 10 minutes |
| **99203** | Detailed | Detailed | Low complexity | 30 minutes |
| **99204** | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| **99205** | Comprehensive | Comprehensive | High complexity | 60 minutes |

993.   Re-evaluation or follow-up office visits/examinations are billed using a CPT Code that starts with the numbers "9921.

994.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the re-examination.

995.   The criteria developed by the AMA to properly assign the CPT Code for a re-evaluation or follow-up visit/examination include the components illustrated in the chart below:

|  | **HISTORY** | **EXAMINATION** | **MEDICAL DECISION-MAKING** | **FACE-TO-FACE TIME** |
|---|---|---|---|---|
| **99211** | Minimal presenting problem(s) | Minimal presenting problem(s) | Minimal presenting problem(s) | 5 minutes |
| **99212** | Problem focused | Problem focused | Straight forward | 10 minutes |
| **99213** | Expanded problem focused | Expanded problem focused | Low complexity | 15 minutes |
| **99214** | Detailed | Detailed | Moderate complexity | 25 minutes |
| **99215** | Comprehensive | Comprehensive | High complexity | 40 minutes |

170

996. The factors considered to determine the "complexity" of medical decision-making in arriving at a proper CPT Code assignment for initial visits/examinations include:

|  | **NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS** | **AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED** | **RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY** |
|---|---|---|---|
| **Straight forward decision-making (CPT Code 99201-99202)** | Minimal | Minimal or none | Minimal |
| **Low complexity decision-making (CPT Code 99203)** | Limited | Limited | Low |
| **Moderate complexity medical decision-making (CPT Code 99204)** | Multiple | Moderate | Moderate |
| **High complexity medical decision-making (CPT Code 99205)** | Extensive | Extensive | High |

997. The AMA has published examples of office visits that are appropriately billed using CPT Code 99205, including:

- "Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, and hypertension."

- "Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis."

*CPT Assistant, Spring 1992.*

998. The AMA has published examples of office visits that are appropriately billed using CPT Code 99204, including:

- "Office visit for initial evaluation of a 63-year-old male with chest pain on exertion."

- "Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion."

- "Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization three times."

*CPT Assistant, Spring 1992.*

999. The AMA has published examples of office visits that are appropriately billed using CPT Code 99215, including:

- "Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly."

- "Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient."

*CPT Assistant, Spring 1992.*

1000. The AMA has published examples of office visits that are appropriately billed using CPT Code 99214, including:

- "Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet.  She now complains of frequency to urination and weight loss, blood sugar of 320 and negative ketones on dipstick."

- "Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication."

*CPT Assistant, Spring 1992.*

1001. The patients at issue in this Complaint almost never presented with symptoms or diagnoses similar in severity or complexity to any of the examples set out above.

1002. Instead, the defendants' patients were involved in low-level motor vehicle accidents and presented with soft-tissue injuries and complaints, to the extent patients had symptoms at all (many patients having presented because they were solicited and paid kickbacks to do so and not because they sought out medical treatment).

1003. Soft-tissue injuries usually resolve themselves without medical intervention.

1004. Yet Angelo, Abraham, Sinha, Pribil, and Mercyland billed Allstate for level four and five examinations for initial office visits (i.e., CPT Codes 99204 and 99205) for every patient at issue in this Complaint.  *See* Exhibit 1.

1005. Angelo, Abraham, Sinha, Pribil, and Mercyland also always billed Allstate for level four and five examinations for follow-up visits (i.e., CPT Codes 99214 and 99215).  Id.

1006. All bills submitted by Angelo, Abraham, Sinha, Pribil, and Mercyland using CPT Codes 99204, 99205, 99214, and 99215 as a matter of course rather than based on an independent assessment of the complexity of medical decision-making were fraudulent.

1007. To warrant a medical bill demanding payment for a level four examination, the injury/condition necessarily requires:

- <u>moderate</u> risk of mortality, morbidity and/or complications;

- <u>moderate</u> diagnoses and review of complex data; and

- the defendants to: (1) obtain <u>comprehensive</u> patient histories; (2) conduct <u>comprehensive</u> examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

1008. To warrant a medical bill demanding payment for a level five examination, the injury/condition necessarily requires:

- <u>high</u> risk of mortality, morbidity, and/or complications;

- <u>extensive</u> diagnoses and review of complex data; and

- the defendants to: (1) obtain <u>comprehensive</u> patient histories; (2) conduct <u>comprehensive</u> examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 60 minutes.

1009. The defendants fall woefully short of meeting the threshold standard to bill for level four or five office visits.

1010. The defendants never obtained comprehensive patient histories nor conducted comprehensive investigations.

1011. For example, patient A.Y. (Claim No. 0503668535) reported to Allstate that his appointments at Mercyland, each of which were billed to Allstate as level four encounters, lasted just five (5) to ten (10) minutes.

1012. It is not possible to obtain a detailed history and perform a comprehensive examination sufficient to meet the criteria for a level four evaluation in just five (5) or ten (10) minutes.

1013. Indeed, with respect to each patient for whom Allstate was billed for a level four or five examinations, Angelo, Abraham, Sinha, Pribil, and Mercyland used template and pre-printed records that purport to document, at most, a cursory examination that failed to satisfy the requirements of CPT Codes 99204, 99205, 99214, and 99215.

1014. The records also demonstrate that the defendants' patients, almost all of whom were involved in minor motor vehicle accidents and were fully ambulatory, rarely presented with serious symptoms and injuries.

1015. The frequency at which Angelo, Abraham, Sinha, Pribil, and Mercyland billed Allstate for level four or five examinations is particularly egregious when considering the amount that the defendants billed for these purported examinations.

1016. As discussed *supra*, a higher-level evaluation requires further analysis and more of the treating physician's time than performing a lower-level evaluation.

1017. Therefore, physicians and medical clinics charge a greater amount for a higher-level evaluation.

1018. Despite not providing treatment that warranted level four or five evaluations, the defendants charged excessive amounts for their purported evaluations.

1019. Mercyland routinely submitted bills to Allstate for $650 each for initial evaluation, regardless of the level of complexity, and $500 for each re-examination, regardless of the level of complexity.  *See* Exhibit 1.

1020. The excessive rates charged by the defendants further demonstrate that the purpose of their scheme was to maximize the amount they billed to auto insurers like Allstate.

1021. By creating medical bills that included CPT Codes for office visits and then causing such bills to be faxed and mailed to Allstate, the defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

1022. However, all of the bills prepared, faxed, and mailed by the defendants were submitted using fraudulent and deceptive examination CPT Codes.

1023. As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

### D. FRAUDULENT P-STIM BILLING PRACTICES

1024. Each time Mercyland allegedly applied a medically unnecessary and clinically useless P-Stim device, Allstate received a series of charges allegedly describing the procedure.

1025. As detailed above, the application of P-Stim devices was medically unnecessary and therefore non-compensable under the No-Fault Act.

1026. The billing practices used in relation to the P-Stim devices were also independently fraudulent.

1027. Mercyland routinely used two (2) separate CPT and HCPCS Codes to bill Allstate for P-Stim devices:

- **64555** – "Percutaneous implantation of neurostimulator, peripheral nerve";

- **95971** – "Electronic analysis of implanted simple spinal cord or peripheral neurostimulator pulse generator system with intraoperative or subsequent programming."

*See* Exhibit 1.

1028. P-Stim devices are transcutaneous, not percutaneous, and are affixed, not implanted.

1029. As discussed above, P-Stim devices are simply acupuncture devices affixed to an area behind a patient's ear.

1030. Hakki, the former medical director of Greater Lakes, which is the facility at which each P-Stim at issue herein was allegedly applied by Mercyland,

has testified that P-Stim is less intrusive than an ear piercing and he has never even seen a drop of blood during application of P-Stim.

1031. Defendant Sinha expressed shock when she discovered that P-Stim applications were billed by the defendants as surgical procedures.

1032. Because P-Stim devices are not percutaneous or implanted, neither of the codes submitted by Mercyland correctly describe the service allegedly performed.

1033. Further, the services that are described when Mercyland submits bills using CPT Code 95971 ("*Electronic analysis of implanted neurostimulator pulse generator system; simple spinal cord, or peripheral neurostimulator pulse generator/transmitter, with intraoperative or subsequent programming*") amount to merely checking the battery of the P-Stim devices.

1034. Mercyland routinely billed Allstate $1,450 each time one of its physicians allegedly checked P-Stim batteries.

1035. Hakki also confirmed in his testimony that the P-Stim devices come from the distributor pre-programmed, and the physician applying the devices does not make any changes.

1036. Beginning in or about October 2017, Block Billing changed its P-Stim billing practices to use two (2) non-specific CPT Codes – 64999 and E1399 – in an effort to induce payment from Allstate. *See* Exhibit 11.

1037. In each instance, the charges submitted by Block Billing using these non-specific CPT Codes totaled $13,100.

1038. The proper HCPCS Code to describe the application of a P-Stim device is S8930, which is for "electrical stimulation of auricular acupuncture points; each 15 minutes of personal one-on-one contact with the patient."

1039. CMS created HCPCS Code S8930 in April 2011, well before the defendants began submitting their fraudulent bills to Allstate.

1040. The defendants choose not to use HCPCS Code S8930, which precisely describes the P-Stim application, because it would require them to submit a single charge with a description befitting the simple, non-surgical device application that it is.

1041. Instead, the defendants chose a series of codes that they believed would justify their unreasonable charges for each P-Stim device applied.

1042. Allstate is not obligated to pay any pending bills for alleged P-Stim application fraudulently billed using billing codes that do not property describe the treatment performed, and it is entitled to reimbursement for payment already tendered.

## XI.    THE DEFENDANTS' CHARGES ARE UNREASONABLE AND NOT CUSTOMARY

### A.    CHARGES SUBMITTED BY MICHIGAN TECHNOLOGY AND SCAN CLEAR

#### 1.    Michigan Technology's Representations Regarding Cost and Revenue

1043. On or about December 6, 2012, Michigan Technology submitted documents to the Michigan Department of Community Health in support its application for a CON to permit to acquire an MRI host site from Affiliated Medical of Dearborn, PLLC, which was then in bankruptcy.

1044.  Affiliated Medical of Dearborn, PLLC was owned by Luis Jorge, M.D., who was the associate of Angelo who promised "pants full of money" from *quid pro quo* MRI arrangements in an email sent on August 13, 2011.  *See* Exhibit 14.

1045. Angelo retained consultant Williams to submit the paperwork necessary to obtain the CON.

1046. One of the documents submitted in furtherance of Michigan Technology's application was a "Financial Components for Nonsubstantive Review."  *See* Exhibit 19.

1047.  This document represents that the total cost to Michigan Technology to acquire this CON, including a three (3) year space lease and a one (1) year equipment lease, was $520,800.  Id.

1048. Michigan Technology represented that its cost to lease the MRI equipment would be $4,000 per day.  Id.

1049. Emails between Angelo and Williams reveal that the terms of the acquisition and the MRI equipment lease amount were both misrepresented to the State of Michigan.  *See* Exhibit 20.

1050. The real terms were for acquisition of the host site at a cost of $200,000 and an agreement to lease MRI equipment owned by Williams at a rate of $2,200 per day.  Id.

1051. Angelo also asked Jankowski to review the deal, to which Jankowski warned that Williams's MRI unit is "antiquated and has one year left of life."  *See* Exhibit 21.

1052. Michigan Technology subsequently acquired and transferred multiple additional CONs to host mobile MRI route stops, including the CON that was ultimately transferred to defendant Scan Clear.

1053. As discussed below, Scan Clear represented in its application for approval of its CON that, after taking into consideration all costs of operation, including space and equipment lease terms similar to those reported by Michigan Technology, that its average charge per MRI would be $1,200.

## 2.    Michigan Technology's Charges to Allstate

1054. Michigan Technology purportedly performed MRI imaging of patients at issue herein from May 9, 2013 to June 19, 2014, though it continues to purportedly perform X-ray imaging and submits X-ray charges for imaging purportedly performed by Cure Imaging.  *See* Exhibit 5.

1055. Michigan Technology submitted the following charges for the MRI imaging purportedly rendered:

| MRI CPT Code Billed | CPT Code Description | Amount Billed Per MRI |
|---|---|---|
| 70551 | Brain MRI, without contrast | $5,500.00 |
| 72141 | Cervical MRI, without contrast | $5,000.00 to $6,200.00 |
| 72146 | Thoracic MRI, without contrast | $5,000.00 to $5,400.00 |
| 72148 | Lumbar MRI, without contrast | $5,000.00 to $6,200.00 |
| 73218 | Upper extremity MRI, without contrast | $5,000.00 |
| 73221 | Upper extremity joint MRI, without contrast | $4,600.00 |
| 73721 | Lower extremity MRI, without contrast | $4,600.00 to $5,000.00 |

Id.

1056. As documented above, Michigan Technology billed Allstate at least $4,600.00 for each MRI it performed since commencing operations.

1057. In just the approximately one (1) year it was submitting charges for MRIs, Michigan Technology submitted bills totaling $312,400.00 to Allstate.

1058. In other words, Michigan Technology's charges were so high, and the number of MRIs performed were so excessive, that it covered the entire cost of acquiring its host site through bills submitted to just one insurer in just one year.

### 3.      Scan Clear's Representations Regarding Cost and Revenue

1059. On or about March 1, 2017, Scan Clear submitted documents to the Michigan Department of Community Health in support of its application for a CON to permit it to acquire an MRI host site using a CON originally obtained by Angelo's Michigan Technology Partners, LLC.

1060. One of the documents submitted in furtherance of Scan Clear's application was a "Financial Components for Nonsubstantive Review." *See* Exhibit 22.

1061. In this document, Scan Clear states that it paid $30,000 to acquire the MRI host site. Id.

1062. Scan Clear also represented that its cost to lease the physical space to host the MRI site would be $2,500.00 per month. Id.

1063. An agreement between Scan Clear and Mobile Technology Management, LLC was attached to the CON application, and documented that Scan Clear would pay $4,200 per twelve-hour day to lease MRI equipment. The lease terms include the provision of qualified and trained support personnel to operate the equipment. *See* Exhibit 23.

1064. Scan Clear also submitted a revenue projection in which it estimated that its total revenue in its first year of operation would be $960,000.  *See* Exhibit 24.

1065. Scan Clear also represented that its total operating expenses would be $325,256 per year, a figure which included "salaries and wages," "fringe benefits," "equipment lease," "maintenance and repair," "insurance," "medical supplies," "office supplies," "rent," "professional services," "internet, telephone, and utilities," and "other."  Id.

1066. In other words, the factors Scan Clear considered in arriving at its projected operating costs were comprehensive, further supporting the accuracy of its projections.

1067. Based on these cost projections, Scan Clear represented in its application to obtain its CON that its average charge per MRI scan would be $1,200.00.  Id.

### 4.     Scan Clear's Charges to Allstate

1068. From November 16, 2013 through present, Scan Clear submitted the following charges to Allstate for its alleged MRI services:

| MRI CPT Code Billed | CPT Code Description | Amount Billed Per MRI |
|---|---|---|
| 70551 | Brain MRI, without contrast | $3,750.00 |
| 72141 | Cervical MRI, without contrast | $3,750.00 |
| 72146 | Thoracic MRI, without contrast | $3,750.00 |
| 72148 | Lumbar MRI, without contrast | $3,750.00 |
| 73221 | Upper extremity joint MRI, without contrast | $3,750.00 |

*See* Exhibit 4.

1069. As documented above, Scan Clear billed Allstate $3,750 for each MRI it performed since commencing operations.

1070. It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

1071. Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

1072. The defendants' charges are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

### 5.   Michigan Technology's and Scan Clear's Certificate of Need Consultant Has Confirmed That Their Charges Are Excessive

1073. Michigan Technology and Scan Clear retained David Williams and Williams Consulting Services, LLC to assist with their applications to acquire CONs to operate MRI host sites.

1074. Williams owns three (3) MRI machines that he leases to mobile MRI route host sites in Michigan.

1075. Williams has been named as the authorized agent on dozens of CON applications submitted to the State of Michigan.

1076. Williams has testified that he has "seen a lot of numbers in terms of MRI costs and charges over [his] career."

1077. In fact, Williams estimated that as of the date of his deposition that he had been involved in 138 CON applications in Michigan.

1078. It is Williams' understanding that the State's purpose for requiring a CON is "to control cost, quality and access."

1079. Williams testified that it was his opinion that in 2010 a charge of "[f]our grand [per MRI] would be high."

1080. Williams further testified that since 2010 the average reimbursement amount for MRIs has gone down.

1081. Because of this decreasing price trend, during the same time period Williams lowered the estimated charge per MRI on CON applications that he submitted from $950 to $750.

1082. In light of his experience and research, Williams testified that charges in excess of $5,000 per MRI are high.

1083.  As itemized *supra*, nearly all of the charges submitted to Allstate by Michigan Technology exceeded $5,000 per MRI and all of the charges submitted to Allstate by Scan Clear were nearly $4,000 per MRI, all of which are amounts that were considered high even before several years of declining MRI prices.  *See* Exhibits 4 and 5.

1084. Every charge at issue herein would be considered to be high by Williams, who was retained by Michigan Technology and Scan Clear to consult on their submissions to the State of Michigan, including cost and charge amount projections, and who has more than fifteen (15) years of experience working on more than 100 CON applications in Michigan.

## 6. Michigan Technology's and Scan Clear's Charges Far Exceeded the Amounts Paid by Other Michigan Payors

1085.  In addition to their charges being unreasonable and excessive based on their admitted-to costs and the testimony of Williams, Michigan Technology's and Scan Clear's charges are also grossly excessive when compared to other prominent Michigan payors.

1086. For example, Medicare reimbursed for MRIs performed in Macomb, Oakland, and Wayne counties at the following amounts for MRIs performed in 2015 through 2017:

|  | 2015A | 2015B | 2016 | 2017 |
|---|---|---|---|---|
| **CPT Code 70551** | $230.15 | $231.30 | $232.01 | $234.22 |
| **CPT Code 72141** | $244.06 | $224.52 | $225.73 | $228.00 |
| **CPT Code 72146** | $223.40 | $224.52 | $225.73 | $228.35 |
| **CPT Code 72148** | $223.33 | $223.44 | $224.66 | $227.29 |
| **CPT Code 73221** | $235.81 | $236.99 | $237.80 | $240.78 |
| **CPT Code 73718** | $364.47 | $366.29 | $366.28 | $368.59 |
| **CPT Code 73721** | $325.45 | $236.63 | $238.16 | $240.42 |

1087. Michigan Medicaid reimbursed for MRIs performed from 2015 through 2017 at the following amounts:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| **CPT Code 70551** | $127.77 | $128.37 | $129.16 |
| **CPT Code 72141** | $124.01 | $124.80 | $125.60 |
| **CPT Code 72146** | $124.01 | $124.80 | $125.79 |
| **CPT Code 72148** | $123.22 | $124.21 | $125.20 |
| **CPT Code 73221** | $130.75 | $131.54 | $132.73 |
| **CPT Code 73718** | $202.46 | $203.05 | $203.84 |
| **CPT Code 73721** | $130.75 | $131.74 | $132.53 |

1088. The Michigan workers' compensation program reimbursed MRIs performed from 2015 through 2017 at the following amounts:

188

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| **CPT Code 70551** | $230.15 | $232.01 | $234.22 |
| **CPT Code 72141** | $324.04 | $225.73 | $228.00 |
| **CPT Code 72146** | $223.40 | $225.73 | $228.35 |
| **CPT Code 72148** | $222.33 | $224.66 | $227.29 |
| **CPT Code 73221** | $235.81 | $237.80 | $240.78 |
| **CPT Code 73718** | $364.47 | $366.28 | $368.59 |
| **CPT Code 73721** | $235.45 | $238.16 | $240.42 |

1089. Allstate is not suggesting that it should pay only what other Michigan payors pay for MRIs.

1090. However, the reimbursement amounts from other payors are indicative of the range for what a reasonable charge and reimbursement is per MRI.

1091. Michigan Technology's and Scan Clear's charges are well outside this range and the spectrum of reasonableness and the defendants cannot sustain their burden of proving otherwise.

### B.    CHARGES SUBMITTED BY MEDS DIRECT AND LIVONIA CARE

1092. Meds Direct and Livonia Care charged Allstate amounts that are hundreds of times above average retail prices for the generic and over-the-counter medications they dispense.

1093. In many cases, Meds Direct charged more than $1,000.00 for medications that could have been obtained through any retail pharmacy for less than $10.00. *See* Exhibit 6.

1094. Meds Direct's pharmacist, Robert Presley, has stated to Allstate that Meds Direct's prices are based on "market analysis."

1095. After allegedly performing a "market analysis," Meds Direct chose a price on the high end of a bell curve and then applied a multiplier of seven (7) to (9) times that amount.

1096. In other words, Meds Direct set its charges by exponentially increasing an amount that was already an outlier on the high end of a bell curve.

1097. Meds Direct obtains the medications it dispenses from a wholesaler; like every other pharmacy, it would be profitable by charging average retail prices.

1098. Instead, Meds Direct's prices are as high as 71,163% higher than a CVS pharmacy located just 1.5 miles away from the 16100 building.

1099. The following chart, which exemplifies the amounts charged by Meds Direct for each patient at issue herein, reflects amounts charged relative to patient E.Y. (Claim No. 0440126950):

| **Drug** | **CVS Price** | **Meds Direct Price** | **Markup %** |
|---|---|---|---|
| Cyclobenzaprine 10 mg (60) | $8.97 | $2,225.94 | 24,715% |
| Norco 10-325 (60) | $21.00 | $3,125.94 | 14,785% |
| Thera Multivitamin (30) | $2.24 | $1,596.30 | 71,163% |
| Lidocaine 2% 30ml | $13.75 | $2,225.94 | 16,088% |
| Dok 100 mg (30) | $1.80 | $1,023.90 | 56,783% |
| Famotidine 40 mg (30) | $19.14 | $1,865.70 | 9,647% |
| Naproxen 500 mg (60) | $15.39 | $1,745.94 | 11,244% |

1100. Each time E.Y. filled prescriptions for the drugs included in the Mercyland predetermined treatment protocol at Meds Direct, Allstate was charged at least $13,000 more than it would have been charged had E.Y. filled his prescription at CVS, where the total charge would have been $82.29.

1101. Durable medical equipment purportedly dispensed by Meds Direct was also charged at unreasonable and excessive amounts.

1102. For example, on August 2, 2016, patient L.E. (Claim No. 0417427085) was allegedly given a "Futuro back stabilizer" by Meds Direct, for which Allstate was charged $961.68.

1103. A Futuro back stabilizer retails for approximately $30.00.

1104. As discussed above, Meds Direct chose these outrageous rates, which no reasonably prudent insurer would actually pay, because it treated outstanding medical bills as a commodity to be traded.

1105. Meds Direct profited from these exorbitant charges by selling accounts receivable to third parties for a fraction of the amounts billed to Allstate.

1106. Allstate is victimized by Meds Direct's scheme even when it does not pay the unreasonable and excessive amounts charged, because it is nevertheless obligated to investigate and adjust each claim, thereby incurring costs.

1107. Further, the purchasers of Meds Direct's accounts receivable continue collection efforts against Allstate after Meds Direct has booked its profit.

1108. Meds Direct knew that purchasers of its accounts receivable would attempt to collect payment from Allstate, including through correspondence sent by U.S. Mail.

1109. Livonia Care similarly uses exponential mark-ups for generic drugs it obtains from wholesalers for very little money.

1110. For example, patient S.V. (Claim No. TXA-0190098) was charged $116.67 for fourteen (14) gummy vitamins.

1111. Livonia Care obtains gummy vitamins for $7.25 for a package of 150.

1112. The fourteen (14) gummy vitamins distributed to S.V. and charged to Allstate at $116.67 cost Livonia Care just $0.67, meaning Livonia Care charged 173 times its cost for this over-the-counter product.

1113. Livonia Care also charges Allstate more than other payors in violation of the No-Fault Act.

1114. At a clinic inspection performed by Allstate, defendant Patel admitted that cash patients would be charged approximately half as much as Allstate for the compounded cream typically ordered by Mercyland physicians.

1115. Documents produced by Livonia Care to Allstate confirm that the ingredients used in its compounded creams were purchased from a pharmaceutical wholesaler.

1116. Each of the ingredients used in Livonia Care's compounded creams is charged at an amount at least twenty (20) times higher than its acquisition cost, and as much as 80 times its acquisition cost.

1117. For example, Livonia Care's formula 8A allegedly contains 14.4 grams of gabapentin, which costs approximately $1.00 per gram.

1118. Livonia Care's billing submissions document that it charged at least one patient, E.Y. (Claim No. 0440126950), $1,139.38 for the 14.4 grams of gabapentin purportedly used.

### C.    CHARGES SUBMITTED BY TOX TESTING AND PARAGON

1119. Like Meds Direct and Livonia Care, Tox Testing and Paragon routinely submitted charges to Allstate that were hundreds of times more than the customary amounts charged by other providers for the same services.

1120. As discussed above, both Tox Testing and Paragon charged Allstate for a qualitative/presumptive screen performed on every urine specimen collected.

1121. Nearly all of the screening tests allegedly performed by Tox Testing and Paragon were conducted using reagent dipsticks.

1122. As set forth *supra*, Tox Testing and Paragon often billed Allstate for screening tests performed by instrument chemistry analyzers, but such services were not actually performed until March 2018 at the earliest.

1123.  Reagent dipsticks can be purchased for less than $1.00, and the highest-end reagent dipstick products rarely sell for more than $5.00 each.

1124.  The process of performing a reagent dipstick test takes only seconds.

1125.  The 2017 Medicare fee schedule amount for performing a urine screen with a reagent dipstick is $14.86.

1126.  Even if Tox Testing and Paragon used chemistry analyzing instruments as they represented on many of their bills, which they did not, the 2017 Medicare fee schedule amount was $79.25.

1127.  By contrast, Paragon invariably charged Allstate $3,796 for urine screening tests and Tox Testing charged Allstate $3,796 for every urine screening test allegedly performed after April 15, 2016, after arbitrarily increasing their charges from an already unreasonable and excessive $950 per screening test.  *See* Exhibits 2 and 3.

### D.  UNCONSCIONABLE CHARGES FOR PROCEDURES

1128.  The defendants aggressively pressured patients to undergo unnecessary procedures, including injections, arthroscopic surgeries, and spinal surgeries.

1129.  When the defendants were successful in coercing patients to undergo medically unnecessary procedures, the bills that resulted from such treatment were staggering.

1130. For example, patient L.F. (Claim No. TXA-0182563) underwent a laminotomy on October 21, 2017, for which, as discussed above, ISpine and Block Billing submitted charges for surgical procedures that were never actually performed totaling at least $180,000.

1131. Pribil has testified that the procedure that was actually performed took one (1) hour and forty-eight (48) minutes from start to finish.

1132. This was an outpatient procedure, and L.F. was discharged to home on the same date.

1133. The procedure was so minor, Pribil could not recall whether he or a nurse performed the follow-up examination to remove the surgical staples.

1134. For this procedure, defendants Mercyland, ISpine, Block Billing, Tox Testing, and Paragon charged Allstate an astounding total of $532,926.

1135. An article published in August 2017 surveyed the costs of lumbar laminotomies for 181,267 patients throughout the country, and found that the average cost in the most recent year studied (2013) was $11,405.  Corinna C. Zygourakis, M.D., *et al*., *Geographic and Hospital Variation in Cost of Lumbar Laminectomy and Lumbar Fusion for Degenerative Conditions*, 81 NEUROSURG 331-340 (2017).

1136. The amount charged by the defendants was more than forty-six (46) times this average cost.

1137. Pribil testified that factors used to choose these unreasonable charge amounts include the "cost of flying," that "this takes me away from my family," and the fact that he "ha[s] to utilize an attorney."

1138. None of these factors are appropriate to consider in setting the price of a medical procedure.

1139. The first two (2) factors exist only because Angelo had to recruit Pribil from Florida to perform the medically unnecessary procedures and surgeries forced on the patients at issue herein.

1140. The fact that Pribil builds the cost of retaining an attorney into the price of the surgery confirms that he is aware that the procedures he performs are medically unnecessary and unreasonably charged, and that insurers adjusting the bills submitted would not voluntarily remit payment.

1141. The defendants also charged unreasonable amounts for drugs used during injection procedures.

1142. For example, for an 80mg injection of methylprednisolone, Mercyland charges $1,200, in addition to nearly $6,000 in separate charges for the procedure, including improperly unbundled fluoroscopy charges, discussed above.

1143. The Medicare fee schedule reimbursement amount for 80mg of methylprednisolone is approximately $10.

1144. Allstate is not obligated to pay any pending bills for surgical procedures billed at excessive amounts, and it is entitled to reimbursement for those procedures for which it has already tendered payment.

## XII.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A. MISREPRESENTATIONS BY THE DEFENDANTS

1145. To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and provided were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

1146. Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

1147. Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157.

1148. Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily

warranted that such bills and records related to lawfully rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

1149. There are no less than eighteen (18) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a.  Mercyland, Tox Testing, Paragon, Meds Direct, Omega Rehab, ISpine, Block Billing, Sinha, Pribil, and Ruefiel billed Allstate for treatment and services that were not actually provided.  Multiple patients at issue in this Complaint denied receiving the treatment or services that the defendants purported to provide.

b.  The defendants offered improper inducements to patients to undergo medically unnecessary treatments, including cash payments, in-kind compensation, and promises of disability certificates and prescriptions for narcotic drugs.

c.  The defendants illegally solicited patients for unnecessary treatment and engaged in *quid pro quo* relationships with each other.  The defendants utilized runners to recruit patients to receive unnecessary treatment and personally sought out patients who did not require medical care.  The defendants' methods of obtaining patients did not include considerations of medical necessity.  The defendants participated in numerous *quid pro quo* relationships that derived profit for themselves without regard for the necessity and lawfulness of medical treatment.

d.  The defendants used an unlawful predetermined treatment protocol, implemented by use of pre-printed and boilerplate purported examination findings, to order excessive physical therapy, urine drug testing, medically useless P-Stim devices, medication, and MRI imaging.  This predetermined protocol is confirmed by the identical purported findings and treatment plans ordered for patients at issue in this Complaint, which have no relationship to medical necessity or any patient-specific considerations.

e.  Angelo, Abraham, Sinha, and Mercyland subjected patients to unnecessary and clinically useless P-Stim devices.  The defendants further fraudulently required patients to have this acupuncture device applied in operating rooms and surgical centers, despite the fact that it is a transcutaneous adhesive application that has no surgical aspect whatsoever.

f.  Tox Testing and Paragon billed for unnecessary and excessive urine drug testing, primarily at the request and referral of Sinha, Pribil, Mercyland, ISpine, and other physicians associated with Angelo. Numerous patients at issue in this Complaint received definitive urine drug testing with no justification or basis for such testing.  The defendants ordered and performed drug testing for every patient at every appointment, regardless of whether medications were actually prescribed.  This further demonstrates that the defendants conducted urine drug testing as part of a predetermined treatment protocol and not based upon the particular needs of the patient.

g.  Angelo, Abraham, Sinha, and Mercyland indiscriminately referred patients for physical therapy without any individual determination of medical necessity, and without any evaluation of the efficacy of such treatment.  The predetermined nature of these referrals is illustrated by the defendants' purported examination findings, which frequently claimed patient reports of improvement with physical therapy when the patient had not actually undergone such treatment.

h.  Angelo, Abraham, Sinha, and Mercyland referred patients for MRIs, and Scan Clear and Michigan Technology performed MRIs, that were medically unnecessary and performed only in furtherance of the scheme to bill Allstate for as many ancillary services as possible, and not based on the individual needs of patients.

i.  Angelo, Ruefiel, Scan Clear, and Michigan Technology submitted bills to Allstate seeking payment for medically unnecessary MRIs that were ordered as a matter of course at the outset of treatment and were excessive in number.

j.  Angelo, Ruefiel, Scan Clear, and Michigan Technology submitted bills to Allstate for MRIs that were medically unnecessary and failed to adhere to applicable standards of care, including ACR guidelines.

Angelo, Ruefiel, Scan Clear, and Michigan Technology routinely performed MRIs that lacked any supporting examination or neurologic test findings. It was these defendants' responsibility to confirm the need for MRIs pursuant to ACR guidelines before performing the same.

k.   Angelo, Ruefiel, Scan Clear, and Michigan Technology submitted bills to Allstate seeking payment for MRI charges that, by their own admissions in documents submitted to the State of Michigan, were many times their cost for each MRI purportedly performed. These defendants' charges to Allstate were not reasonable and therefore non-compensable under the Michigan No-Fault Act.

l.   Angelo, Abraham, Sinha, and Mercyland prescribed medications, including narcotics, on a *pro forma* basis in an attempt to incentivize patients to continue to return to the clinic for medically unnecessary treatment. The predetermined nature of the prescriptions written by the defendants is evidenced by the lack of influence of urine drug test results on their prescription habits, which continued without change even in the face of evidence that patients were abusing or diverting the drugs prescribed.

m.   Angelo, Abraham, Sinha, Pribil Mercyland, and ISpine ordered medically unnecessary injections and surgical procedures in violation of applicable standards of care.

n.   Tox Testing and Paragon fraudulently submitted claims for payment to Allstate for alleged services that were also billed by different medical providers for the exact same purported treatment.

o.   Angelo, Abraham, Sinha, and Mercyland fraudulently upcoded office visits, as all office visits billed to Allstate were for level four or level five even though the office visits did not meet the criteria set by the AMA to bill at such high levels. When done intentionally, as the defendants did, upcoding constitutes a fraudulent billing practice.

p.   Tox Testing, Omega Rehab, Prime Rehabilitation, and Ruefiel submitted claims using multiple CPT codes to describe the same procedure allegedly performed, which is a fraudulent billing practice known as unbundling.

q.   Mercyland and Sinha submitted charges to Allstate for clinically-useless P-Stim acupuncture devices using CPT Codes that they knew described procedures that were far more complex and invasive than P-Stim, which merely involves placing an adhesive behind patients' ears.

r.   Mercyland, Tox Testing, Paragon, Scan Clear, Michigan Technology, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, ISpine, Block Billing, Angelo, Abraham, Sinha, Pribil, Ruefiel, and Patel submitted charges to Allstate at amounts that were excessive and unreasonable for nearly all services at issue herein, including office evaluations, P-Stim, surgical procedures, urine drug testing, MRI imaging, and medications.

1150. As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and rendered treatment without basis or adequate substantiation.

1151. If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

1152. The foregoing facts – billing for services not rendered, unlawfully soliciting patients, paying kickbacks, falsifying documents to justify excessive treatment, using a predetermined treatment protocol to inflate charges, and misrepresenting the necessity of procedures performed on submitted bills – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

1153. Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing allegedly provided by the defendants unnecessary and unlawful.

1154. The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 11.

1155. Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

1156. Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

1157. Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, screenings, testing, procedures, and ancillary services for which they billed Allstate.

1158. As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing

purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

1159. As licensed medical professionals, defendants Sinha, Ruefiel, Pribil, Abraham, and Patel were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

1160. Each misrepresentation made by Sinha, Ruefiel, Pribil, Abraham, and Patel was in violation of their legal and ethical obligations as healthcare professionals.

### B. ALLSTATE'S JUSTIFIABLE RELIANCE

1161. The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

1162. At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

1163. These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek reimbursement under Michigan's No-Fault Act.

1164. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

1165. Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

1166. In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

1167. Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

1168. As a result, Allstate has paid in excess of $952,248 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XIII.  MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

1169. As discussed above, the referrals, treatment, and services purportedly provided by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

1170. The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 11, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

1171. This objective necessarily required the submission of claims for reimbursement to Allstate.

1172. The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

1173. All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

1174. All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Georgia until November 2013 and thereafter were faxed to Allstate in Iowa.

1175. Allstate received all medical records and bills faxed to it by the defendants in Georgia until November 2013 and thereafter in Iowa.

1176. Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, benefits payment checks, and the return of the cancelled check drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of check draft duplicates to Allstate.

1177. It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

1178. Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

1179. The fraudulent medical billing scheme detailed herein generated thousands of mailings and faxes.

1180. A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 25.

1181. As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

1182. It was within the ordinary course of business for Mercyland, Tox Testing, Paragon, Scan Clear, Michigan Technology, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, ISpine, and Block Billing to submit claims for No-Fault reimbursement to insurance carriers like Allstate through interstate wires and the U.S. Mail.

1183. Moreover, the business of providing medical services by each of the Defendant Entities at issue herein is regularly conducted by fraudulently seeking reimbursement to which each defendant clinic is not entitled through the use of fraudulent communications sent via intestate wires and the U.S. Mail.

1184. In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendants.

1185. The Defendant Entities, at the direction and with the knowledge of their owners and managers, continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

1186. Thus, the defendants' commission of mail and wire fraud continues.

1187. As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

1188. As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

1189. Allstate reasonably relied on the submissions it received from Mercyland, Tox Testing, Paragon, Scan Clear, Michigan Technology, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, ISpine, and Block Billing, including the representative submissions set out in Exhibit 25 annexed hereto and identified in the exemplar claims above.

1190. As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIV.  **DAMAGES**

1191. The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

1192. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue,

Allstate's injury includes, but is not limited to, compensatory damages in excess of $952,248.

1193. Exhibits 26 through 35 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to and for the benefit of the defendants by date, payor, patient claim number, check number, and amount.

1194. Exhibit 26 details payments made by Allstate to Mercyland.

1195. Exhibit 27 details payments made by Allstate to Tox Testing.

1196. Exhibit 28 details payments made by Allstate to Paragon.

1197. Exhibit 29 details payments made by Allstate to Scan Clear.

1198. Exhibit 30 details payments made by Allstate to Michigan Technology.

1199. Exhibit 31 details payments made by Allstate to Meds Direct.

1200. Exhibit 32 details payments made by Allstate to Livonia Care.

1201. Exhibit 33 details payments made by Allstate to Omega Rehab.

1202. Exhibit 34 details payments made by Allstate to Prime Rehabilitation.

1203. Exhibit 35 details payments made by Allstate to Block Billing.

1204. Every claim identified in Exhibits 26 through 35 derives from an Allstate insurance policy.

1205. Allstate's claim for compensatory damages, as set out in Exhibits 26 through 35, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

1206. Every payment identified in Exhibits 26 through 35 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 26 through 34.

1207. Moreover, every payment identified in Exhibits 26 through 35 derives from a check sent by Allstate to the defendants through the U.S. Mail.

1208. As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

1209. Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

1210. Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XV.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Mercyland Enterprise)
### Against Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1211.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1212.  Mercyland constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1213. In connection with each of the claims identified in the within Complaint, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Mercyland, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Mercyland's business, or should have reasonably

211

foreseen that the faxing and mailing of such false medical documentation by Mercyland would occur, in furtherance of the Count I defendants' scheme to defraud.

1214. The Count I defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25.

1215. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1216. Policies of insurance were delivered to insureds through the U.S. Mail.

1217. Payments to Mercyland from Allstate were transmitted through the U.S. Mail.

1218. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Mercyland, which they knew would be billed by Mercyland, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1219. Angelo was responsible for the illegal solicitation of patients and improper referrals to Mercyland.

1220. Abraham is the owner of Mercyland and is responsible for all actions taken by Mercyland and its physicians.

1221. Sinha and Pribil rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Mercyland.

1222. Tox Testing, Paragon, Scan Clear, Michigan Technology, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, ISpine, and Block Billing billed for testing and other procedures that created the appearance of injury and permitted Mercyland to continue providing unlawful and medically unnecessary treatment, if provided at all.

1223. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Mercyland for the benefit of the Count I defendants that would not otherwise have been paid.

1224. The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

1225. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1226. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Mercyland for the benefit of the Count I defendants.

1227. The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1228. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

1229. The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1230. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1231. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1232. By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason

of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Mercyland Enterprise)
**Against Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

1233. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1234. Defendants Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Mercyland.

1235. The Count II defendants each agreed to further, facilitate, support, and operate the Mercyland enterprise.

1236. As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

1237. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Mercyland even though Mercyland was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1238. The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1239. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

1240. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Tox Testing Enterprise)
### Against Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1241. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1242. Tox Testing, including its fictitious name Paragon Diagnostics, constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1243. In connection with each of the claims identified in the within Complaint, Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Tox Testing, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Tox Testing's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Tox Testing would occur, in furtherance of the Count III defendants' scheme to defraud.

1244. The Count III defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on

certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25

1245. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1246. Policies of insurance were delivered to insureds through the U.S. Mail.

1247. Payments to Tox Testing from Allstate were transmitted through the U.S. Mail.

1248. As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Tox Testing, which they knew would be billed by Tox Testing, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1249. Angelo was responsible for the illegal solicitation of patients and improper referrals that resulted in testing performed by Tox Testing.

1250. Angelo is the owner of Tox Testing and is responsible for all actions taken by Tox Testing and its representatives.

1251. Mercyland, ISpine, Sinha, Pribil, and Abraham were responsible for the medically unnecessary urine drug test prescriptions that allowed Tox Testing to submit bills to Allstate.

1252. Block Billing submitted charges to Allstate for the medically unnecessary urine drug testing allegedly performed by Tox Testing.

1253. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Tox Testing for the benefit of the Count III defendants that would not otherwise have been paid.

1254. The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

1255. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1256. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Tox Testing for the benefit of the Count III defendants.

1257. The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1258. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

1259. The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1260. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1261. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1262. By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Tox Testing Enterprise)
### Against Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1263. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1264. Defendants Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Tox Testing, including its fictitious name Paragon Diagnostics.

1265. The Count IV defendants each agreed to further, facilitate, support, and operate the Tox Testing enterprise.

1266. As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

1267. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Tox Testing even though Tox Testing was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1268. The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to

Allstate of insurance claim and medical record documents containing material misrepresentations.

1269. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

1270. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Paragon Enterprise)
### Against Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1271. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1272. Paragon constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1273. In connection with each of the claims identified in the within Complaint, Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and

Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Paragon, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Paragon's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Paragon would occur, in furtherance of the Count V defendants' scheme to defraud.

1274. The Count V defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25

1275. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1276. Policies of insurance were delivered to insureds through the U.S. Mail.

1277. Payments to Paragon from Allstate were transmitted through the U.S. Mail.

1278. As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by

Paragon, which they knew would be billed by Paragon, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1279. Angelo was responsible for the illegal solicitation of patients and improper referrals that resulted in testing performed by Paragon.

1280. Angelo is the owner of Paragon and is responsible for all actions taken by Paragon and its representatives.

1281. Mercyland, ISpine, Sinha, Pribil, and Abraham were responsible for the medically unnecessary urine drug test prescriptions that allowed Paragon to submit bills to Allstate.

1282. Block Billing submitted charges to Allstate for the medically unnecessary urine drug testing allegedly performed by Paragon.

1283. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Paragon for the benefit of the Count V defendants that would not otherwise have been paid.

1284. The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for

a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

1285. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1286. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Paragon for the benefit of the Count V defendants.

1287. The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1288. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

1289. The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1290. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1291. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1292. By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Paragon Enterprise)**
**Against Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

1293. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1294. Defendants Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Paragon.

1295. The Count VI defendants each agreed to further, facilitate, support, and operate the Paragon enterprise.

1296. As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

1297. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Paragon even though Paragon was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1298. The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1299. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

1300. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## <u>COUNT VII</u>
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Scan Clear Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1301. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1302. Scan Clear constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1303. In connection with each of the claims identified in the within Complaint, Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Scan Clear, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Scan Clear's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Scan Clear would occur, in furtherance of the Count VII defendants' scheme to defraud.

1304. The Count VII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25.

1305. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1306. Policies of insurance were delivered to insureds through the U.S. Mail.

1307. Payments to Scan Clear from Allstate were transmitted through the U.S. Mail.

1308. As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Scan Clear, which they knew would be billed by Scan Clear, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1309. Angelo was responsible for the illegal solicitation of patients and improper referrals that resulted in imaging performed by Scan Clear.

1310. Ruefiel is the owner of Scan Clear and is responsible for all actions taken by Scan Clear and its representatives.

1311. Mercyland, Sinha, and Abraham were responsible for the medically unnecessary MRI imaging prescriptions that allowed Scan Clear to submit bills to Allstate.

1312. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Scan Clear for the benefit of the Count VII defendants that would not otherwise have been paid.

1313. The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

1314. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1315. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Scan Clear for the benefit of the Count VII defendants.

1316. The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1317. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

1318. The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1319. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

230

1320. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1321. By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Scan Clear Enterprise)**
**Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

1322. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1323. Defendants Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Scan Clear.

1324. The Count VIII defendants each agreed to further, facilitate, support, and operate the Scan Clear enterprise.

1325. As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

1326. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Scan Clear even though Scan Clear was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1327. The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1328. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

1329. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
**(Michigan Technology Enterprise)**
**Against Mercyland Health Services, PLLC, Cure Imaging, LLC, Omega Rehab Services, LLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim**

1330. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1331. Michigan Technology constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1332. In connection with each of the claims identified in the within Complaint, Mercyland Health Services, PLLC, Cure Imaging, LLC, Omega Rehab Services, LLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D., a/k/a Mohammed Ali Ibrahim ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Michigan Technology, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Michigan Technology's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Michigan Technology would occur, in furtherance of the Count IX defendants' scheme to defraud.

1333. The Count IX defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on

certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25.

1334. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1335. Policies of insurance were delivered to insureds through the U.S. Mail.

1336. Payments to Michigan Technology from Allstate were transmitted through the U.S. Mail.

1337. As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Michigan Technology, which they knew would be billed by Michigan Technology, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1338. Angelo was responsible for the illegal solicitation of patients and improper referrals that resulted in imaging performed by Michigan Technology.

1339. Angelo is the owner of Michigan Technology and is responsible for all actions taken by Michigan Technology and its representatives.

1340. Omega Rehab and Ruefiel were responsible for providing medically unnecessary transportation services to ensure that patients presented at Michigan Technology for medically unnecessary imaging.

1341. Mercyland, Sinha, and Abraham were responsible for the medically unnecessary imaging prescriptions that allowed Michigan Technology to submit bills to Allstate.

1342. Cure Imaging used a separate legal entity to submit charges to Allstate using Michigan Technology's tax identification number, thereby concealing the involvement of Michigan Technology in the services allegedly rendered.

1343. Block Billing submitted charges to Allstate for the medically unnecessary imaging allegedly performed by Michigan Technology.

1344. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Michigan Technology for the benefit of the Count IX defendants that would not otherwise have been paid.

1345. The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

1346. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1347. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Michigan Technology for the benefit of the Count IX defendants.

1348. The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1349. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

1350. The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1351. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1352. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1353. By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason

of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Michigan Technology Enterprise)
### Against Mercyland Health Services, PLLC, Cure Imaging, LLC, Omega Rehab Services, LLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim

1354. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1355. Defendants Mercyland Health Services, PLLC, Cure Imaging, LLC, Omega Rehab Services, LLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D., a/k/a Mohammed Ali Ibrahim ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Michigan Technology.

1356. The Count X defendants each agreed to further, facilitate, support, and operate the Michigan Technology enterprise.

1357. As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

1358. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Michigan Technology even though Michigan Technology was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1359. The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1360. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

1361. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## <u>COUNT XI</u>
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Meds Direct Enterprise)
### Against Mercyland Health Services, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1362. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

238

1363. Meds Direct constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1364. In connection with each of the claims identified in the within Complaint, Mercyland Health Services, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count XI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Meds Direct, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Meds Direct's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Meds Direct would occur, in furtherance of the Count XI defendants' scheme to defraud.

1365. The Count XI defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25.

1366. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1367. Policies of insurance were delivered to insureds through the U.S. Mail.

1368. Payments to Meds Direct from Allstate were transmitted through the U.S. Mail.

1369. As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Meds Direct, which they knew would be billed by Meds Direct, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1370. Angelo was responsible for the illegal solicitation of patients that led to improper prescriptions for drugs dispensed by Meds Direct.

1371. Angelo is the owner of Meds Direct and is responsible for all actions taken by Meds Direct and its representatives.

1372. Mercyland, Sinha, and Abraham were responsible for the medically unnecessary drug prescriptions that allowed Meds Direct to submit bills to Allstate.

1373. Block Billing submitted charges to Allstate for the medically unnecessary prescription medications allegedly dispensed by Meds Direct.

1374. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Meds Direct for the benefit of the Count XI defendants that would not otherwise have been paid.

1375. The Count XI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI defendants to continue their fraudulent scheme without detection.

1376. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1377. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Meds Direct for the benefit of the Count XI defendants.

1378. The Count XI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1379. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI defendants' fraudulent acts.

1380. The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1381. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1382. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1383. By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Meds Direct Enterprise)
### Against Mercyland Health Services, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1384. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1385. Defendants Mercyland Health Services, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Meds Direct.

1386. The Count XII defendants each agreed to further, facilitate, support, and operate the Meds Direct enterprise.

1387. As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

1388. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Meds Direct even though Meds Direct was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1389. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1390. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XII defendants' unlawful conduct described herein.

1391. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Livonia Care Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel

1392. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1393. Livonia Care constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1394. In connection with each of the claims identified in the within Complaint, Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel ("Count XIII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Livonia Care, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Livonia Care's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Livonia Care would occur, in furtherance of the Count XIII defendants' scheme to defraud.

1395. The Count XIII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25.

244

1396. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1397. Policies of insurance were delivered to insureds through the U.S. Mail.

1398. Payments to Livonia Care from Allstate were transmitted through the U.S. Mail.

1399. As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Livonia Care, which they knew would be billed by Livonia Care, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1400. Angelo was responsible for the illegal solicitation of patients that led to improper prescriptions for medications dispensed by Livonia Care.

1401. Patel is the owner of Livonia Care and is responsible for all actions taken by Livonia Care and its representatives.

1402. Mercyland, Sinha, and Abraham were responsible for the medically unnecessary drug prescriptions that allowed Livonia Care to submit bills to Allstate.

1403. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts

to Livonia Care for the benefit of the Count XIII defendants that would not otherwise have been paid.

1404. The Count XIII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII defendants to continue their fraudulent scheme without detection.

1405. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XIII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1406. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Livonia Care for the benefit of the Count XIII defendants.

1407. The Count XIII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1408. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII defendants' fraudulent acts.

1409. The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1410. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1411. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1412. By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Livonia Care Enterprise)**
**Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel**

1413. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1414. Defendants Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Livonia Care.

1415. The Count XIV defendants each agreed to further, facilitate, support, and operate the Livonia Care enterprise.

1416. As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

1417. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Livonia Care even though Livonia Care was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1418. The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1419. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XIV defendants' unlawful conduct described herein.

1420. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XV
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Omega Rehab Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1421. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1422. Omega Rehab constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1423. In connection with each of the claims identified in the within Complaint, Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count XV defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Omega Rehab, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Omega Rehab's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Omega Rehab would occur, in furtherance of the Count XV defendants' scheme to defraud.

1424. The Count XV defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25.

1425. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1426. Policies of insurance were delivered to insureds through the U.S. Mail.

1427. Payments to Omega Rehab from Allstate were transmitted through the U.S. Mail.

1428. As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Omega Rehab, which they knew would be billed by Omega Rehab, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1429. Angelo and Ruefiel were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by Omega Rehab.

1430. Ruefiel is the owner of Omega Rehab and is responsible for all actions taken by Omega Rehab and its representatives.

1431. Mercyland, Sinha, and Abraham were responsible for the medically unnecessary physical therapy prescriptions that allowed Omega Rehab to submit bills to Allstate.

1432. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Omega Rehab for the benefit of the Count XV defendants that would not otherwise have been paid.

1433. The Count XV defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XV defendants to continue their fraudulent scheme without detection.

1434. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XV defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1435. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Omega Rehab for the benefit of the Count XV defendants.

1436. The Count XV defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1437. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV defendants' fraudulent acts.

1438. The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1439. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1440. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1441. By virtue of the Count XV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Omega Rehab Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1442. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1443. Defendants Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count XVI defendants") conspired with each other

to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Omega Rehab.

1444. The Count XVI defendants each agreed to further, facilitate, support, and operate the Omega Rehab enterprise.

1445. As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

1446. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Omega Rehab even though Omega Rehab was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1447. The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1448. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XVI defendants' unlawful conduct described herein.

1449. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims

submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Prime Rehabilitation Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1450. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1451. Prime Rehabilitation constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1452. In connection with each of the claims identified in the within Complaint, Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count XVII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Prime Rehabilitation, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Prime Rehabilitation's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Prime Rehabilitation would occur, in furtherance of the Count XVII defendants' scheme to defraud.

1453. The Count XVII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from

Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25.

1454. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1455. Policies of insurance were delivered to insureds through the U.S. Mail.

1456. Payments to Prime Rehabilitation from Allstate were transmitted through the U.S. Mail.

1457. As documented above, the Count XVII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Prime Rehabilitation, which they knew would be billed by Prime Rehabilitation, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1458. Angelo and Ruefiel were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by Prime Rehabilitation.

1459. Ruefiel is the owner of Prime Rehabilitation and is responsible for all actions taken by Prime Rehabilitation and its representatives.

1460. Mercyland, Sinha, and Abraham were responsible for the medically unnecessary physical therapy prescriptions that allowed Prime Rehabilitation to submit bills to Allstate.

1461. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Prime Rehabilitation for the benefit of the Count XVII defendants that would not otherwise have been paid.

1462. The Count XVII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XVII defendants to continue their fraudulent scheme without detection.

1463. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XVII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1464. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Prime Rehabilitation for the benefit of the Count XVII defendants.

1465. The Count XVII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1466. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XVII defendants' fraudulent acts.

1467. The Count XVII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1468. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1469. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1470. By virtue of the Count XVII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT XVIII**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Prime Rehabilitation Enterprise)**
**Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha,**
**M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a**
**Mohammed Ali Ibrahim, M.D.**

1471. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1472. Defendants Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count XVIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Prime Rehabilitation.

1473. The Count XVIII defendants each agreed to further, facilitate, support, and operate the Prime Rehabilitation enterprise.

1474. As such, the Count XVIII defendants conspired to violate 18 U.S.C. § 1962(c).

1475. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Prime Rehabilitation even though Prime Rehabilitation was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1476. The Count XVIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

1477. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XVIII defendants' unlawful conduct described herein.

1478. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (ISpine Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1479. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1480. ISpine constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1481. In connection with each of the claims identified in the within Complaint, Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count XIX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by ISpine, or knew that such false medical documentation would be faxed and mailed in the ordinary course of ISpine's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by ISpine would occur, in furtherance of the Count XIX defendants' scheme to defraud.

1482. The Count XIX defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25.

1483. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1484. Policies of insurance were delivered to insureds through the U.S. Mail.

1485. As documented above, the Count XIX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by

ISpine, which they knew would be billed by ISpine, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1486. Angelo was responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by ISpine.

1487. Pribil is the owner of ISpine and is responsible for all actions taken by ISpine and its representatives.

1488. Mercyland, Sinha, and Abraham were responsible for the medically unnecessary referrals that allowed ISpine to submit bills to Allstate.

1489. The Count XIX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIX defendants to continue their fraudulent scheme without detection.

1490. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to ISpine for the benefit of the Count XIX defendants that would not otherwise have been paid.

1491. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the

261

Count XIX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1492. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to ISpine for the benefit of the Count XIX defendants.

1493. The Count XIX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1494. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIX defendants' fraudulent acts.

1495. The Count XIX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1496. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1497. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1498. By virtue of the Count XIX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XX**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(ISpine Enterprise)**
**Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

1499. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1500. Defendants Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count XX defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of ISpine.

1501. The Count XX defendants each agreed to further, facilitate, support, and operate the ISpine enterprise.

1502. As such, the Count XX defendants conspired to violate 18 U.S.C. § 1962(c).

1503. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of ISpine even though ISpine was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1504. The Count XX defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

1505. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XX defendants' unlawful conduct described herein.

1506. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XX defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XX defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXI**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Block Billing Enterprise)**
**Against Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

1507. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1508. Block Billing constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1509. In connection with each of the claims identified in the within Complaint, Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count XXI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Block Billing, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Block Billing's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Block Billing would occur, in furtherance of the Count XXI defendants' scheme to defraud.

1510. The Count XXI defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 25.

1511. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1512. Policies of insurance were delivered to insureds through the U.S. Mail.

1513. Payments to Block Billing from Allstate were transmitted through the U.S. Mail.

1514. As documented above, the Count XXI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Mercyland, Tox Testing, Paragon, Michigan Technology, and Meds Direct, which they knew would be billed by Block Billing, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1515. Angelo was responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by Mercyland, Tox Testing, Paragon, Michigan Technology, and Meds Direct for which Block Billing billed Allstate.

1516. Angelo is the owner of Block Billing and is responsible for all actions taken by Block Billing and its representatives.

1517. Mercyland, Sinha, Pribil, and Abraham were responsible for the medical evaluation and treatment, and unnecessary urine drug testing and drug prescriptions that allowed Block Billing to submit bills to Allstate on behalf of Mercyland, Tox Testing, Paragon, Michigan Technology, and Meds Direct.

1518. Mercyland, Tox Testing, Paragon, Michigan Technology, and Meds Direct entered into agreements for Block Billing to submit charges for unlawful and unnecessary medical services they allegedly performed.

1519. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Block Billing for the benefit of the Count XXI defendants that would not otherwise have been paid.

1520. The Count XXI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XXI defendants to continue their fraudulent scheme without detection.

1521. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XXI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1522. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Block Billing for the benefit of the Count XXI defendants.

1523. The Count XXI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1524. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXI defendants' fraudulent acts.

1525. The Count XXI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1526. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1527. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1528. By virtue of the Count XXI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Block Billing Enterprise)
### Against Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, Michigan Technology Partners, LLC, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

1529. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1530. Defendants Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D. ("Count XXII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Block Billing.

1531. The Count XXII defendants each agreed to further, facilitate, support, and operate the Block Billing enterprise.

1532. As such, the Count XXII defendants conspired to violate 18 U.S.C. § 1962(c).

1533. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Block Billing even though Block Billing was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1534. The Count XXII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1535. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XXII defendants' unlawful conduct described herein.

1536. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XXII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XXIII
### COMMON LAW FRAUD
### Against All Defendants

1537. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1538. The scheme to defraud perpetrated by Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC

d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, Inc., Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., Stefan Pribil, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel ("Count XXIII defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were lawfully and actually providing necessary services in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

1539. The misrepresentations of fact made by the Count XXIII defendants include, but are not limited to, those material misrepresentations discussed in section XII *supra*.

1540. The Count XXIII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1541. The misrepresentations were intentionally made by the Count XXIII defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

1542. The Count XXIII defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

1543. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

1544. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT XXIV**
**CIVIL CONSPIRACY**
**Against All Defendants**

1545. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1546. Defendants Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, Inc., Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., Stefan Pribil, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel ("Count XXIV defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for reimbursement under the No-Fault Act to which they were

not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants did not submit reasonable charges to Allstate.

1547. The Count XXIV defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

1548. This purpose was known to all of the Count XXIV defendants and intentionally pursued.

1549. Despite knowing that the defendants were not entitled to reimbursement under the No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they charged outrageous and unreasonable prices, the Count XXIV defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

1550. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

1551. All of the Count XXIV defendants directly benefited from the payments made to Mercyland, Tox Testing, Paragon, Scan Clear, Michigan Technology, Meds Direct, Livonia Care, Omega Rehab, Prime Rehabilitation, and Block Billing.

1552. All of the Count XXIV defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XXIV defendants in the commission of acts done for the benefit of all Count XXIV defendants and to the unjustified detriment of Allstate.

1553. Accordingly, all of the Count XXIV defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

<u>**COUNT XXV**</u>
**PAYMENT UNDER MISTAKE OF FACT**
**Against Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, and Block Billing Solutions, LLC**

1554. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1555. Allstate paid the amounts described herein and itemized in Exhibits 26 through 35 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC,

Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, and Block Billing Solutions, Inc. ("Count XXV defendants").

1556. Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XXV defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

1557. The Count XXV defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

1558. Allstate is entitled to restitution from each of the Count XXV defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

**COUNT XXVI**
**UNJUST ENRICHMENT**
**Against Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, and Block Billing Solutions, LLC**

1559. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1560. Allstate paid monies, including those amounts set out in Exhibits 26 through 35, in response to the claims submitted, or caused to be submitted, by defendants Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, and Block Billing Solutions, Inc. ("Count XXVI defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

1561. Allstate's payments constitute a benefit which the Count XXVI defendants aggressively sought and voluntarily accepted.

1562. The Count XXVI defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

1563. The Count XXVI defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

1564. The Count XXVI defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXVII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

1565.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1210 set forth above as if fully set forth herein.

1566. Defendants Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, Inc., Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., Stefan Pribil, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel ("Count XXVII defendants") routinely provided unnecessary and unlawful services with respect to the patients at issue in this Complaint.

1567. The Count XXVII defendants also rendered services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

1568. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment

arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

1569.  The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.   Mich. Comp. Laws § 500.3107.

1570.  The lack of lawfully-rendered treatment (such as treatment arising from illicit solicitation or kickbacks) is also a defense to an insurer's obligation to pay No-Fault benefits.

1571.  Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1572.  Further, providers may only charge a reasonable amount for the products, services, and accommodations rendered.  Mich. Comp. Laws § 500.3157.

1573.  The Count XXVII defendants continue to submit claims under the No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

1574.  The Count XXVII defendants will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied No-Fault claims submitted by any

of the Count XXVII defendants for any or all of the reasons set out in the within Complaint.

1575. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXVII defendants provided unnecessary and unlawful treatment that is not compensable under Michigan's No-Fault Act.

1576. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXVII defendants were engaged in a fraudulent scheme whereby they provided unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

1577. As such, the Count XXVII defendants have no standing to submit, pursue, or receive No-Fault benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXVII defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

1578. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXVII defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate

policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XVI.  DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Mercyland Enterprise)
### Against Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
#### (Mercyland Enterprise)
### Against Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Tox Testing Enterprise)
### Against Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Tox Testing Enterprise)
**Against Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Paragon Enterprise)
**Against Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## <u>COUNT VI</u>
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Paragon Enterprise)
### Against Mercyland Health Services, PLLC, ISpine, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Scan Clear Enterprise)
**Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Scan Clear Enterprise)
**Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Michigan Technology Enterprise)
**Against Mercyland Health Services, PLLC, Cure Imaging, LLC, Omega Rehab Services, LLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Michigan Technology Enterprise)
**Against Mercyland Health Services, PLLC, Cure Imaging, LLC, Omega Rehab Services, LLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Meds Direct Enterprise)
**Against Mercyland Health Services, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Meds Direct Enterprise)
**Against Mercyland Health Services, PLLC, Block Billing Solutions, LLC, Michael Angelo, Chitra Sinha, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Livonia Care Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Livonia Care Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Omega Rehab Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Omega Rehab Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Prime Rehabilitation Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Prime Rehabilitation Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (ISpine Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## <u>COUNT XX</u>
### VIOLATION OF 18 U.S.C. § 1962(d)
### (ISpine Enterprise)
### Against Mercyland Health Services, PLLC, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXI
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Block Billing Enterprise)
**Against Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Block Billing Enterprise)
**Against Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Michael Angelo, Chitra Sinha, M.D., Stefan Pribil, M.D., and Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XXIII
## COMMON LAW FRAUD
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XXIV
## CIVIL CONSPIRACY
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XXV
## PAYMENT UNDER MISTAKE OF FACT
**Against Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, and Block Billing Solutions, LLC**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XXVI
## UNJUST ENRICHMENT
**Against Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, and Block Billing Solutions, LLC**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XXVII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)    DECLARE that Allstate has no obligation to pay pending and previously denied No-Fault insurance claims submitted by Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC

d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, Inc., Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., Stefan Pribil, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC, ISpine, PLLC, Block Billing Solutions, Inc., Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., Stefan Pribil, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel, jointly and severally, cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that Mercyland Health Services, PLLC, Tox Testing, Inc., Paragon Labs, LLC, Scan Clear, LLC, Michigan Technology Partners, LLC, Cure Imaging, LLC, US Health Pharmaceuticals, LLC d/b/a Meds Direct, Livonia Care Pharmacy, Inc., Omega Rehab Services, LLC, Prime Rehabilitation Services, LLC,

ISpine, PLLC, Block Billing Solutions, Inc., Michael Angelo, Chitra Sinha, M.D., Joseph Ruefiel, P.T., Stefan Pribil, M.D., Mohammed Ali Abraham, M.D. a/k/a Mohammed Ali Ibrahim, M.D., and Nilesh Patel, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVI.  DEMAND FOR JURY TRIAL

The plaintiffs hereby demand a trial by jury on all clams.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
Andrew H. DeNinno
adeninno@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Fire and Casualty Insurance*
*Company, Allstate Property and*
*Casualty Insurance Company,*
*Esurance Insurance Company, and*
*Esurance Property and Casualty*
*Insurance Company*

Dated: October 25, 2018